```
                     UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MISSOURI
                           EASTERN DIVISION

FATHER CHRIS COLLINS, et al.,       )
                                    )
                    Plaintiffs,     )
                                    )
     VS.                            ) No. 4:15-CV-1704(RWS)
                                    )
THE DOE RUN RESOURCES CORPORATION,  )
et al.,                             )
                                    )
                    Defendants.     )
_____)

                           MOTION HEARING
                 BEFORE THE HONORABLE RODNEY W. SIPPEL
                          FEBRUARY 24, 2016
                          ST. LOUIS, MISSOURI

FOR THE PLAINTIFFS:

     FRANCISCO R. RODRIGUEZ
     RODRIGUEZ & TRAMONT
     255 Alhambra Circle, Suite 1150
     Coral Gables, FL  33134
     (305) 350-2525

     HUNTER J. SHKOLNIK
     NAPOLI SHKOLNIK, PLLC
     1301 Avenue of the Americas, 10th Floor
     New York, NY  10019
     (212) 397-1000

     D. TODD MATHEWS
     GORI & JULIAN, PC
     156 N. Main Street
     Edwardsville, IL  62025
     (618) 659-9833

FOR THE DEFENDANTS:

     ANDREW ROTHSCHILD
     MICHAEL J. HICKEY
     LEWIS RICE, LLC
     600 Washington, Suite 2500
     St. Louis, MO  63101
     (314) 444-7600
     (Doe Run Resources; Marvin K. Kaiser; Theodore P. Fox,
```

III; Jerry Pyatt; Jeffery L. Zelms)

EDWARD L. DOWD, JR.
JAMES E. CROWE, III
DOWD BENNETT, LLP
7733 Forsyth Boulevard, Suite 1900
Clayton, MO  63105
(314) 889-7300
(DR Acquisition Corporation, Renco Holdings, Inc.;
  the Renco Group, Inc.; Ira L. Rennert)

Proceedings recorded by mechanical stenography;
transcript produced by computer.
_____

DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
Federal Official Court Reporter
111 South Tenth Street, Third Floor
St. Louis, MO  63102
(314) 244-7449

```
 1              (PROCEEDINGS BEGAN AT 2:00 PM.)

 2         THE COURT:  Good afternoon.

 3         MR. SHKOLNIK:  Good afternoon.

 4         MR. DOWD:  Good afternoon, Judge.

 5         MR. CROWE:  Good afternoon.

 6         MR. RODRIGUEZ:  Good afternoon.

 7         THE COURT:  So we're here this afternoon in the case

 8    styled J.Y.C.C., et al., for lack of a better word, against

 9    Doe Run Resources Corporation, et al.; Cause No. 4:15-CV-1704.

10         Would counsel make their appearances, please?

11         MR. SHKOLNIK:  Hunter Shkolnik from Napoli Shkolnik

12    on behalf of Plaintiffs.  Good afternoon, Your Honor.

13         MR. MATHEWS:  Todd Mathews from Gori Julian on behalf

14    of the Plaintiffs.  Good afternoon.

15         MR. RODRIGUEZ:  Frank Rodriguez of the Law Firm of

16    Rodriguez, Tramont & Nunez on behalf of the Plaintiffs,

17    Your Honor.

18         MR. DOWD:  Edward Dowd, Your Honor, for the Renco

19    Group, Inc.; Ira Rennert; DR Acquisition Corporation and Renco

20    Holdings.

21         MR. ROTHSCHILD:  Andy Rothschild, Your Honor, from

22    Lewis Rice for the Doe Run Resources Corporation and the

23    individual Defendants other than Mr. Rennert.

24         MR. CROWE:  Jim Crowe for the same Defendants as

25    Mr. Dowd, Your Honor.
```

```
 1              MR. HICKEY:  Michael Hickey from Lewis Rice; same

 2     Defendants as Mr. Rothschild.

 3              THE COURT:  Very well.  So usually Rule 16

 4     conferences have a certain ease to them and low focus, but

 5     we'll bring focus, if not ease, to where we're going.

 6              So who's going to take the lead for each side?  Or do

 7     you -- You want to go first, Mr. Shkolnik?

 8              MR. SHKOLNIK:  Yes.  Good afternoon, Your Honor.

 9              THE COURT:  All right.  So, you know, hope springs

10     eternal.  Are there any announcements before we begin?

11              MR. SHKOLNIK:  No.  I wish there was.

12              THE COURT:  Okay.  All right.

13              MR. SHKOLNIK:  It stopped snowing.  I can say that at

14     least.

15              THE COURT:  It was a nonevent really at the end of

16     the day.

17              MR. SHKOLNIK:  Your Honor, I think just by way of

18     background, this is, obviously, just one of a number of cases.

19     We have 92 plaintiffs here.  The case was removed from state

20     court as I'm sure Your Honor knows.  There is currently two

21     other -- there's two Complaints before Judge Ross that has 150

22     plaintiffs that were removed to the Federal Court.  There is a

23     fourth Complaint before Judge White that has 73 plaintiffs in

24     it.  Each of these cases, including the 92 before you, all

25     deal with the same series of events; a -- a tragedy down in
```

5

1    Peru, a town called La Oroya, where a smelter poisoned the

2    surrounding environment, resulting in lead poisoning to

3    upwards of 10,000 children.

4            Judge Perry for the last -- I know I'll be corrected

5    but I think six plus years has ---

6            THE COURT:  Well, it's a 2011 case, right?  So ---

7            MR. SHKOLNIK:  Four years; I'm sorry.  Four or five

8    years; five.

9            THE COURT:  Five, six; who's counting.

10           MR. SHKOLNIK:  That's true at that point.

11           THE COURT:  You visited the Eighth Circuit once.  You

12   came back, you know.

13           MR. SHKOLNIK:  So the Court's well aware of

14   Judge Perry's history.

15           THE COURT:  I'm aware of her case, I have to admit.

16   I didn't sit down and just look for trouble because I like not

17   to borrow trouble.  So I wasn't really aware of what

18   Judge Ross had or Judge White has.

19           MR. SHKOLNIK:  They're -- They're virtually --

20   They're the same Complaints as you have here today; just

21   different plaintiffs.  The same next of kin is bringing the

22   case.  Father Chris Collins is bringing it on behalf of those

23   children as well, and the allegations are all the same.  They

24   mirror the allegations in the case before Judge Perry.

