UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

J.Y.C.C., ET AL.,        )
                           )
    Plaintiffs,       )
                           )
    v.               )  No. 4:15-CV-01704-RWS
                           )
DOE RUN RESOURCES     )
CORPORATION, ET AL.,    )
                           )
    Defendants.       )

STATUS HEARING
BEFORE THE HONORABLE RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

MARCH 24, 2022

APPEARANCES:
For Plaintiffs:         Francisco R. Rodriguez, Esq.
                     RODRIGUEZ TRAMONT & NUÑEZ
                     255 Alhambra Circle, Suite 1150
                     Coral Gables, FL 33134

                     Hunter J. Shkolnik, Esq.
                     NAPOLI SHKOLNIK, PLLC - PUERTO RICO
                     1302 Avenida Ponce de Leon
                     Santurce, PR 00907

                     Patrick J. Lanciotti, Esq.
                     NAPOLI SHKOLNIK, PLLC - NEW YORK
                     360 Lexington Avenue, 11th Floor
                     New York, NY 10017

REPORTED BY:           REAGAN A. FIORINO, RMR, CRR, CSR, CRC, CCR
                     Official Court Reporter
                     United States District Court
                     111 South Tenth Street, Third Floor
                     St. Louis, MO 63102 | (314)244-7989

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

APPEARANCES CONTINUED:


For Defendants:          Tracie J. Renfroe, Esq.
                         KING AND SPALDING, LLP - HOUSTON
                         1100 Louisiana St., Suite 4100
                         Houston, TX 77002

                         Geoffrey M. Drake, Esq.
                         Andrew T. Bayman, Esq.
                         KING AND SPALDING, LLP - ATLANTA
                         1180 Peachtree Street, N.E., Suite 1600
                         Atlanta, GA 30309

                         Thomas P. Berra, Jr., Esq.
                         LEWIS RICE, LLC
                         600 Washington, Suite 2500
                         St. Louis, MO 63101

                         Edward L. Dowd, Jr., Esq.
                         DOWD BENNETT, LLP
                         7733 Forsyth Blvd., Suite 1900
                         Clayton, MO 63105

                              *   *   *

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | <u>MARCH 24, 2022</u>                                        |
| 2  | (The proceedings commenced at 10:06 a.m.)                    |
| 3  | **THE COURT:**  So we are here this morning in the case      |
| 4  | styled J.Y.C.C., et al. against Doe Run Resources Corporation, |
| 5  | et al.  It hurts me to call out the cause number, but         |
| 6  | 4:15-CV-1704.                                                 |
| 7  | Would counsel make their appearances, please.                |
| 8  | **MR. SHKOLNIK:**  Good morning, Your Honor.  Hunter         |
| 9  | Shkolnik on behalf of Plaintiffs.  Good to see you again.    |
| 10 | **MR. RODRIGUEZ:**  Frank R. Rodriguez --                    |
| 11 | **THE COURT:**  Yeah, not since NuvaRing.  I hate to say     |
| 12 | that you make me think of a birth control device.            |
| 13 | (Laughter.)                                                  |
| 14 | **MR. RODRIGUEZ:**  Good morning, Your Honor.  Frank R.      |
| 15 | Rodriguez from Rodriguez Tramont & Nuñez on behalf of        |
| 16 | Plaintiffs.                                                  |
| 17 | **MR. LANCIOTTI:**  Good morning, Your Honor.  Patrick       |
| 18 | Lanciotti from Napoli Shkolnik on behalf of Plaintiffs.      |
| 19 | **THE COURT:**  Very good.                                   |
| 20 | **MR. DRAKE:**  Good morning, Your Honor.  Geoffrey          |
| 21 | Drake from King & Spalding for the defendants.  Nice to see  |
| 22 | you and be here.                                             |
| 23 | **THE COURT:**  I don't think of birth control when I       |
| 24 | see you.                                                     |
| 25 | **MR. DRAKE:**  I'll take that as a positive.  Thank         |

1  you, Judge.

2          (Laughter.)

3          **MS. KAJAN:**  Good morning, Your Honor.  Rania Kajan

4  with King & Spalding.

5          **MS. RENFROE:**  Tracie Renfroe with King & Spalding on

6  behalf of the defendants.

7          **MR. BAYMAN:**  Good morning, Your Honor.  Andrew

8  Bayman also from King & Spalding on behalf of all of the

9  defendants.

10          **MR. DOWD:**  Good morning, Your Honor.  Ed Dowd for

11  Renco.

12          **THE COURT:**  They put you at the kids table.

13          **MR. DOWD:**  I'm happy back here.

14          **MR. BERRA:**  Tom Berra with Lewis Rice for The Doe

15  Run Resources Corporation and individual Doe Run defendants.

16          **THE COURT:**  You can afford your own table now.

17          (Laughter.)

18          **MR. TUNG:**  Good morning, Your Honor.  I am Eric Tung

19  with Jones Day, interested nonparty.

20          **THE COURT:**  Very good.

21          All right.  Are there any announcements before we

22  proceed today?

23          **MR. DRAKE:**  No announcement -- should I go to the

24  podium, Your Honor?

25          **THE COURT:**  Sure.  That's a good place to start.

1      **MR. DRAKE:**  No announcements.  The defendants would
2  only request that today's proceedings occur under seal, as
3  have the prior proceedings.  And I'm not sure who all is in
4  the gallery today.

5      **THE COURT:**  You will need to file -- we won't
6  publish the transcript, but I will need a formal motion and a
7  memorandum.

8      Mr. Dowd may have informed you or Mr. Berra.  We
9  have a new local rule on sealing.  I sat through a lecture by
10 the chair of the House Judiciary Committee on five problems
11 with the judiciary and one of them is we seal too much.  And
12 if we don't do something about it, they are.

13     So I don't -- I'm not going to be the Exhibit A, but
14 I will gladly entertain your motion under the new local rule
15 and the memoranda.

16     **MR. DRAKE:**  Thank you, Judge.

17     **MR. SHKOLNIK:**  Your Honor, on that issue, if you
18 will have an opportunity --

19     **THE COURT:**  You got lectured by Chairman Adler, too?

20     **MR. SHKOLNIK:**  I'm very familiar with it and we have
21 been very active in supporting open courts.  But we would like
22 the opportunity to respond --

23     **THE COURT:**  We will not publish the transcript
24 without having ruled on that motion.

25     **MR. SHKOLNIK:**  Thank you.

1        **THE COURT:**  And it may be that it will be an

2   exercise of redaction, perhaps.  But we will cross that bridge

3   when we get to it.

4        Anything else before we get started?

5        **MR. RODRIGUEZ:**  Nothing else from the plaintiffs.

6        **MR. DRAKE:**  Nothing for defense.  Thank you, Judge.

7        **THE COURT:**  Very good.

8        So we have a number of matters that have been

9   briefed.  Let's address the issue -- well, who wants to take

10  the lead on how to . . .

11       When we were together last, I talked about -- this

12  will be in my cliff note version -- the defendants' concern

13  about, I don't want to use the word "fraud."  But I know

14  that's your conclusion.  Certainly inconsistencies or perhaps

15  inappropriate conduct in securing or identifying Plaintiffs

16  listening in on their case.

17       And to bring it back to my observation at the time,

18  while that may be true, that's a conclusion.  And the way we

19  are going to get to it is to explore discovery of the trial

20  pool plaintiffs.  And as evidence of that alleged misconduct

21  surfaces, we will address it.

22       I didn't articulate it but, you know, at the time --

23  I didn't articulate it at the time.  You know, I want to keep

24  my eye on the claims by the individuals.  If, in fact, there

25  was conduct inconsistent with the code of ethics or statutes

1  that govern this case or rules of procedure, there may be

2  sanctions either against counsel or referrals to bar

3  associations.

4          Those are all conclusions upon which I have no basis

5  to decide today or then that that's necessary.  But we still

6  have to stay focused on the individuals and the individuals as

7  have been defined under the Constitution to include your

8  clients.  I'm looking at Defendants.  Everybody has rights and

9  responsibilities in this courtroom.

10          For example, even if counsel may have stepped over

11  the line representing an individual plaintiff, unless the

12  individual plaintiff has participated in that conduct, that

13  doesn't mean their claim necessarily goes away.  They may need

14  to seek new counsel.  These are all hypotheticals.

15          And there were a lot of -- there's a lot of belief

16  that there is misconduct of some sort in this case.  I get

17  that.  But I need to see it.  I need to hear it.  I need to

18  understand it.  It needs to be individualized, not

19  generalized, and subject to conclusions.

20          And what I thought I made clear was let's take it;

21  we've got a trial pool of plaintiffs; let's explore through

22  discovery what the nature and circumstances of their

23  participation or how they came to participate in this case;

24  and let's find it.  And we will deal with it.

25          It's not part of anything that a judge or a court

 1   wants to get involved in.  I work totally globally on the idea

 2   it's my job to keep the hands off the scale.  There are enough

 3   burdens of proof and presumptions in the law.  I don't want to

 4   get involved.  But I will if I have to.

 5           I've tried cases where I struck the defendant's

 6   answer and tried the case only on damages only because of

 7   misconduct by the party or the counsel.  But that's not

 8   healthy for the legal system at large or the public's

 9   confidence in what we do.  We need -- if we can -- and there

10   are Eighth Circuit cases, mainly in the employment arena, that

11   talk about when you can, you get to the facts of the

12   individual case if at all possible.

13           So we have the issue of how do we explore the

14   allegations of the -- within the trial pool plaintiffs while

15   we also work towards a trial date.  Whatever happens, we still

16   have to think about the people who have a claim and may get

17   dismissed on summary judgment.  It may fall out on *Daubert*.  I

18   don't know.  But we have to have a path forward so we get

19   there in a manner where everyone gets to participate.

20           I didn't plan for that lecture.  I apologize.  But

21   in bringing some focus to the next discussion, how do we look

22   at this trial pool of 108 plaintiffs and move forward so that

23   we can get this case tried?

24           Mr. Dowd and Mr. Berra will know I sent my letter in

25   to the president earlier this year that I would take senior

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1    status upon confirmation of my successor.  That's a different

2    issue.  That may never happen.  I don't know.  But I'm not

3    going to be here ten years from now to try this case.  I don't

4    think.  I don't intend to have them carry me out of the

5    building.