25           One of the main issues that I think was delaying

1    things in Judge Perry's case was the jurisdictional issues.

2    That's not an issue here.  They've conceded personal -- They

3    conceded jurisdiction in this Court.

4         The claims, the negligence, the underlying events

5    that occurred down in Peru and as they relate to the corporate

6    as well as the personal or the actual individuals here in --

7    in Missouri are all the same whether it's your case, whether

8    it's Judge Ross' two cases, whether it's Judge White's or

9    Judge Perry's.  They're all the same operative claims.

10        We had made the motion to you, which was denied

11   because we didn't follow the proper procedure, regarding

12   consolidation.  We have since made a motion before Judge Perry

13   to consolidate the cases into her lower numbered cases, and

14   it's now pending.  We have not put in our reply papers.  I

15   think they're due this Friday.

16        THE COURT:  My recollection, although I didn't look

17   at it again today, is that the Defendants have opposed

18   consolidation.  Is that correct?

19        MR. DOWD:  That's correct, Your Honor.

20        MR. CROWE:  That's correct, yes.

21        MR. SHKOLNIK:  Yes, Your Honor.  It's been opposed.

22   It was opposed was here.  It's now opposed before Judge Perry.

23   The gist of the argument is those cases were pending for so

24   long and will somehow disrupt the -- the stream of events

25   there, though I don't see how that happens, but that's left

1    for Judge Perry to decide.  It's not much different than an

2    MDL where new cases get tagged along for years after the

3    initial case is brought.

4            THE COURT:  I called Judge Herndon about a Pradaxa

5    case last week, and he said, "Don't send it to me.  We're --

6    We're done."  So that happens; just saying.

7            MR. SHKOLNIK:  But he closed the -- But he closed the

8    whole MDL down.

9            THE COURT:  That's what he said.  "The money's gone;

10   don't bother me."

11           MR. SHKOLNIK:  I happen -- I happen to have been

12   there the night when we settled that case.

13           THE COURT:  All right.

14           MR. SHKOLNIK:  I'm very well aware of it.

15           So, Judge, I think the issue here is:  If the cases

16   are staying with you, we would like to adopt similar rulings,

17   similar CMOs, rather than have this Court embark upon sort of

18   reinventing wheels.

19           When these clients were signed up, and I -- and I

20   personally was involved in much of these efforts, we made sure

21   that discovery -- the discovery devices that were in place

22   pursuant to Judge Perry's Orders were prepared when the

23   clients were signed up.  One of the big delay factors in the

24   case before Judge Perry was the fact that the plaintiffs in

25   that case did not have Plaintiffs' Fact Sheets done, did not

1    have individual discovery done, or -- I shouldn't say -- I'm

2    not saying it in a negative way.  They just -- It took a long

3    time.  They have a thousand plaintiffs.  It takes a while to

4    do that.

5         What we decided to do in this case was get the

6    plaintiffs' discovery done before we filed our cases.  We have

7    over -- I think it's 1900 or 2000 clients now.  We have almost

8    as many Plaintiff's Fact Sheets already done for these

9    plaintiffs.  We have medical records being collected on almost

10   all of them already.  And before we file, we're collecting the

11   discovery and -- and embarking on the case that way.  We

12   didn't want to tie up the court system for years waiting for

13   this -- for PFSs to be -- to be answered.

14        There was a CMO in place.  What we're asking here is

15   that this Court adopt the same Plaintiffs' Fact Sheets, the

16   same discovery schedules.  If the Defendants don't like it, if

17   they're not happy with sort of the hand that was dealt them by

18   Judge Perry, that's fine.  We could always deal with the

19   additional items that they think they're entitled to by way of

20   further application to the Court after they see what we've

21   done.

22        So, in essence, our -- our submission for the Rule 16

23   is that the similar discovery orders that are in place before

24   Judge Perry be mirrored here rather than have you do the same

25   thing.

1          These 96 -- 92 plaintiffs can have Plaintiffs' Fact

2     Sheets served within -- within days or a week.  We could be

3     moving into the next phase of this case immediately; not

4     months, not -- not years.

5          THE COURT:  Well, just -- Why don't you articulate.

6     What -- What do you think the next nine months look like?  And

7     then -- I don't see biting off trial dates today, but how do

8     you see the next nine months?  And then we'll turn to the

9     Defendants, and we'll talk about ---

10         MR. SHKOLNIK:  We propose to serve our Plaintiffs'

11    Fact Sheets within, I'll say, the next 30 days.  We

12    prepared -- We're prepared to start serving the medical

13    records simultaneously with a -- on a rolling basis.  We're

14    collecting a lot of them.  We're going to be turning them over

15    as soon as we -- as soon as we can.

16         We would propose the same type of procedure as

17    Judge Perry; that by the end of the 60th day, we each

18    designate ten plaintiffs for bellwether pool.  They'll have

19    the Plaintiffs' Fact Sheets.  They'll be translated for them

20    as well.

21         THE COURT:  You pick ten; the Defendants pick ten.

22    We work those 20 cases up.

23         MR. SHKOLNIK:  Yes, Your Honor.  And we do the

24    Plaintiffs' Fact Sheets for all of them.  They have them for

25    all -- all the 92 cases.  And then we work up those cases over

1   the next six months; five, six months, Your Honor.  That's our

2   -- That's our plan, we hope.  I mean it may be ambitious;

3   maybe seven months.

4           THE COURT:  I mean doing 20 plaintiffs in six months,

5   you'd have to -- you'd have to turn into an amoeba multiplied;

6   take multiple depositions.

7           MR. SHKOLNIK:  We have a few -- We have a few amoeba

8   back in -- back in the office.  But if it takes a little bit

9   longer, if it takes seven or eight months, we could do it.  We

10  think we can.

11          THE COURT:  That's fine.  I'm just trying to get a

12  vision of what your vision is.