6           Let's stay focused on the goals that we all share

7    and that's to have this case arrive at its logical legal

8    conclusion.

9           Who wants to go first in how we approach the trial

10   pool plaintiffs?

11           **MR. DRAKE:**  May I, Your Honor.

12           **THE COURT:**  You may.

13           **MR. DRAKE:**  Geoffrey Drake for the defendants.  I

14   appreciate those remarks very much, Judge, because I think,

15   and I hope you found in our papers, that our objectives are

16   consistent, I believe, with Your Honor's.

17           The problem that we have before us in our view is

18   what we believe to be objectively true that there's extensive

19   evidence of fraud in these cases perpetrated by the plaintiffs

20   in Peru.  That concerns both the signing up of clients and the

21   falsification and forging of documents.

22           And we have harped on that a bit, Your Honor,

23   because we believe that that evidence formulates the plan for

24   next steps.  And in terms of finding out and focusing on which

25   particular plaintiffs are implicated and how that may impact

1   where we go from here, we believe -- and this is why we filed

2   the motion that we did -- that certain steps are going to be

3   needed that go well beyond even a verification process which

4   we are going to -- which we will address today, Your Honor.

5          They go to the idea of a special master.  They go to

6   certain discovery that we've served.  And to that end, we

7   tried to take what we believe is a judicious and careful

8   approach on this, starting from filing the initial report

9   under seal, to requesting a status conference, to first raise

10  these issues and discuss them with Your Honor.  We waited for

11  Your Honor's guidance and received it, to then decide on next

12  steps, meeting and conferring with the other side.  Only after

13  the next conference did we then file our respective motions.

14         And frankly, Your Honor, I think the plaintiffs have

15  taken an entirely different approach, whether it be serving

16  discovery on King & Spalding, serving discovery on Jones Day

17  or various other approaches, including they have opposed the

18  idea of a special master.  Of course they are free to oppose

19  the idea, Your Honor, but they said in their opposition to the

20  special master motion that the appropriate steps would be

21  discovery.

22         We served discovery and they filed a motion for

23  protective order.  They couldn't even take the time to answer

24  the discovery or respond to it or even offer an objection to

25  certain questions.  And I'm sure we will take up all of those

1   issues today.

2          And in the latest move, on Tuesday night, they filed

3   an after-hours emergency motion that's riddled with

4   misrepresentations that we look forward to responding to and

5   can address today if Your Honor would like.  Including the

6   claims that we misrepresented to the Court that the defendants

7   were the criminal complainant in Peru which is not true.

8          It's in the Jones Day report.  It's on page 2.  We

9   were very clear about that in the November conference.  And

10  all of the people who are being interviewed down in Peru by

11  the prosecutor have been dismissed with prejudice from these

12  cases.

13         So that's been the guardrail the entire time.  And

14  we think this is so serious, of course, Your Honor, that the

15  Peruvian prosecutors are looking into it.  They didn't have to

16  do this investigation.  They are expanding that investigation.

17  That's clear from the affidavits that Plaintiffs have

18  submitted into evidence.

19         So we thought what a helpful approach today, then,

20  might be to take a few minutes, if we could, Your Honor, to

21  review where we are with the evidence that's before the Court.

22  And then Ms. Renfroe is going to discuss the verification

23  proposal specifically.  I'm sure the plaintiffs would address

24  that.  And we can kind of go through any other motions.  If

25  that would be -- if that would be okay, Your Honor.

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1              And to that end, we have prepared some slides to

2   assist the Court and assist us in that regard.  I believe we

3   are keyed into the system.  And I have hard copies for Your

4   Honor and for Plaintiffs, if I may approach.

5              **THE COURT:**  Sure.

6              We are not going to look at all of these slides, are

7   we?

8              **MR. DRAKE:**  I don't know, Your Honor.  But we

9   thought we would prepare as many as needed.  You can keep them

10  in our files.  Plaintiffs can have them as well.  I doubt we

11  will need to go through all of them.

12             **THE COURT:**  It's 62 pages.

13             **MR. DRAKE:**  It's a lot of slides.  We won't need to

14  go through them all, Your Honor.

15             But thank you for the opportunity to address it.

16  Because we think it's important to kind of take a step back

17  and refresh and recall where we are and how we got here and

18  what we believe the evidence shows and how that informs our

19  motions.

20             Your Honor, one of the big disagreements that we

21  seem to have between the defendants and the plaintiffs is that

22  the evidence that's before the Court is a lot more than just

23  Richard Romero.  He is certainly an important piece to the

24  puzzle and we'll review that, but there are multiple sources

25  of corroborating evidence in play.

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1          And Mr. Romero's affidavit has not been discredited,

2    as Plaintiffs have claimed.  It's actually been corroborated.

3    He is certainly the first witness that's before us today.

4    He's Plaintiffs' own former employee, recruiter and document

5    collector in Peru from 2013 to 2016.

6          He offered sworn testimony about fraudulent conduct

7    in which he participated or observed while working under

8    Plaintiffs' counsels' supervision.  That includes fraudulent

9    recruitment that parents didn't sign their children up for the

10   lawsuits.  He said that they were signing up for assistance

11   programs but instead were signing documents to enroll their

12   children.

13         On top of this, as I mentioned, there's the issue of

14   fraudulent records.  Falsifying records.  Falsifying profile

15   sheets.  Paying extra money to certify documents outside the

16   presence of Plaintiffs' parents and in bulk.  There's evidence

17   that there was a forgery of at least one notary signature and

18   an imitation of that was used.  And Mr. Romero estimates that

19   this occurred 200 to 300 times, the false seals did, and 200

20   to 300 documents were attested to, were attested to by

21   notaries without proper authentication.

22         Even the compensation system down in Peru changed in

23   2016.  When instead of being paid a salary, Mr. Romero and

24   others were paid on the basis of a number of Plaintiff

25   packages that they signed up, some similar to a bounty system

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1    where you sign up as many people as you can.  And while

2    Plaintiffs seemed singularly focused on what the defendants

3    paid Romero, they will not answer any questions about what

4    they paid Romero.

5            Mr. Romero's affidavit, Your Honor, is very

6    specific.  He specifies particular years in which this

7    occurred, 2013 to 2016 some of the activity.  Other activity

8    in 2016.  The reason I bring this up, Judge, is because it's

9    important.

10           Your Honor may recall, Mr. Shkolnik was here in

11   2016, six years ago, well before we were involved in the case

12   talking about the process for signing up these clients.  And

13   he said in 2016, the very time that Mr. Romero says that these

14   activities were taking place, that he already had 2,000

15   clients signed up, he already had the fact sheets, and they

16   already had a lot of the medical records.  So the timing syncs

17   up very specifically.

18           On top of all of this, as we mentioned, we have the

19   evidence from Ms. Rojas.  She is a former plaintiff.  She

20   testified she never signed documents in March 2016, the exact

21   same time period we're talking about, that she thought would

22   provide school supplies for her children.  That's what she

23   thought she was signing.  It turns out she was signing some

24   sort of, perhaps, engagement letter or something like that.

25           She said that happened, again, in exactly

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1   March 2016, as I said.  And then when she went to pick up

2   those school supplies, the recruiters asked her to take her

3   children's blood tests which she refused.  She has refused to

4   participate in this case altogether.

5          This came up in the November hearing.  Plaintiffs'

6   counsel said she had signed an engagement letter.  Again, Your

7   Honor, we have asked for that engagement letter now in the

8   context of discovery, and they won't even answer the question,

9   much less provide an objection or produce the document.

10          She said very clearly she's never signed the

11   documents and she said this signature right here is fake.  Her

12   children were dismissed from this case earlier this year for

13   what was called "failure to cooperate," which seems like a

14   significant understatement.

15          But the point that I want to really drive home, Your

16   Honor, to my earlier comment is that the evidence is not just

17   these two affidavits.  We have a number of corroborating

18   pieces that I wanted to bring to the Court's attention.

19          The first is the issue of the fake notary stamps.

20   Mr. Romero has the stamps that he faked.  Do I know exactly

21   which plaintiffs those stamps were used on right now?  No.

22   We're working hard at it.  And that's why we filed our motion

23   for a special master as well.  Because that additional

24   investigative step is the only way we will ever know who is a

25   real plaintiff and who is not and which documents are real and

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

 1   which documents are not.  It's outside of our ability to

 2   really find it out any other way.  And that's why that motion

 3   is important to us.

 4          Mr. Romero also testified that he has recorded

 5   messages on a computer from his boss, Victor Careaga.

 6   Mr. Careaga works for Plaintiffs' counsel.  Or did at one

 7   time.  I don't know if he still works for them or not.  We

 8   have been unable to get that information.  But he's a former

 9   Florida-based attorney who was hired by the plaintiffs'

10   counsel in this case after he was fired by the plaintiffs'

11   counsel in the *Reid* case.

12          And I say he's a former Florida-based attorney

13   because he's been disbarred in the time since.

14          We don't have this computer.  Again, it's something

15   that perhaps a special master can gain access to.  Maybe the

16   Peruvian investigators will get it.  It's not exactly clear at

17   the moment.

18          We also have evidence from Mr. Balbín.  Mr. Balbín

19   is one of the notaries who has been involved in these cases

20   down in Peru.  He notarized thousands of documents in this

21   case and in the *Reid* case.  And in 2016, according to

22   Mr. Romero, Balbín was paid by the plaintiffs' team extra

23   money to notarize fact sheets without the plaintiffs being

24   present, which is an issue the investigators down in Peru I'm

25   sure will look into because that would be a violation of

1    Peruvian law.

2           He also had Mr. Balbín -- Plaintiffs did -- notarize

3    plaintiff fact sheets in bulk.  The reason I bring this up,

4    Judge, is because Mr. Balbín is another person who has a

5    checkered past.  He has been publicly accused of fraud

6    numerous times.  In 2012, a complaint was filed against him

7    with Peru's counsel of notaries alleging he falsified

8    fraudulently notified [sic] documents.

9           This is a 2013 newspaper article reporting on how he

10   had notarized falsified property documents without the listed

11   owner being present.  And in 2015, a criminal complaint was

12   filed against him.