13          MR. SHKOLNIK:  Yeah.  We can -- We can move this

14  pretty quickly.

15          And then we would like to start the discovery

16  simultaneously with the Defendants.  There are issues

17  regarding Plaintiffs' Fact Sheets.  We would like to propose

18  those as well; that those be done within 30 to 60 days of the

19  Plaintiffs' Fact Sheets.  It's only reasonable.

20          And then we will be proposing certain documentary

21  discovery upon the Defendants.  But in order to expedite that,

22  we've seen in motion papers that the Defendants claim that a

23  voluminous amount of discovery has been done in the other

24  cases.  We would be happy not to propose any further discovery

25  and just have them produce what was produced in Judge Perry's

```
1    case so there is no duplication of efforts.  We don't want to
2    increase the burden on the Defendants in these cases
3    whatsoever.  We're willing to take that.  If they haven't
4    produced, then we will propose our discovery in the same
5    60-day window that I'm -- that I'm suggesting here,
6    Your Honor.  And I think by the end of the year we should have
7    most of the discovery done where we could then be looking for
8    a trial sometime in the latter part of '17, into the beginning
9    of '18.
10          THE COURT:  What's the status of the Ross cases and
11   the White cases?
12          MR. SHKOLNIK:  We haven't had our first conference
13   yet.
14          THE COURT:  Okay.  All right.
15          MR. SHKOLNIK:  Thank you, Your Honor.
16          MR. CROWE:  Good afternoon, Your Honor.  Jim Crowe
17   again for the record.
18          I think I'll -- with the Court's indulgence, I'll
19   start with one of Mr. Shkolnik's later comments and work
20   backwards through how that would impact the plan as the
21   Defendants see it.
22          And by that, I'm referring to the assumption that the
23   extent of the discovery of the Plaintiffs would largely be
24   comprised by the Plaintiff Fact Sheets as they're referring to
25   them.  And I'd note at the outset that we didn't have input
```

1   into whatever Fact Sheet it is that they are completing with

2   their clients.  And while we did have some input into the Fact

3   Sheet, that they said they've modeled it after the one that

4   Judge Perry endorsed in her cases, there were items that we

5   had sought to see included in that sheet that were declined by

6   the Court and we would want to revisit again.  And so

7   regardless of what is in them now, I can tell the Court that

8   there will be other items we'd like to see completed by the

9   Plaintiffs.

10         And what we found from those Plaintiff Fact Sheets is

11  that they are helpful to a point, and they are what makes this

12  case different from the type of MDL that Mr. Shkolnik is

13  referring to which is they cannot serve as the sole basis for

14  discovery in the claims of these Plaintiffs.  They are

15  inadequate for that.  What they are useful to do is to

16  identify basic bio data, family relationship and perhaps the

17  providers, educational and medical from whom discovery needs

18  to be obtained.  And it's -- it's significant in our

19  experience, and I think the plaintiffs in the cases before

20  Judge Perry's experience, more difficult to obtain those

21  records in Peru than it is here, and it's not as

22  straightforward as simply serving releases and the records are

23  forthcoming for all the parties, nor would that be the limit

24  of the discovery we're seeking.  We -- We need to discover on

25  matters that relate to issues of liability, legal framework of

 1    the case to include the law of Peru that would remain

 2    steadfast as the applicable law in these cases, and we'll

 3    visit with the Court on that at the appropriate time in this

 4    and any other case.

 5          But also, likewise, what is it that the Plaintiffs

 6    have to support their claims?  Each of these claims is an

 7    individual one.  These -- This cannot be treated in MDL

 8    fashion because while the exposure that they claim and the

 9    allegations as they've related to us, ---

10          THE COURT:  Well, in fact, it's more like an MDL

11    because MDLs are a substitute for -- You can't have a class

12    action because the causation is unique to each plaintiff which

13    is what you're arguing.

14          MR. CROWE:  It is similar in that vein.

15          THE COURT:  That's -- That's how the MDL world came

16    to exist because -- I just finished the 2500 cases in

17    *NuvaRing* --

18          MR. CROWE:  Sure.

19          THE COURT:  -- which Mr. Shkolnik started out with.

20    Every woman had a different causation issue with the product.

21    So it's not a class, but you can do -- In an MDL you can do

22    the general liability issues before you get to the individual

23    causation liability issues, and that's kind of where we are

24    here, I gather.

25          MR. CROWE:  Fair enough.  And it's -- it is distinct

1  from the pharmaceutical MDLs in that we don't have a known

2  common exposure for each client or similar exposure, no doubt.

3           THE COURT:  Right.  I mean, first, you're going to

4  have -- they're going to have to go over the initial threshold

5  of:  Does the, you know, the product even cause what they say

6  it causes before we get to whether it caused it in this

7  individual person.

8           MR. CROWE:  Correct.

9           THE COURT:  It's a two -- Like anything, it's going

10  to be two levels of expert discovery here.  Overarching expert

11  discovery could start tomorrow.  The individual expert

12  discovery has to wait until whatever this dispute about what

13  Plaintiffs' information is complete before we go down that

14  road.  So I still see it like an MDL.  There's two tracks

15  going on.

16           MR. CROWE:  Agreed.  And there are certain things

17  that, as Your Honor suggests, can be addressed at a higher

18  level and perhaps in tandem with some of the work being done

19  on the individualized discovery, but that's where the

20  Plaintiff Profile Sheets prove inadequate.  And what we have

21  found is that there has been a need, as we protrayed from the

22  outset, and I think those cases have borne out, despite a lot

23  of effort on the Plaintiff Profile Sheets, that they've borne

24  out the fact that written discovery is needed.  It's

25  incontrovertible that deposition discovery would be needed.

15

1   And as a practical note on that point, I'll submit to the

2   Court that even if we were to proceed only with Plaintiff Fact

3   Sheets, which we would object to, getting the Plaintiffs here

4   for deposition and completing even 20 Plaintiff -- Peruvian

5   Plaintiffs' depositions inside of six or nine months I think

6   will be a steep hill to climb.