13          On top of all of this we have the evidence from

14   Mr. Curi.  Plaintiffs have been dismissive of Mr. Curi, who

15   provided a signed affidavit that's included with the Jones Day

16   report.  But he testified that he, while working on the *Reid*

17   case, fabricated, altered or forged documents, paid other

18   recruiters, paid notaries to do false signatures, et cetera.

19          But his affidavit is highly relevant, Your Honor,

20   for the reasons on this slide, right here, 21.

21          We are dealing with the same set of underlying facts

22   in the same area of Peru with the same area of potential

23   claimants with the same types of documentary evidence.  And at

24   times the same individuals, both Mr. Romero and Mr. Careaga,

25   worked on both cases.  And Mr. Balbín worked as a notary in

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1  connection with both cases.

2          On top of that, Mr. Romero has testified that he has

3  seen fraud perpetrated by other recruiters working for the

4  plaintiffs' team in this case.

5          Ms. Rojas was not recruited by Mr. Romero or

6  Mr. Careaga or Mr. Curi, of course, so we know that there is

7  something else is going on.  There are other people involved.

8  And we have this additional evidence.

9          Now, Your Honor, the hearing in November,

10  Mr. Rodriguez invited us, he said, we have given all of the

11  documents to the defendants so the defendants can look at the

12  documents and let us all know whether there's any fraud in

13  them.

14          Well, putting aside the unfairness we believe of

15  that ask, that the burden is somehow on the defendants to

16  ascertain whether the evidence in these cases is real when

17  it's Plaintiffs' duty to perform a reasonable inquiry into

18  those documents they produced before actually producing them,

19  we've done exactly what Mr. Rodriguez challenged us to do.

20          At considerable expense and time over the last

21  six months, we have been undertaking a comprehensive review of

22  medical, educational, employment records, as well as profile

23  sheets, focusing, first, Judge, just on the initial trial

24  pool, the 108 people you were referring to earlier.  And from

25  that work, we have learned a lot.

1          First, we have an issue of many examples where a

2     plaintiff, who was proceeding at one time in both the *Collins*

3     cases that we're here for today and in the *Reid* cases, these

4     are these duplicate plaintiffs, served 180-degree different

5     fact sheets in connection with certain issues, whether it's

6     blood level testing results, the number of siblings they have,

7     the durations and times they went to a different school and

8     even their alleged injuries.

9          We found of the over 80 plaintiffs who served

10    profile sheets in both cases, many contain these kind of

11    serious discrepancies.  And we can certainly provide, you

12    know, more information to the Court, including specific names.

13         We found an example, Judge, of profile sheets --

14    this is for Plaintiff R.D.B.H. -- which has a notary stamp

15    dated seven months after the signature date.  The notary in

16    Peru needs to occur at the same time the signature occurs.

17         This is consistent with what Mr. Romero is talking

18    about.  And we've identified profile sheets for 39 of the 108

19    plaintiffs in the initial trial pool to have this exact issue.

20    Again, we can provide names and lists.

21         We've identified on this slide -- this is Plaintiff

22    J.C.Z.P.  This is an example of a plaintiff in the trial pool

23    in the 108 whose profile sheet has a notary stamp dated before

24    the signature.  This is exactly what Mr. Romero is talking

25    about where the documents were being notarized in bulk and

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1   then signed somehow somewhere at a later point in time.

2           And I bring this up just to show that this is not

3   just a disgruntled former employee or however the plaintiffs

4   describe him.  This is -- we are finding evidence and we are

5   putting it together in the trial pool itself.

6           And this is one more example to this point, Your

7   Honor.  This is plaintiff I.C.C.B.  Oddly, this plaintiff has

8   produced both a handwritten fact sheet, which you can see on

9   the left, and a typed fact sheet on the right.  I don't know

10  why it got produced twice, but this plaintiff has produced two

11  fact sheets.

12          You can see on the left the plaintiff appears to

13  check no for every answer to Question 13, which is what are

14  his injuries.  Then in the typed fact sheet that was produced

15  years later, somebody has typed in all of this additional

16  information about how this person was allegedly injured.

17          There's no explanation about this.  We can't get any

18  answers.  It's one of the reasons that we moved to compel the

19  handwritten profile sheets, is to be able to look at this

20  information, either ourselves or in camera with either the

21  assistance of Your Honor -- although I doubt you are inclined

22  to do that -- or a special master to dig into this information

23  with us.

24          And importantly, the plaintiffs have already

25  admitted that fraud did occur in these cases.  At the November

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1    hearing, Mr. Rodriguez admitted there were some issues with

2    some documents, issues with some medical records.  But they

3    won't tell us what, when or how they know this.  The

4    plaintiffs admit that they found Mr. Romero ethically lacking

5    and they fired him.  And they said further that there is some

6    evidence of some fraud.

7          Your Honor, this is a situation that was created, as

8    we relayed out in our papers, consistent with the plaintiffs'

9    efforts to leave no stone unturned in trying to find as many

10   people and to exert as much leverage as possible over the

11   defendants.

12         They hired Mr. Careaga, who I mentioned earlier, to

13   run this operation down in Peru.  We don't even know if he's

14   still in Plaintiffs' employ or not.  They then hired

15   Mr. Romero who they describe in a letter that they sent us a

16   couple months ago is an admitted forger, felon and liar.  It's

17   not clear why they are calling him an admitted forger, felon

18   and liar.  Is it because of what he said in his affidavit?  If

19   so, that sounds like an admission of its accuracy.  Or is it

20   something altogether different that we don't know about.

21         We talked about the payment system of per-package

22   situation.  Mr. Rodriguez also testified under oath himself in

23   this case back last November that he supervised -- he and his

24   team in the United States supervised the activities that were

25   going on in Peru and that his team would review the documents

1    before they were produced.

2          And, now, there seems to be a new player in the mix,

3    Ms. Ampuero, who submitted the declaration in connection with

4    the emergency motion that the plaintiffs filed the other night

5    that we will be responding to, who is a criminal lawyer, I

6    guess, guiding the team down in Peru.  She was a prosecutor at

7    one point, but she was removed as her role as a special

8    prosecutor for corruption in a high-profile case.

9          So before I pass it to Ms. Renfroe, let me just

10    finally address, Your Honor, the claim that the plaintiffs

11    have made about our payments to the witnesses.  Because we

12    have produced that evidence.  Plaintiffs served discovery.  We

13    produced the documents that reflect those payments.  Nothing

14    to hide in that regard, Your Honor.  It's in the Jones Day

15    report that they received compensation.  We have been very

16    upfront about it the whole time.

17          And, Your Honor, documents showed that Mr. Romero

18    has been paid about $10,000.  That's $10,000 in compensation

19    from the time he spent, the costs he's incurred and the income

20    he's lost due to his cooperation.

21          Ms. Rojas, she has been paid $50.  That was a

22    reimbursement of expenses for her to travel from La Oroya in

23    the mountains down to Lima.  This is not a lot of money.  This

24    is not bought-and-paid-for testimony or evidence.  And even

25    so, the corroboration is stark.  And the Peruvian

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15–CV–01704–RWS*

1  investigation and criminal activities continue regardless of

2  these payments.  And it's really of no moment, Your Honor, and

3  we don't think it should be in any way a dispositive issue as

4  we address these particular motions.

5         Thank you for indulging me, Your Honor, to provide

6  that additional background.  Because I think the evidence, as

7  it is coming together, is deeply troubling, it's very serious,

8  and it informs the next steps in how we proceed.  And with

9  that, I'll pass it to Ms. Renfroe to handle the verification

10 issue specifically and then from there we can, perhaps,

11 continue on.

12         **MR. RODRIGUEZ:**  Can I respond?

13         **THE COURT:**  Well, let's let Ms. Renfroe speak and

14 you will have all the time you need.

15         **MS. RENFROE:**  Good morning, Your Honor.  Tracie

16 Renfroe for the defendants.  And thank you for the opportunity

17 to be heard.

18         We very much appreciate the Court's perspective and

19 desire in trying to get to the bottom of this while at the

20 same time advancing the litigation as to the individuals as

21 the Court mentioned in opening remarks.

22         But also as the Court mentioned, it's very important

23 to the defendants as participants in this litigation to

24 understand exactly the magnitude of the litigation that they

25 face.  The Court observed that and understood that, I believe,

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1  in our conference in November.  And to that end, I believe the

2  Court observed we need to figure out who is in and who is out

3  of this litigation.  It's essential.  It's important both to

4  the plaintiffs as well as to the defendants.

5          And so to that end, we proposed in January of this

6  year, following the Court's order, we proposed a process for

7  verifying which plaintiffs are intended, genuine, legitimate

8  plaintiffs and which are not.

9          So what I want to do is speak to that verification

10 process.  But going to the Court's question this morning, what

11 are the steps and how can this process unfold to continue to

12 progress the claims of the legitimate individuals.  Here is

13 how we see that unfolding.

14         Step one.  To have a rigorous, robust and

15 transparent verification process to answer that essential

16 question:  Who is a genuine, legitimate plaintiff and who is

17 not?  After that verification process, then the defense would

18 make their defense picks to marry up with the plaintiff picks

19 to yield the 28 discovery -- 28 plaintiffs for the discovery

20 cohort.

21         Then the discovery process could begin.  For those

22 28 discovery cohort plaintiffs, Defendants propose that we

23 recollect the essential medical and education records and then

24 discovery can proceed, of course pursuant to a new schedule

25 that the Court can develop.

1          But we don't see that the progress has to stop.

2    What we do see and feel that it's essential to an appropriate,

3    genuine and trustworthy litigation process is that this

4    verification process of the 108 and the broader group of

5    2,000-plus claimants must proceed immediately and can proceed

6    on a two-track process.

7          Let me address the specifics of that verification

8    process.

9          We've proposed that each plaintiff, the group of --

10   in the group of 108, as well as the broader balance of

11   2,000-plus plaintiffs, appear before a neutral independent

12   third party.  That individual could be from an accounting

13   firm, perhaps from a law firm or some other organization

14   approved by the Court.  Ideally agreed by the parties.

15         In the presence of that neutral, each plaintiff or

16   their guardian or parent would sign a verification form

17   approved by this Court, identifying and confirming a few

18   simple basic facts.

19         One, that that individual plaintiff truly intended

20   and intends to be a litigant in this court.  Without any

21   inducement or financial incentive or any coercion, such as

22   what we have seen in the evidence in the Jones Day report.