7           THE COURT:  But that's why we're here.  We're going

8   to figure this out.

9           MR. CROWE:  Sure.

10          THE COURT:  I mean so how do you see the next nine

11  months?

12          I mean part of -- When listening to you, and without

13  getting -- going back and forth, they say they've got

14  Plaintiffs' Fact Sheets ready for you.  You can see them

15  within a month.  It seems, from this side of the room, you get

16  them.  And then if -- Rather than borrow trouble, then you

17  file motions telling me what it is you think is missing or

18  what else would be necessary, you know.  Let's not assume it's

19  too little, but I'm sure -- I have no doubt you'll come back

20  and tell me it's too little, but let's define it rather than

21  talk about it in generalities.

22          MR. DOWD:  I think we could -- I think Jim could

23  probably define it right now for you, Judge, some of the

24  things we know we're going to need.

25          THE COURT:  Okay.  But I don't have a motion in front

1    of me, you know, --

2              MR. DOWD:  Yes.

3              THE COURT:  -- for me to give a definitive ruling,

4    but they, obviously, know the troubles or lack thereof that

5    you've experienced with Judge Perry.

6              MR. DOWD:  Yes.

7              THE COURT:  Hopefully they've accommodated some of

8    that in anticipation of not repeating some of the trauma.

9              MR. DOWD:  Exactly.  I think Jim could give you some

10   examples of what we need from them.

11             MR. CROWE:  And Mr. Shkolnik will ---

12             THE COURT:  I mean the sooner we all figure out how

13   to satisfy that, the better off we all are.

14             MR. DOWD:  Exactly.

15             MR. CROWE:  Mr. Shkolnik also alluded that they're

16   gathering the medical records.  And depending upon what they

17   look like, what we use the Plaintiff Profile Sheet for is to

18   compare and say:  Who are the providers identified?  And do we

19   have records from those providers?

20             So certainly we agree, Your Honor, it's a starting

21   point.  We simply, and with the Court's leave, we want to be

22   able to come back and visit about what else is needed

23   because ---

24             THE COURT:  That's my greatest weakness.  You will

25   come back over and over and over again.

1              MR. CROWE:  Well, ---

2              THE COURT:  So there will be no lack of opportunity

3       to discuss these issues in the future.

4              MR. CROWE:  Sure.  Well -- I mean in the ordinary

5       course, we would have just served the discovery or agreed on

6       the Plaintiff Fact Sheets.  So the fact that we're coming back

7       in response to a sheet we haven't seen can be surprising.

8              THE COURT:  But today we're managing expectations.

9              MR. CROWE:  Fair enough.

10             THE COURT:  So you tell me what your expectations

11      are, and let's see where we go.

12             MR. HICKEY:  Right.  And, Your Honor, Michael Hickey.

13             Just to add on to that, in the cases before

14      Judge Perry, we started with the paradigm of the Fact Sheets,

15      and what ultimately was adopted was that we then did more

16      fulsome written discovery of -- of plaintiffs.  And we -- So

17      we have sets of interrogatories and document requests that --

18      that really get -- get behind what are the bio data in those

19      Fact Sheets.  So we'll be ready to go with those whenever you

20      want.

21             THE COURT:  So you don't have to pay some poor, young

22      first-year associate to sit in a room all by himself for the

23      next month drafting document requests, interrogatories.

24      They're ready to go.

25             MR. HICKEY:  Not this time around.

1          MR. CROWE:  And we've learned from those, too, much

2     like we have the Plaintiff Profile Sheets, and we would modify

3     those based on the types of response we're seeing --

4          THE COURT:  Sure.

5          MR. CROWE:  -- and try and get to meaningful

6     information.

7          THE COURT:  That is a question I didn't ask.  Since

8     you all have had some experience with this, let's take

9     *NuvaRing* as a hypothetical.  There were three common types of

10    injury.  There was a DVT, a stroke and a heart attack.  Do --

11    Do these kinds of cases have categories of injury or is it --

12    is there a commonality generally?

13         I understand you're not going to concede any injury.

14    I'm not asking you to -- to give it up at the first hearing,

15    but -- but when you look at the Plaintiffs' claims, are

16    they -- do they break down by category or is there just one

17    overarching type of claim?

18         MR. SHKOLNIK:  There's one injury:  Lead poisoning.

19    And that's ---

20         THE COURT:  Does it manifest itself in different

21    ways?

22         MR. SHKOLNIK:  I would suggest not as to the claims

23    in these children.  I think there's a common constellation of

24    symptoms in lead-poisoned children that we're going to be

25    presenting, Your Honor.

```
 1              THE COURT:  This is just to educate me a little bit

 2   so when we get to:  You pick ten plaintiffs and you pick ten

 3   plaintiffs, I don't need the worst and the best.  I need a

 4   better sample to inform us as to how to proceed.

 5              MR. SHKOLNIK:  And, Your Honor, I would also suggest

 6   that we could, like we did in NuvaRing, have a science day of

 7   some type or science presentation be down the road.

 8              THE COURT:  You know, I can't make anybody do a

 9   science day, but they help, I mean, you know, so.

10              MR. ROTHSCHILD:  Judge, --

11              THE COURT:  Yes.

12              MR. ROTHSCHILD:  -- Andy Rothschild as part of the

13   tag team.

14              THE COURT:  I don't -- I don't mean to wander as far

15   off the reservation as I did.

16              MR. ROTHSCHILD:  Well, and I -- Because I've been

17   involved personally probably the longest, representing --

18   There's been domestic cases here from Herculaneum and

19   St. Francois County on the various types of claims.

20              So to answer your question, the term "lead poisoning"

21   that counsel just used has a -- is a term with little meaning.

22   The types of injuries fall within a general category from

23   light exposure, particularly to children, that we think of as

24   neurocognitive, and that's a very subjective type of injury.

25   It can be measured perhaps by some IQ deficits, some
```

1    manifestation of ADHD, things like that.  And so it's a very

2    difficult thing.  And with it, from our experience of the many

3    domestic cases we've had here for the same client, the same

4    type of exposure to someone of a similar age and the like can

5    manifest itself very differently in the individual.