23   And that that person swear to those things before a notary

24   which is what is required under the law in Peru and what

25   should have been happening all along.  But as we now know,

1    many of the notarized documents are forged notarized documents

2    and many were never notarized at all.

3          Along with that verification process where the

4    plaintiff would confirm his identity, confirm his intention to

5    be a plaintiff without incentive or compensation or coercion,

6    we would also ask as part of that verification process that

7    each individual plaintiff re-sign an authorization allowing

8    the recollection of medical and education records which are an

9    essential part of Plaintiffs' claim and evidence.

10         Now, we propose that that verification process

11   unfold before a neutral independent third party to provide the

12   transparency and the rigorous and robust process.  All we are

13   asking for, Your Honor, is that we have a process that's

14   rigorous, transparent and robust so that we can get a

15   trustworthy, reliable answer to the question of how many

16   plaintiffs are legitimate, whether as part of the 108 initial

17   trial cohort or part of the broader 2,000.

18         And let me speak to that broader group of 2,000 just

19   briefly.  We don't think that requiring verification of the

20   2,000 has to impede in any way the progress of this

21   litigation.  But those 2,000 plaintiffs are plaintiffs who

22   claim to be litigants in this court and for whom Plaintiffs'

23   counsel has represented to Defendants they have legitimate

24   claims.

25         As the Court I'm sure can appreciate, whether there

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1   are claims of 100 or less versus claims of 2,000 or more,

2   those are two very different situations, two very different

3   worlds for purposes of evaluating these cases, trying to

4   explore resolution of these cases, and even trying to think

5   through how these cases would be tried.

6           And so we do say and believe very strongly that it's

7   essential and just basic fairness requires that if a plaintiff

8   has filed a suit in this court against our clients, the

9   defendants in this case, the least that they can do is show up

10  and verify that they are indeed genuine and legitimate

11  plaintiffs given the extensive evidence of fraud that is now

12  before the Court.

13          So with respect to transparency, we believe that

14  each side can or should be allowed to have a representative

15  participate or observe the verification in front of the

16  third-party neutral.  However, we strongly believe that

17  Plaintiffs' ground team in Peru should not be part of that

18  process.

19          The evidence that we've put forth that has been

20  presented in the Jones Day report and that has been touched

21  upon briefly by Mr. Drake establishes that members of

22  Plaintiffs' Peru ground team appear to have been involved

23  in -- whether you want to call it fraud, misrepresentation,

24  discrepancies -- whatever word the Court wants to use at this

25  stage, the evidence that has been presented to the Court is

1   that there have been serious, serious problems.

2           And we have no reason to have any confidence or

3   trust in Plaintiffs' team in Peru.  And so we respectfully

4   suggest, for transparency purposes, a representative of

5   Plaintiffs' team from the U.S. and a representative of defense

6   team can observe the verification process if they wish.

7           So those are the basics of the defendants' proposal.

8   Let me address briefly why we think the plaintiffs' proposal

9   for verification is inadequate and does not yield a rigorous,

10  robust or transparent process, Your Honor.

11          Essentially, Plaintiffs propose to have their team

12  in Peru engage in a whiteboard or video process to have their

13  clients verify that they are true, genuine plaintiffs.  As I

14  believe may be obvious, that risks repeating exactly where we

15  are today.  It doesn't give Defendants any confidence that

16  there -- that we would get a genuine, trustworthy, credible

17  answer to the question:  Who really is a legitimate plaintiff

18  and who is not?

19          As the Court I'm sure can appreciate, a videotape

20  can be easily manipulated, and I'm afraid at the end of a

21  whiteboard or videotaped process we would have no more

22  reliable information than we have today.

23          So, what we propose is a simple process.  It doesn't

24  have to take years, nor does it have to delay the progress of

25  this litigation.  The Court mentioned in November a two-lane

1  or two-track process where the 108 could be verified perhaps

2  with priority, and then the rest of the litigation can unfold

3  as the Court is, I know, concerned with.  But at the same

4  time, the 2,000 plaintiffs should also be subject to the same

5  verification process.

6          I'm happy to answer any questions from the Court.

7          **THE COURT:**  I want to hear from the plaintiffs

8  first.

9          **MS. RENFROE:**  Thank you, Your Honor.

10         **THE COURT:**  Thank you.

11         **MR. RODRIGUEZ:**  Thank you, Judge.

12         Again, a lot to unpack there.

13         Your Honor, I think the biggest problem that we have

14 with the presentation of the defendants is that it assumes

15 that there's widespread --

16         **THE COURT:**  Pull the microphone --

17         **MR. RODRIGUEZ:**  It assumes there's widespread fraud

18 in this case.  They want Your Honor to assume the veracity of

19 an affidavit and a report that is -- it's -- the report is

20 rank hearsay.  The affidavits are hearsay.  And we have -- if

21 Your Honor is even remotely considering any of the proposals

22 that you just heard by the defendants, the sequence of events

23 should be that we should be able to evaluate the reliability

24 of the evidence.

25         And I can get into some of the minutia, but the

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15–CV–01704–RWS*

1   gist of their position is the Jones Day report supported as it

2   relates to the *Collins* cases, primarily the affidavit of

3   Richard Romero.

4         Curi, who as I told you before, if he was right

5   here, I wouldn't recognize him.  I've never met him.  And

6   Romero, by the way, started working in 2006.

7         A lot of the evidence and a lot of the attachments

8   to that Jones Day report are things that took place before

9   Mr. Shkolnik's law firm and my law firm got involved.  We got

10  involved in the case in March of 2014.  Mr. Romero -- just to

11  put context, Mr. Romero was fired in June of 2016.

12        Now, the defendants come before Your Honor and they

13  would have the Court totally dis- -- first of all, cede

14  control of the case to a master and totally disrupt the cases

15  with very time consuming and very expensive procedures, all on

16  the basis of these -- the report which is hearsay and the

17  affidavit which is hearsay.

18        Now, as Your Honor knows, you've been around, I

19  mean, there's no truer words have ever been spoken that the

20  rubber meets the road during cross-examination.  That's when

21  we get to the truth.  So at a minimum, we should be able to,

22  the plaintiffs should be able to cross-examine and examine the

23  creator of the affidavits, excuse me, of the report, which is

24  Jones Day.

25        Jones Day has, up to now, refused to voluntarily --

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1   they have made some technical objections.  We can get into

2   those.  But it seems to me that if Defendants are coming

3   before the Court and saying, "Please believe me, Judge,

4   because Mr. Romero has prepared this affidavit and Jones Day

5   has done X, Y and Z," it's not easy for us.  We can't depose

6   Romero.  At a minimum we should be able to depose the creators

7   of the affidavit.  I mean, no court would ever accept that

8   evidence of any report, certainly if the creator of that

9   report wasn't put forth to the Court and to the -- and be

10  subject to cross-examination.

11          To be clear, Romero is a fired ex-employee.  When I

12  mentioned that he is an admitted liar and criminal, it's --

13  it's just taken from his affidavit.  That's what he himself

14  has said in his affidavit.

15          I think it's important to note that it's not only

16  that he was paid $10,000, but he actually -- and I find this

17  quite somewhat incredible -- he enters into what effectively

18  is a retainer agreement in September of 2021, where he -- the

19  defendants agreed to pay him a thousand dollars a month for

20  the next succeeding 12 months.  And they agreed to pay his

21  criminal attorney that they hired in Peru.

22          Now, look, it doesn't seem like -- so I don't know

23  if it was intentional.  I'm not suggesting it was intentional,

24  but Mr. Drake was mistaken.  He has been paid 10,000, but they

25  still owe him another six pursuant to the retainer agreement

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1    that he didn't get into very much.

2          So I think to give context to the $12,000 -- to the

3    16,500 roughly that he's being paid, we had -- we did a little

4    bit of research and one of my associates, Stephanie Nuñez,

5    prepared an affidavit.  And in the affidavit she talks about

6    this information and statistics website that is run by the

7    Peruvian government.  And the average worker in the Junin

8    province, which is where La Oroya is, makes $297 a month.  So,

9    you know, $16,000 is a king's ransom.

10          It's also important to note that the sequence of

11    events, what occurred here chronologically.  You had

12    Mr. Romero going back -- he apparently -- after we fired him

13    he moved to Lima.  He moved back to La Oroya sometime around

14    2019.  In 2020, in his own affidavit, he acknowledges that --

15    it was either his affidavit or the retainer agreement, I can't

16    remember -- he acknowledges that he was living off of savings.

17          Remember, Judge, we had the pandemic here.  The

18    pandemic hit harder over there.  And the pandemic created a

19    dynamic where the entire business world was shut down.  And

20    Mr. Romero admittedly was living off his savings.  And that's

21    the backdrop of Mr. Romero having what I refer to as his

22    come-to-Jesus moment where he, you know, decides to go forward

23    and approach the defendants.

24          So he's not working.  He's not making any money.  So

25    he reaches out to them.  And over a period of time, November

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1   of 2020 to September of 2021, they have these series of

2   meetings with Jones Day and with representatives of the

3   defendants.

4         Now, that culminates in 2021, September 22, where

5   in -- it's kind of an odd situation.  I really don't know what

6   to make of it.  Romero goes outside the country of Peru to

7   Mexico.  Maybe it's pandemic related.  I don't know.  But they

8   go to Mexico and he signs this retainer agreement September 22

9   of 2022 [sic].

10         And on September 22 of 2022 [sic], it's right in the

11  retainer agreement, Judge, and we just recently -- that's one

12  of the few things they produced to us, the defendants produced

13  to us.  And that indicates that simultaneous with the signing

14  of the retention agreement, which is, "Romero, we'll give you

15  $12,000," Romero signs an affidavit on September 22.

16         Now, I find that interesting because the affidavit

17  that's attached to the Jones Day report was dated

18  October 19th.  I can't tell if or I don't know if the

19  September 22 affidavit that's referred to in the retainer

20  agreement is the same affidavit just signed like at a

21  different time, you know, twice, or if it's a different

22  affidavit.

23         It does refer to the fact that on September 22,

24  simultaneous with the defendants signing the retainer

25  agreement agreeing to retain him, to pay him a thousand

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1  dollars a month for the next 12 months, that he signed an

2  affidavit that essentially confirmed all the information that

3  he had been telling the company over the last X amount of

4  time.