6              And I know this is not the answer the Court may want

7    to hear, but it is, in fact, the truth.  So that it does get,

8    as the Court was indicating earlier, very fact specific to

9    each individual plaintiff as to (1) whether there truly is a

10   manifestation of injury, and (2) of what type and to what

11   extent.  So that's -- I wanted the Court to know that.

12             THE COURT:  Okay.  But there are no -- there are no

13   easy categories to place it in.

14             MR. ROTHSCHILD:  That is correct.

15             MR. CROWE:  And that's perhaps, Your Honor, what I

16   was inartfully trying to tell the Court; that although you

17   might be able to employ an MDL style of managing the case,

18   you're not going to find those silos of plaintiffs with sort

19   of if they're in this certain age category, the known effects

20   of the product or the pharmaceutical product are "Y."  You're

21   not going to have those nice neat bundles of cases, certainly

22   not -- without knowing from a bellwether standpoint, which we

23   think is a term which doesn't really have application here,

24   what all of these plaintiffs look like.  So to say one

25   plaintiff or another is representative of the balance is

1    impossible until you have discovered each of those plaintiffs'

2    claims within the group.

3            THE COURT:  Yeah.  And I'll give you my learned bias.

4    This is a -- "Learned" is too strong a word.  My historical

5    bias.  Bellwethers don't do us a lot of good.  If they pick

6    their best case, you'll say, "See, that was their best case."

7    You pick your best case and you win, and they'll go, "See,

8    they picked their best case."  Every case is going to stand

9    and fall on its own.  We just have to inform ourselves over

10   time because if we just try the extremes, we don't learn

11   anything is my point.  We really don't, so.

12           MR. DOWD:  Right.

13           MR. HICKEY:  And -- And to that end, I think the

14   issue that -- in terms of the way that Plaintiffs have

15   presented here of kind of the ten and ten, ---

16           THE COURT:  I'm almost better off picking ten at

17   random than I am letting you all each pick ten, you know, --

18           MR. HICKEY:  Well, ---

19           THE COURT:  -- to inform us as to what happens.  I

20   don't have an opinion yet.  I'm learning, so.

21           MR. HICKEY:  Right.  Because I think the issue that

22   we found when we were in the cases before Judge Perry with

23   respect to selection of Plaintiffs based solely on Plaintiff

24   Profile Sheets, it was -- it was a shot in the dark.  The

25   Plaintiffs in the cases before Judge Perry had information

```
1    beyond what the Defendants had and were able to make their

2    selections on their cases, whereas we simply had the Fact

3    Sheets and that's all we could judge from.

4              THE COURT:  Have you even gotten to the Daubert level

5    debate in the Judge Perry cases?

6              MR. HICKEY:  No.

7              MR. CROWE:  We've not.

8              THE COURT:  I mean that's where the -- that's where

9    the case really comes into focus.

10             MR. CROWE:  No question, Judge.  And a lot is riding

11   on the expert discovery.  They're -- At least it's been

12   suggested that they're going to rely on experts to -- to

13   supplant or suffice for Rule 26 disclosures even on the

14   category and computation of damages, method of damages and

15   what not, so.

16             THE COURT:  So let's -- let's -- let's take

17   Mr. Shkolnik at his suggestion that they produce their

18   Plaintiff Fact Sheets in 30 days.  Why don't we do that?

19             MR. CROWE:  Why not, Judge?  We agree.

20             THE COURT:  You know.  And then if you -- You have an

21   opportunity then to come back and say -- I mean maybe you all

22   should meet and confer as you leave today.  I mean if -- if --

23   Mr. Shkolnik, why don't you approach.

24             MR. SHKOLNIK:  Thank you.

25             THE COURT:  The Fact Sheets you've used, are they the
```

```
 1   ones -- do they mirror the ones from the Judge Perry case?

 2          MR. SHKOLNIK:  Your Honor, just ---

 3          THE COURT:  Or did you add anything after having gone

 4   through ---

 5          MR. SHKOLNIK:  Docket No. 109 from Judge Perry, dated

 6   April 25, references the Plaintiffs' Fact Sheets.

 7          THE COURT:  April 25 of?

 8          MR. SHKOLNIK:  I'm sorry.  I'm sorry.  2013.  I

 9   apologize.

10          THE COURT:  All right.

11          MR. SHKOLNIK:  And it is an Order that enters a

12   format; medical, educational authorization form, and a format

13   of Plaintiff Profile Fact Sheet form.  We used those forms.

14          THE COURT:  So you're -- The Fact Sheets you're going

15   to produce here mirror the ones from there.

16          MR. SHKOLNIK:  Yes, Your Honor.

17          THE COURT:  All right.

18          MR. SHKOLNIK:  And, Your Honor, just -- if I could

19   just add to that.

20          THE COURT:  Yeah.

21          MR. SHKOLNIK:  We were never suggesting that

22   additional discovery wasn't necessary on trial -- depositions

23   and ---

24          THE COURT:  Because, you know, you wouldn't get any

25   far -- very far with that, so that's okay.
```

1          MR. SHKOLNIK:  Yeah.  We weren't suggesting that.  I

2     just want to make sure that was clear.

3          THE COURT:  All right.

4          MR. CROWE:  So I just want to do a couple of other of

5     Mr. Shkolnik's suggestions, Your Honor.

6          They -- There was a suggestion that there be a

7     Defendant Completed Profile Sheet for each Plaintiff about

8     whom we have information, and that is not an approach we think

9     makes sense.  Certainly, if there is blood lead data -- There

10    were studies conducted at various points in time in this area

11    both by Public Health Ministry in Peru and some in

12    collaboration with the Peruvian company, Doe Run Peru, and so

13    there is -- that data is available, and we have produced it as

14    to the Plaintiffs who are represented by counsel in the

15    Judge Perry case as to those Plaintiffs' lawyers.  What we

16    would submit, because we're treating it as effectively

17    HIPAA-protected information, based on the way the data is

18    presented, it has their name and their individual results

19    where that is presented in some of the studies.  We would need

20    to know, to make this exercise efficient and to not have to

21    repeat it, the identities of all the Plaintiffs that these

22    gentlemen represent so that when we're redacting Plaintiff

23    information out, we're only redacting clients -- information

24    of clients they don't represent, whether or not they filed or

25    not, because it's a tedious process.  Some of the records are

1    handwritten in Spanish.  We don't want to have to repeat it

2    multiple times, and that's something I suggest we meet and

3    confer on a -- on a protocol about.