5         So, again, I think that, you know, very, very

6  suspicious circumstances.

7         The payment of the criminal lawyer.  One of the

8  things that they haven't given us -- and I find that kind of

9  odd as well -- they gave us the retainer agreement and some

10  documents that confirm some monies that Romero was paid prior

11  to him entering into the retainer agreement, which brings the

12  total to 16,500.  But they don't give us what apparently

13  exists, which is an engagement agreement engaging this

14  criminal law firm and/or monies that were paid the criminal

15  law firm.

16         I mean, you can't -- it's not the $16,500 or roughly

17  that to change hands.  It is that plus whatever monies were

18  paid to the criminal law firm.  And I'm very interested in

19  those amounts of money.

20         So now they come before the Court today.  And,

21  again, you know, one of the ways I approach the hearing is I

22  took very literally what Your Honor said which is very similar

23  to what Your Honor said when we started the hearing today.

24  That, hey, let's get to the end; let's move the cases along;

25  let's see if there's any fraud here; let's take a look.  It's

*J.Y.C.C., et al. v. Doe Run, et al.* | *4:15-CV-01704-RWS*

1  a random sample.  It's now 108.  It was 120.  And let's take a

2  look.  Let's -- we -- we -- by the way, we agreed in our

3  proposal that we would have our clients sign authorizations so

4  they can look at whatever documents they wanted to.

5          Your Honor, you know, one of the things that I would

6  point out to you -- and I think you remember this.  We have

7  gone through a lot.  And we had a lot of these Zoom hearings

8  during the pandemic.  And I would come to you oftentimes, hat

9  in hand, not knowing what to say almost because we were having

10  so much time -- so much trouble because of the pandemic and

11  the circumstances surrounding the pandemic to get all of the

12  records.

13          It's not an easy place to get records to begin with,

14  and it makes it that much more difficult when you are dealing

15  with a pandemic.  So I would come to you, I think, maybe it

16  was two years' worth of -- I don't remember exactly.  But I

17  would come to you and say, Judge, this is what we've done.  I

18  would always report what we had gotten at that particular

19  time, what we had achieved since the last status conference.

20  And I kept asking you for extensions.

21          Okay.  If we were forgers and were making up

22  records, we are like the Keystone cops of forgers because, I

23  mean, you know, it took us two years to get the darn records.

24  I'm damn proud of my team.  Okay.  And I think --

25          And by the way, there is nobody -- and they mention

1   Careaga.  Careaga is in the United States and Careaga is a
2   disbarred lawyer and we keep an eye on him.  And he has a
3   specific role.  It's not -- he's not down there.  And the --
4   they haven't mentioned one member of our team, not one, that
5   presently is a member of our team that was involved in any
6   fraudulent conduct.  It would be questionable, for the reasons
7   I've already stated, even if they had.  But they haven't.
8           So, you know, our team, what they have done so far
9   is they have muzzled us so that we can't -- for example,
10  Ms. Lucy, her affidavit.  I would love to be able to talk to
11  my team about it and say, "Guys, what is this about Ms. Lucy?"
12  By the way, Ms. Lucy signed an engagement agreement.  And she
13  signed -- and she had her children photographed with DNI
14  cards.  And the engagement agreement is in Spanish and it's
15  not hard to read.  And it says, you know, that Mr. Shkolnik
16  and I are her lawyers.
17          There could have been a misunderstanding there.  I
18  don't know.  I don't know who -- I -- I believe it's the case
19  that nobody from our present team was involved in that.  But,
20  you know, they muzzle me so they -- they file this hearsay
21  affidavit.  I can't -- I can't -- I can't not depose the
22  person that prepared the affidavit.  It's by -- you know, I
23  don't want to go over it, you know, all the reasons why it's
24  inherently reliable, but it is.
25          And then I can't go and ask some of the people that

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1    they accuse of -- inferentially, by the way, because there is

2    nobody specifically from our team other than Careaga that was

3    named.  And Careaga is not in Peru.  He is in the United

4    States.

5          So they want you to cede control by appointing a

6    special master.  Judge, that would be immensely expensive.

7    Very time consuming.  It makes no sense.  And by the way --

8    well, let me go through the list.  They want you to trample

9    the attorney-client privilege of all the individuals that are

10   before you, you know, by -- this is, by my count, this is at

11   least the third time or certainly twice that they have asked

12   for these handwritten profiles.

13         And Your Honor could not have been any clearer.  And

14   I -- let me.

15         **THE COURT:**  Obviously I could have been.

16         **MR. RODRIGUEZ:**  No, you could not.

17         I just want to read from a transcript.  I can't say

18   it any better than you said it at that time which is similar

19   to what you just said now.

20         You say "There are obviously overarching" -- excuse

21   me.  You go into the history, the cases were removed.  And you

22   say:

23         "I'm sure you've seen, appreciated the fact that

24   I've separated each of them out, because this is not a class

25   action.  Each plaintiff's case shall stand or fall on their

1    own merits.

2        "There are obviously overarching issues.  I've

3    treated this case for a long time like I treat my MDLs.  You

4    know, we do have common questions, certainly, as to the nature

5    of the claim and there is, in fact, causation, but I'm not

6    going to enter an attorney-client privileged ruling on all

7    cases based on some cases.  The conduct in one case

8    wouldn't -- I couldn't, you know, waive the attorney-client

9    privilege for each of you or any one of you even if we shared

10   counsel.  So we have to start with that fact.

11       "Each plaintiff here is a distinct plaintiff with a

12   distinct claim.  While, obviously, the science of the claim

13   and the causation -- the causation may not even be the same.

14   And so it's my intention -- I still generally, just so you

15   understand, see the communication between counsel and their

16   clients -- and even the disclaimer was as to information and

17   not documents -- as protected by the attorney-client

18   privilege.

19       "But as you work these cases up in the trial pools

20   and discovery may show that waiver was affected by the way

21   information was gathered and disclosed, I'm willing to

22   consider that in the trial pool cases as they are worked up

23   for trial.  But I'm not going to reach this issue for the

24   reasons I just stated, on any global basis or conduct a global

25   in camera.

1          "But, obviously, as you do more particularized

2   discovery with each claimant, these issues may resurface, but

3   I'm not going to make a finding based on this motion.  So I'm

4   going to deny the global motion.  We'll reach the question on

5   a case-by-case basis as these cases are prepared for trial.

6          "So, obviously, for today, the motion is denied, but

7   one of the arguments for the plaintiff can't be later, 'Well,

8   you already ruled that.'.

9          "The answer is, no, I didn't.  I waited until there

10   was more particularized facts, with a particular plaintiff,

11   before I reached any issues as to waiver and whether the

12   document should be produced."

13          I think, you know, those comments are very timely

14   and they are still true today.  I mean, there is nothing --

15   there is nothing that they have shown that would change what

16   the words of Your Honor -- a lot of generalized statements by

17   a very unreliable source that was handsomely paid.

18          Now, one of the issues that I want to bring to Your

19   Honor's attention about the proposal that the plaintiffs have

20   made is it would really very adversely affect the case because

21   the people down there have been very much intimidated.  And

22   I've gone into this issue many times over the last few years.

23          If they start having -- if we -- if our team is the

24   people that they know is eliminated from the process as the

25   plaintiffs -- as the defendants suggest and if these, you

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15–CV–01704–RWS*

1   know, the service companies are brought in that they don't
2   know, I mean, it's going to be very counterproductive.

3          What you have had from the beginning -- and, again,
4   a little background I think would be helpful.  This smelter
5   hasn't been working in full capacity since, I think, 2009.
6   The -- it's decimated the area economically.  It's a really
7   sad state of affairs because a lot of those folks understand
8   they are being poisoned, but they don't want to cause waves.

9          Because if you have two choices, Judge, and one is
10  can you eat or you are going to die or be adversely affected
11  down the road because of lead poisoning, you are going to
12  choose eating.  And that's a choice a lot of these workers
13  made.

14         And it was a very difficult environment because --
15  and it's not -- you know, we contend it was Doe Run, but it's
16  not important.  It was a misinformation campaign that was
17  carried out blaming, you know, everything on the American
18  lawyers, blaming the fact that the smelter was still closed,
19  blaming the fact that the smelter couldn't be sold because the
20  American lawyers were litigating.  And it was the source of
21  all the problems in the community.

22         So the clients are already concerned and somewhat
23  intimidated.  So for now -- and, by the way, there's issues
24  that, you know, there's a lot of reasons why clients -- I'm
25  getting into another area but they kind of blend together, why

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1  clients drop out.  You know, there's -- a lot of them move out

2  of La Oroya.

3          The lawyers haven't been able, for the last two

4  years, we haven't been able to go and visit them, which we

5  used to do, Mr. Shkolnik and I in particular, several times a

6  year.  The intimidation factor, which I've already mentioned.

7  There's a lot of reasons.  I mean, just because people drop

8  out doesn't mean there's any fraud or anything untoward going

9  on.

10          Back to what we were talking about, the delay, the

11  factors or the procedures that the defendants want the Court

12  to consider.  I mention intimidation and various other points.

13  And, incredibly, they want you to consider these items without

14  allowing us to examine or to conduct the deposition on the

15  preparer of the affidavits and in this case, Jones Day, which

16  is the preparer of the Jones Day report.

17          Your Honor may remember, as it relates to Jones Day,

18  the first -- I think it was the very first status conference

19  we had about this in November of 2021.  They had a

20  representative there.  And Your Honor said, hey, if you're --

21  they were going to say something.  And Your Honor said, "If

22  you are going to say something, you have to either make an

23  appearance" --

24          **THE COURT:**  You either have to be subject to Rule 11

25  or subject to perjury, but I am not taking outsiders telling

1    me what's going on.

2         **MR. RODRIGUEZ:**  And you gave them a choice.  You

3    either, you know, make an appearance or swear.  You know, get

4    on the stand and we will swear you in.  They said, No, we'll

5    pass.  They didn't want to do that.

6         Again, you are -- this is the hearsay that they are

7    asking you to base these what I think are monumental and

8    draconian procedures.  And we haven't even had an opportunity

9    to cross-examine.  I would respectfully submit that even if

10   you are remotely considering this, we have to take their

11   deposition.  We've got to kick the tires.  We've got to see

12   what happened here.

13        **THE COURT:**  Well, let's focus on the verification

14   process.