4          MR. SHKOLNIK:  Your Honor, we'll stipulate and we'll

5    work it out.  We'll even give them the list of all of our 1900

6    plus clients so they can do it once and never repeat it for

7    those clients.

8          MR. CROWE:  That's -- That's the goal, Your Honor, is

9    all.  I mean we're not ---

10         THE COURT:  It's good to talk.

11         MR. CROWE:  Right.  Well, it's good.  There have been

12   some changes today.  It's all -- all productive.

13         I think there was one other item that he mentioned.

14   Oh, the -- Importantly, the discovery of the Defendants.  I

15   think, certainly, we're amenable to not repeating what has

16   been, I'd say, a long and hard-fought negotiated discovery by

17   the plaintiffs' lawyers in the *Reid* case.  It is a substantial

18   corpus of information, both hard copy and ESI, and that is a

19   process that is concluding shortly, we hope.  And so that --

20   If and once that's ready and subject to, you know, a schedule,

21   we can provide that to the Plaintiffs.  We'll want to -- And

22   we can confer with counsel.  As we intimated in the Scheduling

23   Order, we would offer a 502(d) order, a protective order, for

24   the information itself and any other protocol of production.

25         THE COURT:  I was going to ask.  So you need to work

```
 1    out a protective order.

 2              MR. CROWE:  No question.  And -- And all that's been

 3    done subject to a clawback order in Judge Perry's case because

 4    there's been very limited review made of that information due

 5    to its sheer volume.  There was very limited privilege review

 6    done.

 7              MR. SHKOLNIK:  We will most likely adopt what has

 8    already been entered and just discuss it the way counsel has

 9    with the PFS, Your Honor.

10              THE COURT:  How's your document depository being

11    maintained in the Perry case?

12              MR. CROWE:  So we have -- It's all being maintained

13    in a relativity environment at this point, the produced data.

14    And so that's -- We're able to produce it to them in most

15    formats that they might need it in, depending upon what their

16    database is.  So they can export it in different formats.

17              THE COURT:  Which -- Do you have a cost-sharing

18    agreement in the case?

19              MR. CROWE:  No.  There was limited cost-sharing

20    entered.  It's not a shared environment.  So the Plaintiffs

21    are hosting it on their own, and the Defendants are hosting it

22    on -- on their own.  So if that's something that -- they want

23    to entertain a shared-hosting environment, that's certainly

24    something we're happy to discuss.  As to ---

25              THE COURT:  I'm just asking.  I'm not telling you at
```

1    this point.

2          MR. CROWE:  No, it didn't come about in a shared

3    environment.  The Plaintiffs are going to host the data or are

4    hosting the data on their own as they receive it.

5          MR. SHKOLNIK:  We could do the same thing.  We have

6    the capability.

7          THE COURT:  All right.

8          MR. SHKOLNIK:  We'll work something out.

9          MR. CROWE:  So we'll just work on the protocol and

10   the format of what they need.

11         THE COURT:  All right.  What else do you see

12   happening in the next six to nine months?

13         MR. CROWE:  So after receiving the Plaintiff Profile

14   Sheets for all the Defendants on file, we would then identify

15   the additional likely written discovery responses we'd like to

16   see that would address both any outstanding medical or

17   educational records.  Other questions of -- that relate to

18   facts that we think could relate to the legal issues we'll

19   present to the Court; capacity to sue, the adequacy of the

20   next friend, who the legal guardians are of these people in

21   Peru and any related evidence; any diagnoses they have about

22   whether or not symptoms they complain of are related to

23   exposure to substances emitted by the complex or if they've

24   been ruled out to the contrary as not resulting from such

25   exposure scenarios.  We'll want to know that, but there are

1    liability issues that we want to vet through that discovery

2    process.  We'd present that.

3         Depending upon how long it takes for Plaintiffs'

4    counsel to be able to secure responses from the 92 Plaintiffs,

5    we'd then move forward from there to depositions thereafter,

6    understanding that by that point, Your Honor, I think the

7    parties might be in a position to at least, based on the

8    Plaintiffs' position, come up with what expert discovery could

9    commence upon their receipt and analysis of the information

10   the Defendants will discover to them by our productions of ESI

11   and hard-copy information because knowing those expert

12   opinions before we discover the Plaintiffs through deposition

13   will be important.  That will also allow the Plaintiffs

14   adequate time to secure the requisite national identity

15   documents for them to apply for a passport for them to secure

16   a Visa to travel to the United States for deposition which is

17   a process in and of itself.

18        THE COURT:  All right.  Anything further from the

19   Defendants?

20        MR. HICKEY:  I was just going to throw in two points,

21   Your Honor, to the extent relevant which is: (1) In the cases

22   before Judge Perry, I would note that it wasn't a ten and ten.

23   It ultimately was 18 Plaintiffs selected by Plaintiffs'

24   counsel and 16 by Defendants' counsel out of a pool of 120.

25        THE COURT:  You had north of 200 Plaintiffs there.

1          MR. HICKEY:  Out of -- Out of -- Actually out of a

2    pool of 120 initially.

3          THE COURT:  Okay.

4          MR. HICKEY:  Then there was -- Some of those

5    selections ended up being outside the trial pool because,

6    again, the efficiency of the Fact Sheets ended up kind of

7    falling below that.

8          I'd also note on the consolidation motion that's

9    before Judge Perry that that is a motion that's also been

10   opposed by Plaintiffs' counsel in that case as well, so.