15        **MR. RODRIGUEZ:**  Okay.

16        **THE COURT:**  I mean, at a minimum, we have 108

17   plaintiffs who we need to know about so we can go forward.

18   And there is certainly enough here to ask the question.  So I

19   know you have agreed that there could be a verification

20   process.  So let's talk about that.

21        **MR. RODRIGUEZ:**  Judge, I agreed and I still agree

22   because I just want to move forward.  Right?  I just want to

23   cut through all of the crap and move forward.  But had I --

24        **THE COURT:**  That's a legal term?

25        **MR. RODRIGUEZ:**  I'm sorry.  It is.  Excuse me,

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15–CV–01704–RWS*

1    Judge.  The junk.  Okay?

2          Look, had I known then what I know now, unless

3    you -- unless you -- when you ultimately ordered us to come up

4    with a proposal, but I even -- I think I even volunteered it

5    before you ordered it.  I'm not sure I would have volunteered

6    it had I known what I know today then.

7          **THE COURT:**  Tell me what you think or tell me what

8    your proposal is.

9          **MR. RODRIGUEZ:**  Okay.  My proposal is that we meet

10   the -- when I say we, my ground team in Peru meet with the 108

11   trial pool plaintiffs.  At that meeting -- and, obviously, I

12   don't think logistically, not all at one time but over a

13   period of a relatively short time.  They at that point they --

14   the -- it will either be a plaintiff that's over the age of

15   majority or it will be a guardian of a plaintiff.

16          And they will show up and they will show their DNI

17   cards, which is akin to Social Security, and I would think

18   even more important in Peru.  They would then -- we would

19   propose a statement that we could work on together with

20   defense counsel so that the statement would make it clear that

21   these persons are, by their own volition without being

22   coerced, are -- intend and want to participate in this

23   litigation.

24          And anything else that makes sense.  We would put it

25   on a whiteboard.  We would photograph them.  We would

1   videotape them.  They could articulate whatever the parties

2   felt was appropriate to articulate in the videotape.  We --

3   we -- we -- I mean, they suggested this as well, but I think

4   their suggestion is even more narrow than us, if I read their

5   proposal properly.  Or correctly I should say.

6           Our suggestion is we will sign -- every one of the

7   108 we will sign authorizations, and they can go get whatever

8   documents they want.  We -- it took us a long time and a lot

9   of hard work to get those documents, but they can do whatever

10   they want if they feel that any of those documents are suspect

11   from the 108.

12           I think their proposal was once they pick their 14,

13   that the 28 would have authorizations and then they would

14   go -- look, it really doesn't matter to me because we have

15   nothing to hide here.  And I think -- I'm looking for

16   something that you can kick the tires on and test and I think

17   it is a random test.  I mean, they picked half of them.  We

18   picked half of them.  It's a random test.  And you can see is

19   there this kind of widespread fraud that they are alleging,

20   which I strongly would -- I strongly believe is not the case,

21   Judge.  And the evidence that there is, is very suspect.

22           So what we suggest is it's not assuming that

23   everything they are saying is accurate because there's no

24   reason to do that.  I mean, it has not been tested, their

25   evidence.  But let's go through the initial process of 108.

1    Let's see what that reveals.  Your Honor even said, hey, after

2    that initial test we may have to do more.  We may.  I don't

3    know.  I suspect strongly that won't be the case.

4           This is very narrow in scope.  We are talking about

5    the 108.  We are talking about all of the documents involved

6    in that.  We can look at everything soup to nuts.  You know,

7    the profiles.  Once we get to the 28, we can do new profiles.

8    I mean, there's -- there's a way of dealing with this where we

9    don't derail the entire process.  There's a lot of cases here.

10   We would like to get to trial at some point.

11          So with the -- and if there is an issue, we will

12   find it.  If we -- if we go through the 108 and we find

13   there's very little to no problem, I think that's very

14   telling.  And the people that dropped out from the 108 -- from

15   120 to 108, I already went over the reasons, Judge.  There are

16   multiple reasons why people are dropping out in La Oroya.  You

17   can't imagine, unless you have been to La Oroya, it's not --

18   "Third World" doesn't do it justice.

19          Let me see if I have missed anything.

20          The plaintiffs' proposal, again, they -- it's --

21   they are putting the cart, you know, before the horse here.

22   Again, their proposal, they want you to buy -- hook, line and

23   sinker -- everything about the, you know, this hearsay

24   affidavit and this unreliable hearsay affidavit or the hearsay

25   report by Jones Day and the hearsay and unreliable affidavit

1    of Romero.

2              They want you to assume all of that is true.  And

3    they want to start from the position that there's widespread

4    fraud.  I want to start from the position, the plaintiffs, and

5    I believe we are entitled to that, to say, hey, we have to

6    look at something, let's look at it, let's see what we have

7    here.  And let's do it with 108 and let go from there.

8              This dual track at some point may be appropriate,

9    but let me steal one of my favorite lines from you, Judge.

10   "We're not there yet."  All right.  We are not there yet.

11   That's flat-out the truth.

12             **THE COURT:**  Usually it's "Don't borrow trouble,"

13   but . . .

14             **MR. RODRIGUEZ:**  There you go.

15             Judge, I think for now, there's -- I want to -- I

16   just have a list here.  I just see the list of why some of

17   these plaintiffs have dropped out.  They move out of La Oroya.

18   We are unable to locate them.  Some do fail to cooperate.  I

19   mean, the case, as far as they are concerned, the case is

20   taking way too long.  They don't understand why.  We haven't

21   been there because we can't visit so we can't give them any

22   comfort on that front.  Again, there's a lot of reasons that

23   are unrelated to, you know, any kind of fraud at all.

24             There was a series of -- I'm trying to find -- oh,

25   here it is.  There's a couple of things that I just can't let

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1    stand.  They -- they quoted me and they cut the quote short.

2    They said something like -- and, Judge, I don't have to find

3    it.  You are going to remember this.  We talked about it in

4    one of the Zoom conferences where I said, look, we're

5    attorneys.  Yeah, I can't say that an affidavit is not

6    evidence.  It is evidence of some kind.  It is evidence.  It's

7    the weight you give the evidence.

8           So I was making that point and they took that from

9    the transcript where I said there is evidence of fraud, if you

10   will, because that's an affidavit and it is evidence.  But how

11   reliable is it?  I went on to say, you know, what our point

12   is, is that it's completely unreliable, and you can't just

13   assume that what is in there is accurate.  So, you know, they

14   took me out of context there.

15          Let me just -- I tabbed some of the things in their

16   60-odd-slide presentation.

17          The Rojas, I can't -- I won't be able to respond to

18   Rojas until I can talk to my team.  I think I have already

19   covered that.

20          Any messages that anybody has on a computer.  I

21   mean, Romero met with these guys for 45 days with Defendants

22   and Defendants' counsel.  I'm not sure what the problem is.

23   If that evidence existed, they should bring it forward.

24          **THE COURT:**  Well, who wants to speak for the

25   defendants?  I have an idea what we should do next.  Join

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15–CV–01704–RWS*

1   Mr. Rodriguez at the podium.

2            **MR. RODRIGUEZ:**  I have worn out my welcome.

3            **THE COURT:**  No, if you want to keep reading, that's

4   fine.  One of my --

5            **MR. RODRIGUEZ:**  I get it.  No, no --

6            **THE COURT:**  One of my --

7            **MR. RODRIGUEZ:**  Hey, Judge, I'm not the smartest --

8            **THE COURT:**  One of my problems is I let everybody

9   say everything they want to say so they don't go to the Court

10  of Appeals and say "but if I only had a chance, I would have

11  told the judge this . . ."  And the other problem I have is I

12  was thinking, you know, being consistent, there is also a

13  saying "consistency is a hobgoblin of small minds."  But it is

14  important to have a focus and an orientation and a path to go

15  forward.

16           **MR. RODRIGUEZ:**  I'm not --

17           **THE COURT:**  So if you have more to say, I don't mean

18  to cut you off.

19           **MR. RODRIGUEZ:**  You know what?  I'm not the smartest

20  guy in the world, but I can take a hint.  I get it.  Thank

21  you, Judge.

22           **THE COURT:**  No, no, don't leave.  I want to --

23           **MR. SHKOLNIK:**  Your Honor, can I add one thing?

24           **THE COURT:**  Sure.

25           **MR. SHKOLNIK:**  I'll be quick.

1          Hunter Shkolnik for the plaintiffs.

2          Your Honor, the only point I want to add to

3   Mr. Rodriguez is during the presentation and in the affidavits

4   and the Jones Day, quote, report.  We keep hearing it as

5   "Jones Day report."  What they provided to you was, in

6   essence, an expert report that relied upon evidence that they

7   accumulated and are asking the Court to take action based on

8   that expert's report.  Unless they are lawyers of record,

9   that's the only way we can really phrase that.

10          If there is going to be reliance on an expert

11  report, a party has an obligation to provide the reliance

12  materials, provide all the documents that really serve as the

13  basis for it, and they have to produce the experts for

14  deposition.  So I don't think we really even should be going

15  down the road.

16          **THE COURT:**  30(b)(6) objection?

17          **MR. SHKOLNIK:**  I'm just saying, Your Honor, I don't

18  think we should be addressing it.  I think we should take the

19  Court's suggestion and let's move this case forward.  These

20  same issues are presented before Judge Perry.  In fact --

21          **THE COURT:**  Which issues are presented?

22          **MR. SHKOLNIK:**  I'm saying the issues about what

23  happened in La Oroya.  They have attempted to bring this

24  before Judge Perry and they are going forward --

25          **THE COURT:**  When I look at the docket sheet, I don't

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1    see much activity in front of Judge Perry.

2              **MR. SHKOLNIK:**  They have made the Court aware of the

3    Jones Day report.  Most of the -- all of the affidavit of Curi

4    occurred with respect to those plaintiffs, not our client.  It

5    had nothing to do with us.  Yet they submitted to this Court

6    as being the basis of some kind of fraud that we implicated.

7              Your Honor, they are digging a hole here trying to

8    find anything to attack the cases.  Judge Perry is letting

9    that case go forward.  I believe summary judgment motions and

10   *Daubert* motions are even going in this week.  There was delays

11   because of a death of an expert.  The case is moving forward

12   to trial.  If there's problems with any plaintiffs in the

13   pool, I think the discovery process will show that and then we

14   come back to you.  And that should be the goal here.