11         THE COURT:  So it's 2 to 1.  It's 2 to 1,

12   Plaintiffs/Defendants against new Plaintiffs.

13         MR. HICKEY:  2 to 1.

14         MR. SHKOLNIK:  And we were former co-lead counsel,

15   Your Honor.

16         THE COURT:  Well, but we've been down that road with

17   you in *NuvaRing* before, too.  You got along with all of

18   Plaintiffs' counsel in that case so well.

19         MR. ROTHSCHILD:  Judge, Andy Rothschild again.

20         If I may, this is a -- perhaps the major concern from

21   our experience so far with the Judge Perry cases.  It is just

22   starting to become a little clearer, and it's this.  The

23   concern is:  There are 1100 plus plaintiffs before

24   Judge Perry.  Mr. Shkolnik has said 1900.  Of course, we're

25   only here on one case right now.

 1             THE COURT:  Right.  That's all we've got.

 2             MR. ROTHSCHILD:  And we don't know what goes on with

 3    the other cases pending in the court already or to be filed,

 4    but the concern is how many of those many, many plaintiffs

 5    truly are committed to this litigation or whatever case they

 6    may be named in.  And I have to tell the Court as background:

 7    Judge Perry would not permit the Defendants, us, to do written

 8    discovery until very recently and only in a very small number

 9    of Plaintiffs; the 18 that the Plaintiffs selected and then

10    the 14 or 16 that we were able to select.  All of them had

11    provided Plaintiff Profile Sheets.  However, we're, as we

12    speak, wrestling with the fact that six selected by the

13    Defendants of the 16 selected by the Defendants have failed or

14    refused to participate.  That's a large number in our mind if

15    we extrapolate that.  And the concern, as the Court, I think,

16    can see, is:  How many of these many plaintiffs are truly

17    committed to this litigation?  And that's something that we,

18    on behalf of our clients, want to make sure we get an answer

19    to relatively early.

20             THE COURT:  Well, I don't know where we're going

21    here.  I understand what you're saying.  Usually it makes

22    sense to maybe start doing them in batches, you know, months,

23    you know, like -- It happens in any case.  You have this first

24    group, but they don't all stay intact for a number of reasons,

25    but if we've got to keep people coming in -- and I'm not sure

```
 1    we do them all at once, but we do them all in pretty short

 2    order.

 3              MR. ROTHSCHILD:  Yes, Your Honor.

 4              THE COURT:  Just sequence it in batches.

 5              MR. ROTHSCHILD:  And I may have made this clear, but

 6    the point I wanted to make clear is:  With this very small

 7    sample so far, where the individuals did provide a Profile

 8    Sheet, a Plaintiff Profile Sheet, when it got to the point of

 9    answering interrogatories or providing documents was

10    apparently where they were unable or unwilling to go to that

11    next step.

12              MR. CROWE:  Judge, I'd add only that -- the request

13    then that if we're going to proceed in batches, just so that

14    it's manageable, ---

15              THE COURT:  I don't know.  I'm just suggesting.  I

16    mean I don't see -- If we do them all at one, that's a little

17    daunting, but we can do these in phases.

18              MR. CROWE:  I agree that if we're to try and take all

19    those depositions at once, but what I -- what I was going to

20    suggest to Your Honor is that we consider completing the Fact

21    Sheet and any additional written discovery of those

22    Plaintiffs, and including production of records, before we

23    undertake to limit to a smaller group, if that's what the

24    Court is inclined to do, the group to be selected for

25    deposition because, otherwise, as Mr. Hickey intimated, you're
```

1   shooting in the dark.  You have no idea.

2          THE COURT:  We're borrowing trouble right now.  I'm

3   just trying to get to the fair 60/90 days.  Okay?

4          MR. CROWE:  Fair enough.

5          THE COURT:  And so why don't you stay up there.

6   We'll talk to Mr. Shkolnik.

7          We're going to get back together again in 60 days.

8   So that's the only way to get this case off the ground in some

9   focus.  Judge Perry may take it away from me, which is fine,

10  but I'm going to act and assume that this is my case to

11  manage --

12         MR. CROWE:  We can get a lot done in 60 days.

13         THE COURT:  -- unless and until.  So you're going to

14  produce your Plaintiff Fact Sheets in 30 days.

15         MR. SHKOLNIK:  Yes, Your Honor.

16         THE COURT:  And what are you -- What does that then

17  trigger?

18         After they produce their Plaintiff Fact Sheets, that

19  will give you a chance to look at them, and let us know what

20  other additional information you think you need to evaluate

21  these Plaintiffs; right?

22         MR. CROWE:  Correct, Your Honor.

23         THE COURT:  What do you want from them, say, before

24  we get back together again in 60 days?

25         MR. SHKOLNIK:  Well, Your Honor, two things.  Number

```
 1    one, whatever's been produced ---

 2          THE COURT:  In the meantime you're going to work out

 3    the document production issues.

 4          MR. SHKOLNIK:  Yes.

 5          MR. CROWE:  Yes.

 6          THE COURT:  You're going to work out protective order

 7    issues.

 8          MR. SHKOLNIK:  Yes.

 9          MR. CROWE:  Production of the blood lead studies or

10    blood lead data on their individual Plaintiffs, --

11          THE COURT:  Right.

12          MR. CROWE:  -- if that's in a discrete environment.

13          THE COURT:  So there's the three things we'll get

14    from them.

15          MR. SHKOLNIK:  And I think that's -- I think we're

16    going to be biting off ---

17          THE COURT:  That's enough.

18          MR. SHKOLNIK:  That's a lot within 60 days.

19          THE COURT:  In 60 days we'll get back together.

20    We'll see what we -- what we have and then chart the next

21    three to four months after that.  I think that's the only way

22    to do this for now until we get a better sense of what we're

23    -- where we're going.  And then we'll worry about narrowing it

24    down for trial purposes sometime later this year.

25          MR. CROWE:  I -- I think that works well, Your Honor.
```

1    I submitted the 30-day mark.  If we could also target

2    submission of a joint proposed order or competing orders if we

3    -- if it comes to that on these issues that we just related,

4    document-related issues, and then, likewise, our Rule 26

5    disclosures of the Defendants, and that will beat the Profile

6    Sheets for now.

7         THE COURT:  Okay.  So we'll get back together again.

8    How does April the 27th look for everybody?

9         MR. SHKOLNIK:  Your Honor, that would be -- that's a

10   really bad one.  I have two days of -- of inspecting an

11   airplane crash wreck in Pensacola.