15             We have 108 cases.  Whether or not you lose 20

16   some-odd plaintiffs out of 128, you have been in other MDLs,

17   we have lost a lot more percentage-wise than that in cases.

18   So we would ask that we just get a process in place, look at

19   the 108, let's get a trial pool and a setting.

20             Thank you very much.

21             **THE COURT:**  We need to get the motions for summary

22   judgment and *Daubert* motions done.

23             **MR. SHKOLNIK:**  I mean the whole --

24             **THE COURT:**  There I'm borrowing trouble, but we need

25   to get through that first.

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1         **MR. SHKOLNIK:**  No, I understand.  I'm suggesting a

2    trial schedule that includes this discovery.  Thank you.

3         **MR. RODRIGUEZ:**  Judge, I have just one other item I

4    forgot to touch upon.  It has to do with the emergency motion.

5    I'm not going to argue it, but I would like to bring a couple

6    of things to Your Honor's attention, and I would like the

7    matter treated as an emergency and resolve expeditiously if at

8    all possible.

9         What's happening here is -- and counsel, Mr. Drake

10   is right that there was some reference to this in the Jones

11   Day report.  In the Jones Day report I think what was said was

12   something, words to the effect that the defendants hired

13   criminal counsel and criminal counsel brought this activity

14   that we have been talking about to the attention of law

15   enforcement.

16        And then there's another portion of the report that

17   I think references the fact that counsel is still in contact

18   and to -- criminal counsel for the defendants is still in

19   contact with law enforcement or something like that.

20        What was not said was the content of the affidavit

21   of the criminal lawyer that Plaintiffs retained which is that

22   she's -- we had one of our clients bring to us a document that

23   indicated that this was an investigation where the claimant

24   was the defense -- a guy by the name of Peña Flores, attorney

25   by the name of Peña Flores, who is counsel for the defendants.

*J.Y.C.C., et al. v. Doe Run, et al.* | *4:15-CV-01704-RWS*

1   He went down there -- the way their process works is somebody

2   can go and make a complaint and he can be actively involved in

3   the process.

4           So not only did he make a complaint, but he gave a

5   list of witnesses.  And the list of witnesses include --

6   Mr. Drake I don't think would purposefully mislead the Court,

7   but he is mistaken.  There are -- some of our clients, at

8   least one for sure and several, my associate has told me there

9   are several clients of the firms.

10          So he, Peña Flores, on behalf of the defendants has

11  asked to sit in on the process of interrogation, of

12  deposition, interview, whatever you want to call it, and he

13  can participate by not only formulating questions but actually

14  asking questions.  So it's *ex parte* communication with our

15  clients.  And it's ongoing.  It started March 16th.  I don't

16  know how many of them have already gone and gone through this

17  process, but that's why it's an emergency.  I want to put a

18  stop to that.

19          And I have also heard, recently, it's not part of

20  our motion, but I have more recently heard, since the motion

21  was filed, that some of our team members are saying that our

22  clients are being approached by lawyers to go to Lima and talk

23  about the -- talk about these cases and give falsehoods about

24  the process of -- the process of being -- of engaging lawyers.

25          So, look, you can't have *ex parte* communication with

1    our clients.  So what we are looking for, among other things,

2    is to cease that kind of activity.  And I hope Your Honor can

3    understand why.  I just wanted to bring it to your attention.

4          **THE COURT:**  I just wanted to focus on the

5    verification process right now.

6          **MR. RODRIGUEZ:**  I got it.

7          **THE COURT:**  Here is what we are going to do.  We

8    have gone an hour and 20 minutes.  I will take a 15-minute

9    recess.  We will come back.  We will talk about the next step

10   there, who is in, who is the focus.  Some of this will overlap

11   because it was the discussion about a special master.  I think

12   how we manage it can also focus on the original fact sheets.

13   We will put the Jones Day report aside.  These are the matters

14   that are fully briefed.  Then you have another protective

15   order as to an individual plaintiff.

16          So we will see you, let's say, at 11:40.

17          (At this time, the Court declares a recess.)

18          **THE COURT:**  Mr. Rodriguez, perhaps Mr. Drake.  It's

19   not up to me.  But whoever . . .

20          So some new observations today.  But I have not been

21   persuaded that we are at the point where a special master is

22   necessary.  We are going to pursue the verification process

23   proposed by the plaintiff and we are going to stay focused on

24   the 108 trial pool plaintiffs and see where it takes us.

25          I read the last paragraph of Mr. Romero's affidavit

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1   in which he said, despite having said there's a couple hundred

2   here and a couple hundred there, he concluded with the -- he

3   thought there was a total of 200 plaintiffs that may have

4   trouble, but that's out of more than 2,000 and actually more

5   than 3,000 when we count the *Reid* case.

6          And I think we are going to find out a lot.  You are

7   going to get to test the plaintiff fact sheets when you do

8   discovery of the trial pool plaintiffs.  There could be

9   explanations or there may not be.  But you are going to get to

10  find out if the changes are a result of something nefarious or

11  a simple mistake.  But that's how we are going to have to stay

12  on track to pursue this case.

13         I'm going to leave it to you all to send me an order

14  on what the verification process is.  I would say by next

15  Monday, if you can't agree, then send me your -- each proposed

16  order.  You haven't -- we may have talked about this at the

17  beginning, but I'm a baseball arbitrator on protective orders.

18  I will pick one.  And that way it keeps you kind of close to

19  the middle.  Whoever's is the least unreasonable is the one I

20  will adopt.  But I think you all can figure out and you should

21  be able to figure out this verification process based upon the

22  proposal made by Plaintiffs' counsel.

23         And we will see where it takes us.  It may blow up

24  and it may be not with a bang but a whimper but we will see.

25  I am not precluding that this gets bigger, but we are not

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1   going to do two tracks yet.

2         The epiphany today actually to go back to the

3   beginning, when you were concerned about the ability to

4   resolve the case, if possible, and I understand and it's not

5   lost on me, you don't want to be paying people who really

6   shouldn't be in the room for whatever reason.

7         When the NuvaRing case settled it was $100 million

8   and we retained a special master who then reviewed the claims.

9   And there was a different complication.  And it may manifest

10   itself here because I don't know yet.  The use of NuvaRing

11   device could cause a DVT, stroke or heart attack.  You

12   obviously don't treat those the same.  The special master,

13   based on the medical records, will make a determination about

14   whether the claimed injury was even actually within the zone

15   of causation or not.

16         A number of people didn't participate.  Then when

17   they got put to it, they didn't have the medical records or

18   the background to justify pursuing a claim out of the

19   settlement pool, but the settlement amount was capped.  And

20   then the special master made a determination about in the end

21   who was going to participate and who was not going to

22   participate and how much.

23         So whether or not that's a model here, I don't know.

24   But there the defendants capped their liability and then had

25   the exercise of diligence to make sure there were no --

1    there's -- in MDLs especially, there's always hangers-on who

2    show up and, look, you know, they think they will get glommed

3    on with the bunch.  And we don't want that.

4         So that's just -- when you were discussing the

5    inability to resolve the case for lack of clarity, perhaps

6    it's not "whether," it's "when" we get to that question.

7         You know, you can pursue the issue with the

8    individual plaintiffs as to individual discovery.  We are not

9    going to do discovery -- there was a motion for protective

10   order on a couple of plaintiffs, W.M.B.E. [sic], and there

11   were some odd questions.  Just pace yourself a little bit

12   about asking that individual plaintiff who is on the

13   plaintiffs' team and how it was constituted and who was hired

14   and when they were hired.  That may -- I don't know how to get

15   at that, but I'm not sure it's through an individual plaintiff

16   in the case.  But you may want to talk about how to do that.

17        Given what I decided today, I don't know if there's

18   any real reason to pursue the Jones Day issue.

19        **MR. RODRIGUEZ:**  Judge, the -- primarily, no.  But

20   the one issue that I'm interested in that we don't have, which

21   should be simple enough, is just getting the information about

22   the monies that were paid to the law firm, the criminal law

23   firm that was hired for Romero.

24        Look, for right now, if we are going to pursue this,

25   we can table that and come back to it later.

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1    **THE COURT:**  Right.  Let's put that aside.  I don't

2   think it's really relevant to getting the trial pool.

3       **MR. RODRIGUEZ:**  I just want to be clear.  The motion

4   for protective order, they served a ton of discovery on

5   essentially on the lawyers.  Because if you look at the

6   questions, it's just --

7       **THE COURT:**  Right.

8       **MR. RODRIGUEZ:**  Are we tabling that for now until we

9   go through this process?

10      **THE COURT:**  Well, I'm not going to prejudge

11  anything, but certainly to the extent discovery is propounded

12  to people outside the 108, the protective order is granted.

13      **MR. RODRIGUEZ:**  Okay.

14      **THE COURT:**  And that was my understanding.

15      I'm a little concerned about the difference in the

16  understanding of who is being interviewed in Peru by the

17  prosecutor.  I had great relief, Mr. Drake, when you told me

18  the only people they were talking to were those who had been

19  dismissed with prejudice from this case.  That's none of my

20  business.

21      To the extent that there are, advertently or

22  inadvertently, people who are current plaintiffs and clients,

23  obviously your counsel and any of your agents cannot

24  participate in their interviews.  That would be an

25  inappropriate *ex parte* communication.

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1          **MR. DRAKE:**  Can I address that, Your Honor?

2          **THE COURT:**  Sure.

3          **MR. DRAKE:**  Can you hear me okay?

4          Yes, Your Honor.  That's correct, that all of the

5   plaintiffs were dismissed with prejudice.  Perhaps there's a

6   disagreement there.  I don't know.

7          **THE COURT:**  We just need to -- you know, compare

8   notes before you leave today to make sure there's no

9   confusion.  To the extent they have been dismissed, you know,

10  that's of no concern.  Obviously, you know, you can't have

11  *ex parte* communication with his client.

12         **MR. DRAKE:**  Well, that's right.  Certainly, Your

13  Honor.  I'm not sure if those ethical rules apply directly to

14  a lawyer --

15         **THE COURT:**  Well, they will apply in this courtroom

16  if you have a lawyer or an agent participate in an *ex parte*

17  interview.  That's all I'm saying.