12        THE COURT:  What -- What good would it do for you to

13   go see an airplane crash?

14        MR. SHKOLNIK:  They actually teach us how to -- they

15   teach us how -- what the defect is.  We always do them.

16        THE COURT:  Look, it's broken.

17        MR. SHKOLNIK:  It's really just a ---

18        THE COURT:  Okay.  Are there any days that week when

19   you're available?

20        MR. SHKOLNIK:  Monday would be fine.

21        THE COURT:  Which I try to avoid but you're the guy

22   who's traveling on this side of the room.  I mean I try to

23   avoid Mondays for out-of-town counsel.

24        MR. SHKOLNIK:  28th would be great or the 29th.

25        THE COURT:  What do I here from the Defendants?

```
 1   What -- What say you?

 2           MR. DOWD:  It's fine with me, Your Honor.

 3           MR. CROWE:  It works for us, Your Honor, subject to

 4   Mr. Hickey and Mr. Rothschild.

 5           MR. ROTHSCHILD:  That works for us.

 6           MR. CROWE:  Okay, great.

 7           THE COURT:  What day does?

 8           MR. CROWE:  The 28th.

 9           THE COURT:  The 28th at 10:00.

10           MR. SHKOLNIK:  That's great.  Thank you, Your Honor.

11           MR. CROWE:  Very good.  Thank you.  I appreciate

12   that.

13           THE COURT:  And can you all -- Well, what we just --

14   The Plaintiffs' Fact Sheets in 30 days.

15           MR. SHKOLNIK:  Yes.

16           THE COURT:  Before we get back together again, you're

17   going to work out the document production issues, protective

18   order issues, and the blood ---

19           MR. CROWE:  We'll agree on the protocol.  It's going

20   to take some time to redact, but we'll ---

21           THE COURT:  You'll agree on the protocol for going

22   through the data that you apparently have from the testing on

23   the ground in Peru.  Is that correct?

24           MR. CROWE:  Right.

25           THE COURT:  Are there any other categories of things
```

1    that ---

2            MR. SHKOLNIK:  No.  I think that would do it.

3            THE COURT:  What do you call -- What's the term of

4    art for the Peru blood ---

5            MR. CROWE:  "Blood lead studies" are what they're

6    commonly referred to.

7            MR. SHKOLNIK:  I think that covers the solid 60 days

8    of work.

9            THE COURT:  Are there any -- Has Judge White or

10   Judge Ross set anything in those other cases?

11           MR. SHKOLNIK:  No.

12           MR. DOWD:  No, Your Honor.

13           MR. CROWE:  No, Your Honor.  They were later filed,

14   and so the Answers have only ---

15           THE COURT:  I'm not suggesting that they're not doing

16   their job.

17           MR. CROWE:  Right.  No, but it's -- they're --

18   they're trailing Your Honor's case.

19           THE COURT:  I'm just -- I'm just trying to inform

20   myself, you know.

21           MR. CROWE:  I think it's fair to say they're trailing

22   this case in time.

23           THE COURT:  And just as a matter of caution, I won't

24   entertain adding more plaintiffs into this case.  I just --

25   You know, we're not going to have a vehicle where we just

```
 1    keep -- I mean they're individualized cases in the first

 2    instance.

 3              MR. SHKOLNIK:  We understand.

 4              THE COURT:  There are challenges to break them out,

 5    not add them in, so.

 6              MR. SHKOLNIK:  We're not going to make the motion to,

 7    in light of the pending motion with Judge Perry.

 8              THE COURT:  Managing expectations; all right?  That's

 9    all.  "Why didn't he do that?"  I mean you know what I mean?

10    The real challenge is why not break these into 94 cases and

11    just consolidate them for discovery purposes, but I haven't

12    formed an opinion on that.

13              MR. CROWE:  That's what we view them to be,

14    Your Honor, so.

15              THE COURT:  I haven't formed an opinion on that yet.

16    We get to the same place.

17              MR. SHKOLNIK:  Yes, Your Honor.

18              THE COURT:  Don't panic.  You had that look like,

19    "Oh, my gosh!"

20              MR. SHKOLNIK:  No, no.  I think we -- I think that

21    may have happened in -- in the past.  In *NuvaRing* I think

22    there was a couple of bundled Complaints that got transferred,

23    and that issue was considered.  I don't remember how it was

24    handled in that case, but I -- I think that was an issue.

25              THE COURT:  Well, on MDL it's more important because
```

1  you got to know where to send them home to if they don't

2  settle.

3          MR. SHKOLNIK:  True, Your Honor.

4          THE COURT:  You know, you can't send a bundle when

5  half of them are in Northern Florida and half are Northern

6  North Carolina, you know.  So they almost have to originate

7  properly as an individual case so if the -- if there's not a

8  global settlement, they have a home to go to when you're done.

9          MR. SHKOLNIK:  I understand.

10          THE COURT:  So all right.  Thank you all very much.

11          MR. CROWE:  Thank you, Your Honor.

12          MR. DOWD:  Okay.  Thank you, Judge.

13          MR. CROWE:  I appreciate it.

14          MR. ROTHSCHILD:  Thank you, Your Honor.

15          (Hearing concluded at 3:00 PM.)

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATE OF OFFICIAL REPORTER</u>


        I, Deborah A. Kriegshauser, Federal Official Realtime

Court Reporter, in and for the United States District Court

for the Eastern District of Missouri, do hereby certify that

pursuant to Section 753, Title 28, United States Code, that

the foregoing is a true and correct transcript of the

stenographically-reported proceedings held in the

above-entitled matter and that the transcript page format is

in conformance with the regulations of the Judicial Conference

of the United States.

        Dated this 31st day of March, 2016.



                        /s/ Deborah A. Kriegshauser
        _____
                        DEBORAH A. KRIEGSHAUSER, FAPR, RMR, CRR
                        FEDERAL OFFICIAL COURT REPORTER