18         **MR. DRAKE:**  Understood.

19         **THE COURT:**  I'm not going to become an expert in

20  Peruvian law, but as far as we are concerned, we are not going

21  to backdoor our rules.

22         **MR. DRAKE:**  The only other thing I wanted to note on

23  that, just to clarify the process in Peru, is as I understand

24  it, the representative, the lawyer, the Peruvian lawyer who is

25  acting on behalf of the defendants in Peru cannot participate

1   in those sessions.  Like, he can't ask questions.  He is

2   just -- he sits there.  And so that was just another factual

3   inaccuracy.

4           **THE COURT:**  If they are an active client, I don't

5   want them in the room when they are interviewed by prosecutors

6   or law enforcement.

7           What other loose ends do we have?

8           When should we get together again?  Because the next

9   step, we will get the verification process completed.  What is

10   your time frame for that?  Do you think you can do that in

11   60 days?  90 days?

12           **MR. RODRIGUEZ:**  You know I'm ambitious.  I would

13   like to -- first of all, it depends how quickly we can get

14   together with the defendants and come up with, you know, a

15   proposal that we both agree with consistent with the proposal

16   made by Plaintiffs.  But I would say 60 days, Judge, just to

17   be aggressive.

18           **THE COURT:**  To get back together again?

19           **MR. RODRIGUEZ:**  If we have -- I mean, let's shoot

20   for 60 and let's see what happens.

21           **THE COURT:**  So that puts us to late May.

22           **THE DEPUTY CLERK:**  Twenty-third is exactly 60 days.

23           **THE COURT:**  What day of the week is that?

24           **THE DEPUTY CLERK:**  It's a Monday.

25           **THE COURT:**  Do you want me to avoid Mondays?  I

1   don't want to ruin people's Sunday because they have to come

2   to St. Louis on Monday.  I would see that as a privilege, but

3   you may not see it quite the same way I do, and I don't have

4   the baseball schedule in front of me.

5          **MR. RODRIGUEZ:**  The only thing I ask is the weather

6   be better today.  I don't want weather --

7          **THE COURT:**  This "return to normal" didn't turn out

8   as planned.

9          **MR. RODRIGUEZ:**  Look, it's a small ask.  I don't

10  want to have to take an Uber if I'm staying at a hotel a block

11  away from the courthouse.

12         **THE COURT:**  Are we wide open on that day?

13         **THE DEPUTY CLERK:**  The 23rd, you have nothing set.

14         **THE COURT:**  So 10:00 on the 23rd.  Are the Cardinals

15  in town?

16         **THE DEPUTY CLERK:**  Yes.  The 22nd.  And they play

17  the 24th, not the 25th.

18         **THE COURT:**  Who do they play on Sunday?

19         **THE DEPUTY CLERK:**  On Sunday they play the Pirates.

20         **THE COURT:**  I wouldn't waste my time going to a

21  Cardinals/Pirates game.  Who do they have on Tuesday?

22         **THE DEPUTY CLERK:**  They play the Blue Jays on Monday

23  at 6:45.

24         **THE COURT:**  That will be good.  They play Toronto in

25  St. Louis.

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15–CV–01704–RWS*

1    **MR. RODRIGUEZ:**  A couple of years ago when we had a

2    status conference, I got great seats for the game and then we

3    moved the status conference at the last minute.  I haven't

4    tried again, but I'm a big baseball fan and I have never been

5    to a game in St. Louis.

6        **THE COURT:**  The Blue Jays/Cardinals will be good

7    that Monday.

8        And I really -- like today, I have to say, where I'm

9    sitting, I didn't hear anything today that ought to be sealed.

10   So I need to have a better understanding of what you are

11   concerned about.

12       **MR. DRAKE:**  Sure.  We can file those papers, Your

13   Honor.  They would really be the same arguments that we

14   offered in our motion to seal that Your Honor granted at the

15   time we filed the Jones Day report, which is that the

16   individual witnesses in Peru have significant safety concerns.

17   They have been chased with guns through the streets and we

18   want to ensure that this information remains as private as it

19   can be.

20       **THE COURT:**  So that means just redacting a few

21   names, I think, perhaps.

22       **MR. DRAKE:**  Well, we have obviously, for all of our

23   filings over the last couple of months, we have been serving

24   redacted versions and trying to comply with Your Honor's

25   orders.

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1          **THE COURT:**  That's my -- just managing expectations,

2   that's my kind of view of that.  If it's a safety concern,

3   let's make sure that that portion that would imperil someone

4   personally --

5          **MR. DRAKE:**  I don't.

6          **THE COURT:**  -- is redacted.

7          **MR. DRAKE:**  My original motion or request this

8   morning probably wasn't as much out of concern for the

9   transcript itself as if there was a member of the media

10  sitting in the audience and writing an article and using

11  people's names.  That was the concern.  I don't know that that

12  happened, but . . .

13         **THE COURT:**  I will let you know --

14         **MR. DRAKE:**  I don't know how interesting this is.

15         **THE COURT:**  If Robert Patrick is here, I will let

16  you know.  We are one of only five cities left in the country

17  where the reporter for the daily newspaper who is dedicated to

18  covering federal court.  It's a dying breed, but we still have

19  one.

20         **MR. RODRIGUEZ:**  Am I able to communicate with my

21  team in Peru?

22         **THE COURT:**  Any reason why he shouldn't be allowed

23  to communicate with his team in Peru?

24         **MR. DRAKE:**  Well, for all of the reasons we

25  articulated in that original motion to seal, Your Honor.  We

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1   stand by those.  There are significant safety concerns.  I

2   don't know who would be chasing Mr. Romero around the streets

3   with a gun, but we are worried about him.  And we want to make

4   sure that doesn't happen.  That is why we asked to seal all of

5   this.  That's why we have asked them not to reveal this.

6          **THE COURT:**  Okay.  So by your team, you are not

7   including Mr. Romero; correct?

8          **MR. RODRIGUEZ:**  No.  It's just our ground team, you

9   know, in Peru from La Oroya.  We have like six members.

10         **MR. SHKOLNIK:**  Your Honor, if I can add something

11   here without walking up.  Mr. Romero we know has a fairly

12   checkered history in the town.  Whether or not someone is

13   chasing him with a gun is probably not surprising.

14         La Oroya, having been there a lot, and I'm sure -- I

15   don't think any of the counsel here have spent much time

16   there.  People with guns, unfortunately, and stopping people

17   from going places are not uncommon.  To suggest that we in any

18   way, in any way are involved in Mr. Romero, being involved

19   with something to do with guns or his life is really just -- I

20   mean, now it's going too far.  It really is.  It's an -- there

21   is unsafe --

22         **THE COURT:**  Well, look, I'm not going to be a party

23   to endangering someone's safety, so I need to entertain this.

24         **MR. DRAKE:**  It would also be helpful, perhaps, to

25   just get the names of the six people on their team who work in

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1    Peru.

2          **MR. SHKOLNIK:**  Your Honor, why -- it's now getting

3    to the point where why don't we have the name of everyone at

4    Jones Day that's down there on the street.  Why don't we have

5    every King & Spalding lawyer who is on the street in Peru.

6          **THE COURT:**  What I would rather hear about is to

7    allow you to communicate with your team, but tell me how you

8    are going to protect Mr. Romero in the process.

9          **MR. RODRIGUEZ:**  I mean --

10          **THE COURT:**  I mean, he is not the focus of what you

11    are talking about.

12          **MR. RODRIGUEZ:**  No.  No, no.

13          **THE COURT:**  So let's say you can talk to them, but

14    you are not going to discuss Mr. Romero in any fashion.

15          **MR. RODRIGUEZ:**  I mean, I -- Judge --

16          **THE COURT:**  You need to be able to talk to your

17    people.

18          **MR. RODRIGUEZ:**  Yes.

19          **THE COURT:**  They have articulated their safety

20    concern about Mr. Romero.  Let's not make Mr. Romero the topic

21    of discussion.

22          **MR. RODRIGUEZ:**  I will keep Romero out of it.

23          **THE COURT:**  That's all.

24          **MR. DRAKE:**  I didn't mean to interrupt.

25          And Ms. Rojas as well.  I mean, for all the same

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

1    reasons, especially while the Peruvian investigation is going

2    on, we don't think the plaintiffs' team should be

3    communicating with her.  That's for certain as well.

4            **THE COURT:**  Is Plaintiffs' team communicating with

5    her?

6            **MR. DRAKE:**  Correct.

7            **MR. RODRIGUEZ:**  I mean, I -- Judge, as I sit here

8    now, it wasn't my intent to have the plaintiffs' team

9    communicate with her.  But it just -- it is galling that --

10   who are they concerned about?  Articulate a concern.  It

11   certainly can't be that the lawyers -- our team, we have

12   females.  I think we have a male.  I mean, what are they

13   concerned about?  How does this relate to our team?  I just

14   don't understand.

15           There could be some issues, you know, like

16   Mr. Shkolnik said, but it's 100 percent totally unrelated to

17   our team.  Our team is not creating a health problem --

18           **THE COURT:**  I don't know enough.

19           **MR. RODRIGUEZ:**  -- or safety problem for Mr. Romero.

20           **THE COURT:**  I don't know enough to know.  I want you

21   to be able to communicate with your team.  All I'm asking is

22   you don't talk about Mr. Romero.  For the time being, until I

23   get a better fix on this, don't communicate directly with

24   Ms. Rojas.

25           **MR. RODRIGUEZ:**  Yes, Your Honor.

1          **THE COURT:**  Beyond that, I want you to be able to

2   work with your people.  We have a lot of work to do.

3          **MR. SHKOLNIK:**  Thank you, Your Honor.

4          **THE COURT:**  Anything further?

5          **MR. DRAKE:**  No, Your Honor.

6          **THE COURT:**  All right.  See you in 60 days.

7          (The proceedings concluded at 12:04 p.m.)

*J.Y.C.C., et al. v. Doe Run, et al. | 4:15-CV-01704-RWS*

<u>CERTIFICATE</u>

I, Reagan A. Fiorino, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 66 inclusive and was delivered electronically and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 31st day of March, 2022.


*/s/ Reagan A. Fiorino*
Reagan A. Fiorino, RDR, CRR, CRC, CCR
Official Court Reporter