**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| J.Y.C.C., **et al.**, | ) |
| | ) |
|     **Plaintiffs**, | ) |
| | ) |
|     **v.** | ) |
| | ) |
| | ) No. 4:15-CV-1704 RWS |
| DOE RUN RESOURCES CORPORATION, **et al.**, | ) |
| | ) |
| | ) |
|     **Defendants.** | ) |

**MOTION AND STATUS HEARING**
**BEFORE THE HONORABLE RODNEY W. SIPPEL**
**UNITED STATES DISTRICT JUDGE**
**JULY 19, 2022**

APPEARANCES:
For Plaintiffs:     Francisco R. Rodriguez, Esq.
                   RODRIGUEZ TRAMONT & NUÑEZ
                   255 Alhambra Circle, Suite 1150
                   Coral Gables, FL  33134

                   Hunter J. Shkolnik, Esq. (By Phone)
                   NAPOLI SHKOLNIK PLLC
                   1302 Avenida Ponce de Leon
                   Santurce, PR  00907

(Appearances Continued on Page 2.)

REPORTED BY:        SHANNON L. WHITE, RMR, CRR, CSR, CCR
                   Official Court Reporter
                   United States District Court
                   111 South Tenth Street, Third Floor
                   St. Louis, MO  63102
                   (314) 244-7966

PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

APPEARANCES CONTINUED:


For Defendants:        Geoffrey M. Drake, Esq.
                       Rania Kajan, Esq.
                       Andrew T. Bayman, Esq.
                       KING & SPALDING, LLP
                       1180 Peachtree Street, N.E., Suite 1600
                       Atlanta, GA  30309

                       Tracie J. Renfroe, Esq.
                       KING & SPALDING, LLP
                       1100 Louisiana Street, Suite 4100
                       Houston, TX  77002

                       Thomas P. Berra, Jr., Esq.
                       LEWIS RICE LLC
                       600 Washington Avenue, Suite 2500
                       St. Louis, MO  63101

                       Edward L. Dowd, Jr., Esq.
                       DOWD BENNETT LLP
                       7733 Forsyth Boulevard, Suite 1900
                       Clayton, MO  63105

**(THE FOLLOWING PROCEEDINGS STARTED AT 10:04 AM:)**

THE COURT: Good morning. So we're here this morning in the case styled J.Y.C.C., et al., against Doe Run Resources Corporation, et al., Cause No. 4:15-CV-1704. Would counsel make their appearances, please.

MR. RODRIGUEZ: Good morning, Your Honor. Frank R. Rodriguez from the law firm Rodriguez, Tramont & Nuñez on behalf of the plaintiffs.

THE COURT: You might want to get closer to a microphone.

MR. RODRIGUEZ: I'm sorry. Frank R. Rodriguez from the law firm of Rodriguez, Tramont & Nuñez on behalf of the plaintiffs.

THE COURT: Very good.

And Mr. Shkolnik is on the phone; is that correct?

MR. SHKOLNIK: Yes, Your Honor. And thank you so much for allowing me this --

THE COURT: Well, no. It's a self-preservation decision.

MR. SHKOLNIK: Thank you. I understand and appreciate this.

THE COURT: All right. On behalf of the defendants?

MS. RENFROE: Tracie Renfroe with King & Spalding on behalf of all the defendants.

MR. BAYMAN: Good morning, Your Honor. Andrew Bayman

also of King & Spalding on behalf of all the defendants.

MS. KAJAN: Rania Kajan from King & Spalding as well on behalf of the defendants.

MR. DRAKE: Good morning, Judge. Geoffrey Drake from King & Spalding for the defendants.

MR. DOWD: Morning, Judge. Ed Dowd for the Renco defendants.

MR. BERRA: Morning. Tom Berra, Lewis Rice, for the Doe Run Resources Corporation and the Doe Run Resources individual defendants.

THE COURT: Very good.

So on the proposed agenda we have first up the verification process for initial trial pool plaintiffs. Who wants to lead off on that?

MR. DRAKE: We can both come up, however you'd like.

THE COURT: You can both come up, and I'm sure we'll have a conversation.

MR. DRAKE: Well, perfect.

[Court security officer pulling extension from the podium.]

MR. DRAKE: Good morning, Your Honor. Geoffrey Drake.

THE COURT: She'll also "wrastle" you down if you misbehave. She's a full-service court security officer.

MR. DRAKE: Okay. Well, I will try to be on good behavior, then.

THE COURT:  Yeah.  Well, it's always a good idea to be on good behavior.

MR. DRAKE:  Well, good morning, Judge.  The last time we were here was May 23, and the verification process for the --

THE COURT:  You think I forgot?

MR. DRAKE:  -- for the 108 initial trial pool plaintiffs had just begun at that particular point in time, and it's now concluded.  The last meeting was on June 4, I believe.

And Your Honor will recall that at that hearing the plaintiffs frankly attempted to derail the verification process by filing an emergency motion the day before the hearing, or the couple days before the hearing, citing various safety concerns that they believed were in play and that perhaps would inhibit their clients' ability to get verified.

And as Your Honor will recall, you offered to postpone the verification process.  The plaintiffs declined and withdrew that request and said that they would proceed. And Mr. Rodriguez even represented and recognized at the hearing that he didn't believe that anybody was actually in danger or had any safety concerns.  And from there, we had a meeting of the minds that we would proceed with the verification process.

So that's now done, and as we predicted and as

Mr. Rodriguez recognized, I think those concerns proved to be somewhat alarmist and incorrect. As expected, there were no incidents, as far as I'm aware, at any of the verification meetings. They all went off without anybody being put into danger or their safety being compromised.

But as Your Honor has perhaps seen, we did file a motion last week. We recognize that motion is not ripe. It hasn't been briefed, and we don't intend to argue the substance of it today.

But there were various issues at the verification process that the defendants have issues with, actions taken by the plaintiffs that we believe are of concern; namely, 15 percent of the plaintiffs didn't get verified. So we filed our motion that will be, I'm sure, ruled upon in due course that those plaintiffs should be dismissed.

And we also moved to dismiss the 41 plaintiffs who were verified outside the presence of our observer who, for various reasons, was not able to attend all the sessions. There are kind of two different reasons for that. The first was inaccurate information provided by plaintiffs in terms of the locations of the meetings, and the second was a last-minute location change where the plaintiffs simply switched the location on us the morning of the verification meeting.

So that motion is out there. I believe plaintiffs

have until next Wednesday or so to respond, and so we'll take that up in due course.

The one issue, though, that we did want to raise today that we believe is ripe for adjudication -- and we've conferred with plaintiffs about this; we did so last week; and we both agreed that it would be ripe to adjudicate today -- is that of one aspect of Your Honor's order that relates to the authorizations for the medical, employment, and educational records.

And, Your Honor, I did bring a copy just to -- so we have it printed out, because I think it will be of help, of Your Honor's verification order.

If I may approach?

This is Your Honor's order at Docket 622. And on the second page, I took the liberty to highlight one particular passage that's relevant to today's discussion, which is that the adult ITP plaintiffs or parents or guardians will be required to sign new authorizations that have been previously approved by this Court for the release of medical, school, and employment records, authorizing defendants, should they choose to do so, to require and obtain any records or documentation of the ITP pool.

And the operative language there, I believe, Your Honor is "any records." And as Your Honor will recall, the letter and the spirit of that order was to address the

concerns that we had raised at prior hearings and in prior submissions regarding the allegations of fraud that's been committed by the plaintiffs' representatives in Peru, that we would get new authorizations for all the records for the ITP plaintiffs and we could go do our best to collect them and we could see what -- and then we would have comfort in knowing that the records that we have are not tainted at all by the evidence of fraud.

The plaintiffs have now taken the position that they got all those authorizations signed at the meetings, as they were required to do under the Court's order, but they won't give them to us, at least without some significant concessions.

So the first, Your Honor, they said that we have to identify for the plaintiffs particular providers that we want to get the authorizations for.

I said, well -- in response to that, well, what's the concern?

And they said it would be too much work to fill out the names of all the providers on each authorization.

So we offered to do that for them.

They said that that was not acceptable and that instead they need a list of the providers that we believe should be included in these authorizations because the Court-ordered authorization, as you would expect, includes a

line that requires you to enter the name of the provider that would be for whom the records would be collected.

And we said, well, we'll just send you a list of all the providers for all the plaintiffs. We all have that list.

We've been back and forth, as Your Honor will recall and Mr. Rodriguez will remember, over the completeness of record collection for some period of time.

And they said, well, we're not going to give you all of the records. You have to identify which particular providers you want to collect from because you believe there is evidence of fraud.

And that was not the letter or the spirit of Your Honor's order.

So I don't believe that briefing on that particular issue is needed, although we can do so if Your Honor would like. But we conferred with plaintiffs and would like to try to get that issue resolved so we can get the authorizations, combining that with, presumably, at the next conference addressing our pending motion, and then at that point we will know what the universe is of plaintiffs in the ITP that are verified and proceeding. We will be able to collect their medical records and education records over the course of however many days. And we're happy to confer with plaintiffs on that. And then we can move the case forward again in terms of next steps for the ITP.

So with that, I'll pass the microphone to Mr. Rodriguez.

MR. RODRIGUEZ:  Thank you, Counsel.

Yeah, Judge.  Let me address that last point first.  And I'll get into the details of the verification process.

What our team did is, when the various plaintiffs or their guardians came for the verification process, they had them sign blank authorization forms.  And so we have the requisite number of blank verification forms.  We followed the court order.

Now, for us to fill in, to go through all of the profiles and get all the various -- you've got a bunch of different schools -- at least three, if not more -- for each plaintiff.  You have employment records, multiple employment records at times.  You have postgraduate records.  You have medical records from multiple facilities.

We have the authorization forms.  All we're asking is, if they have any specific concerns, to let us know and then we'll fill in the information and give it to them.  We don't want to give them blank authorization forms, Your Honor.  I think Your Honor can appreciate that.

And I think we did comply fully with the order, the spirit of the order and the letter of the order.  We have the authorization forms signed.  We're ready to give it to them.  We want to know which ones they have a problem with.

I think it would be interesting for purposes of -- and we're going to talk a little more about that, I think, during the course of the status conference; but, you know, delay is an issue, and they're accusing us of delay.  I think this kind of stuff is certainly delaying the litigation.  I think, if they have a concern and there's a basis for their concern, they should tell us.  Those are two different issues.

If they have a concern and they give us a list, we'll give them the authorizations.  If we think the list is too onerous, we'll bring that to the Court's attention.  But we're not going to hold back if they give us a list of the institutions that they want authorizations for.

Okay.  With regard to the silent observer, counsel is just flat-out wrong.  You know, they had a -- they hired a silent observer who wasn't from the area.  We gave them the correct address for the verification meeting.  Your Honor may recall that in real time, when we were here on May 23, I, in open court, said, "The verification process has started." They knew it had started because I told them, and I told the Court, and it was scheduled to start.

We didn't get notified until the Tuesday -- that was Monday -- until Tuesday at three o'clock they sent us an email and say, "What the heck's going on here?  Why did you give us the wrong address?  The guy's in the wrong place."

I said, "We didn't give you the wrong address."

12

We had emails back and forth.  And then the gentleman found his way, finally, in the afternoon on Tuesday.  Through no fault of ours.  We gave them the right address.  The guy just got lost.  He wasn't from the area.  Maybe they should have gotten somebody from the area or somebody that would have asked and he would have found the right place.

So, I mean, the record speaks for itself.  We told the Court and we told them, "Process has started."  They had no basis to believe that it hadn't started.  All they had to do was reach out to us, and we would have figured it out and identified what the problem was, and we would have told them where to go.

Now, that particular concern is -- I mean, look, here's what we have, Judge.  You had an order, and the order required -- I mean, it was very specific.  It required that the ITP plaintiff, if they are the age of majority, the plaintiff, or, if not, their guardian or parent, they had to go to a location that was mutually agreed.  We did that.  They had to have their pictures taken in front of a white board, with their name, date of birth, DNI number, and a statement that was mutually agreed upon by the parties that required the adult plaintiff or the guardian to confirm each individual's name, date of birth, DNI number, and that they were voluntarily proceeding with their claims currently pending before this Court.

Now, each ITP plaintiff or guardian -- now, there were 92 out of 108 -- and I'll get to that in a second -- that actually were verified. Each of those 92 took a picture in front of the white board. Each of the 92 read a mutually agreed-upon statement for a video recording. All of this was recorded on video, and it was produced to the defendants.

And in addition, the ITP plaintiffs or their guardian signed a verification form that was not part of the Court's order, and it was a verification form that the defendants had requested. It's pretty lengthy. I thought about reading it.

But I think for purposes of, you know, of being efficient with this, just let me say it was word for word as the defendants requested, you know, saying their name again; that they were here on their own free volition; that they had signed these documents themselves; that, you know, the person verifying had retained the attorneys. They had questions that they had to answer yes or no. Anyway, it was very, very detailed.

And at the end, it was read to -- and by the way, this was read to them -- and this is all on video, Judge -- it was read to them in Spanish, and they went ahead and signed it. And at the end, it said: I understand that lying on this document constitutes a crime that has penal consequences, et cetera, et cetera.

So, I mean, not only did these 92 comply with the

14

court order, but we went above and beyond by agreeing to sign a verification form that was drafted, prepared by the defendants.  And all this was videotaped.  So the fact that you had one of their -- or their silent observer who got lost -- and it's his fault, not ours -- and wasn't there, but in fact they're not prejudiced because all this is on videotape.  So they can see it.  You know, they can see everything.

So the fact that they would -- we certainly don't agree that any of these, the 41 that they -- that their silent observer didn't attend the verification process for should be dismissed.  I mean, I think that's a non-issue.

By the way, Judge, of the 92 -- I'm sorry -- of the 108 that were -- where we attempted to verify, the 16 that were not, that did not verify, five were relatives of Richard Romero and purposely -- because of the circumstances that Your Honor is aware of with Romero and, you know, he's hostile to the team and to the plaintiffs' lawyers -- purposely did not reach out to those folks until the last minute.  And, you know, not surprisingly, none of the five relatives of Romero.

So when you look at the percentages, it's really 92 out of 103.  And if you consider the headwinds, you know, you consider the fact that litigation has been going on for quite some time and the smear campaign which we'll get into a second that was carried out in the social media, the media, the

intimidation campaign -- and by the way, Judge, because I'm not one for drama.  And in that hearing or the status conference, I came before Your Honor and I said, look, I really don't think that there's -- these people are at the risk, because I don't, you know, because I saw some of the social media comments.  If there would have been more activity on social media, I would have been more concerned myself.

That doesn't mean they weren't concerned.  That doesn't mean they're not intimidated.  I can tell you flat out, as an officer of the court, my team was telling me they were very, very concerned for their safety.  I would not have gone forward with the process if I thought that there was any risk at all to them.  I didn't think there was, realistically, but they thought there was.  That's the key -- not what I think, what they think.  They were intimidated.  They were concerned.  I'm talking about the team members and also the plaintiffs.  And the fact that we got 93 out of really 103 or 92 out of 103, I think, speaks volumes.

THE COURT:  Do we agree on the 16 that, after all this, we've done everything we can and they're ripe to be dismissed?

MR. RODRIGUEZ:  That's -- Judge, we'd like the opportunity to respond but -- to the motion that's pending. But -- but, Your Honor, my inclination --

THE COURT:  You'd like the opportunity to respond,

16

but --

MR. RODRIGUEZ:  Yes.

THE COURT:  -- you know, but there is an end to the line.

MR. RODRIGUEZ:  It is, Judge.  And we're thinking we want to just confirm a couple things, and we're thinking along those same lines.  We don't necessarily disagree in principle. We just want to see each individual circumstance and see if there's any reason why we -- you know, again, the individual circumstances matter.

THE COURT:  So, Mr. Drake, the question for you is -- and maybe for both of you.  It's hard for me today to know what really happened.  You've presented fact patterns that are inconsistent.  The Venn diagrams don't intersect other than your observer was present for the majority of them.  Certainly you've identified 57; so maybe 41 that were not -- your observer wasn't there.

The reason we went through this exercise is your concern that there's fraud in the cases; these people aren't serious; there were perhaps misrepresentations that got them to sign up.

You now have a videotape of each of these people, whether your observer was present or not, you can show them at a deposition because at some point we need to try these cases. I mean, I can't decide, based on what's in front of me, what

17

happened that day or those days.  You understand that.

MR. DRAKE:  Yes.

THE COURT:  But we now have these people on videotape saying, "Yes, we want to proceed."  So the threshold question that you were concerned about that either they weren't real or they didn't know what they were doing or that they were somehow misled into participating -- we've crossed that threshold whether your observer was there or not.

MR. DRAKE:  Well --

THE COURT:  And you'll be able to show them the videotape at their deposition.

MR. DRAKE:  Well, we are a bit concerned still for a few different reasons, Judge.

THE COURT:  Okay.

MR. DRAKE:  The first is, I think, our concerns, you know, to have 15 percent of the population of the key group that apparently just produced medical records, educational records over the last year, to not participate in this process is, we believe, quite telling.

THE COURT:  They didn't show up.

MR. DRAKE:  They didn't show up.  Understood.

THE COURT:  I don't know enough to know what to take away from that.  What I do know is that, out of the 108, we have videotapes from 92.

MR. DRAKE:  We do, Your Honor.  But the concern that

we have -- there are two issues, and Mr. Rodriguez didn't address the second one.

THE COURT: Okay.

MR. DRAKE: There's not just the issue about this we'll call it, just to be generous, "confusion" over the location. And we submitted an affidavit from our observer in connection with our papers. The plaintiffs haven't submitted any supporting evidence, and maybe they will.

THE COURT: The time to respond hasn't come. We take nothing --

MR. DRAKE: Yes. And, Your Honor, the other issue that's spelled out in our papers which Mr. Rodriguez didn't address is that one of the days our observer showed up at the correct location. He then got there, he called us, and said, "There's nobody here."

We immediately reached out to Mr. Rodriguez and Mr. Lanciotti, and they said, "Oh, we switched the meeting to a different city two hours away."

That kind of behavior, Your Honor, we don't think should be rewarded. And those plaintiffs -- that's a serious issue, and it's a serious violation of Your Honor's order to switch the location.

THE COURT: How many plaintiffs did that involve?

MR. DRAKE: I don't know -- sorry, Your Honor -- off the top of my head. I'll pull that --

THE COURT:  Here is the -- and I hate to do this, but you've already appealed and taken an interlocutory appeal to the Eighth Circuit from what I decided last time.  It's clear to me -- and I don't care.  Go talk to three other people all you want.  I mean, that's fine.  I've always enjoyed the Court of Appeals.  We make decisions in a span of a minute that they get to spend a year thinking about.  You can read that to them, and then they'll laugh heartily and understand.

You're going to end up in the Eighth Circuit for who knows how many different issues; so the only way I can get here is if this is fully briefed.

MR. DRAKE:  Agreed.

THE COURT:  And that's going to also go to the medical authorization and school authorization issues.  On that, I think you should do simultaneous briefs in two weeks.  One week after that, you can respond to the other, and I'll take it at issue.

MR. DRAKE:  Thank you.

THE COURT:  Because just doing it on the record -- some of the judges on the Eighth Circuit read the transcripts very closely.  Some just like to read the briefs.  So we need to have both just so it's clear what we have in front of us and what we made our decision on.  Some read everything word for word.  I'm sure that's all of them.

MR. DRAKE:  That sounds good, Your Honor.

THE COURT:  That's the only way we're going to get there.  Because you won't even be able to agree on the underlying what happened at the hearing and what happened and how we get there, and they'll send it back for further proceedings not inconsistent with their opinion, whatever that means, because they could find no clear error; so, you know.

MR. DRAKE:  Sounds good.  And we'll continue to confer on that authorization issue.  I don't know why we wouldn't be able to reach an agreement --

THE COURT:  I think it's resolvable, but I get if you reach an impasse.  That's why I'm here.  We'll figure it out.

MR. DRAKE:  Thank you, Judge.

MR. RODRIGUEZ:  Yeah, Judge.  Just -- and I think your solution makes a lot of sense, and we'll certainly brief the issue.

THE COURT:  Don't be a sycophant now, you know.

MR. RODRIGUEZ:  Look, here, I just -- that was my -- I was going to preface what I'm saying by that statement.

The meeting that counsel is referring to, we actually had several scheduled meetings, and then, for various reasons, some people had legitimate reasons that they couldn't attend. So we had one before the time expired.  We had one to clean things up and to try to get some stragglers that -- not stragglers but people that legitimately couldn't attend.  They initially wanted to have -- "they" meaning the team -- wanted

to have the meeting in Huancayo, which is about an hour and a half from La Oroya.

[Reporter clarification.]

MR. RODRIGUEZ: Huancayo is H-u-a-n-c-a-y-o, I think.

Anyway, they wanted to have the meeting in Huancayo because of all the stuff that was going on in La Oroya, just to get out from, you know, all the issues that we presented to Your Honor that we're going to talk about, I think, now in a second -- the intimidation campaign and the media campaign and the social medica.

But what happened is that the plaintiffs -- some of them couldn't attend, couldn't get there. It's an hour and a half away; so we changed the meeting. And he's right about that. There was, like, five or six that were implicated; but, you know, that will be fully briefed.

The meeting that I referenced earlier was the meeting that took place on Monday the 23rd and the 24th, Tuesday the 24th, that I mentioned to Your Honor. I told the Court we were starting. And this gentleman didn't show up, and he didn't tell us he was lost till the afternoon or the next day. Anyway, that's all I have, Judge.

The next thing on the agenda, I think, is the --

THE COURT: The order for protective order and motion for sanctions.

MR. RODRIGUEZ: Right.

Judge, as Your Honor may recall, we talked a little bit about this at the last status conference, and we, the plaintiffs, requested a protective order prohibiting the defendants from engaging in this intimidation and scare tactics that we had reason to believe was orchestrated by the plaintiffs because it involved interviews that were done of an ex-employee of Doe Run of Peru. It was, I think, general counsel, but he was a certainly in-house in Doe Run of Peru.

And he had a lot of information that was confidential or he would have had to look at Pacer, you know, or get access to Your Honor's docket to find out some of these facts.

So it's interesting to me, in responding to our motion, one of the points that defendants made is, well, plaintiffs, you haven't presented any evidence. There's a link between this dissemination of information or misleading information or scare tactics or intimidation -- whatever -- I guess no link between them and Huanay I think is the gentleman's name who's their ex in-house lawyer.

Interestingly to me, they stopped short of saying, "Look, we had nothing to do with it." They could have done that. I mean, they could have said, "Look, we had nothing to do with that. Not only did you not prove anything, but we affirmatively are representing to the Court that we didn't egg this guy on. We didn't ask him to do this. We didn't provide him with any information."

And by the way, as Your Honor may recall, he knew not only about the 108, but he knew about the fraud that was perpetrated was the fraud in the notarizations.  So that, I think, the fraud involving the notarizations, if I remember correctly -- I think that was under seal at the time; so I don't know how he could have learned that.

And, you know, I mean, you'd have to believe that this guy Huanay was so involved in this that he was following the court's docket and reading the transcripts.  I mean, it's just -- I -- it defies credulity.  I mean, it's hard to believe that they had nothing to do with it, but if they would come forward and say, "Look, we had nothing to do with this," that's one thing, but they didn't.

So, you know, the motion that we're asking for -- a protective order -- if, in fact, they had nothing to do with it, they shouldn't have a problem with the order.  Just stop doing it.  And if you're not doing it, then don't do it in the future because --

THE COURT:  How do I even have jurisdiction or should engage in limiting speech in the community?  How do I end up there?

MR. RODRIGUEZ:  It's not -- I don't think Your Honor can generally limit speech, but I think Your Honor can -- you have jurisdiction over the Doe Run defendants in this case, and I think you can say, you know, "Don't get involved in this

kind of process. I don't think it's appropriate."

I mean, think about it if it was litigation in this country and we were -- and you had defendants that were going out and hitting the social media and having their ex-lawyers on social media and talking about the case and trying to intimidate plaintiffs and trying to scare plaintiffs. I mean, there's plenty of challenges to this litigation, Your Honor, and we'll get into some of them a little bit later on; but, you know, you -- it's been ongoing for quite some time. It's a very remote, very poor area. Communication is not always easy. You have a lot of different challenges. And, you know, these people are now hearing all this thing on, you know, on social media and on the radio.

And I think, Your Honor, to answer your question, I think Your Honor has jurisdiction and you can curb conduct of defendants just like when they were trying to -- you know, they were initiating these legal, criminal legal proceedings in Peru through their criminal lawyer, having the criminal lawyer participate in the proceeding -- which you're allowed to do in Peru -- having the criminal lawyer give a list of witnesses, some of which were our clients, and Your Honor said "You can't do that. Stop it."

I mean, I think you can do the same thing. I just -- you know, it doesn't seem like the conduct that defendants should be able to get away with -- if, in fact, they're

involved in it.  If they're not, let them say they're not.

And if they're not, then they shouldn't have any problem with

the order.

        With regard to the sanctions, Judge, I think, you

know, under the circumstances, given what was going on at the

time, now we know that we went through the verification

process.  And I don't have any serious dispute with what

counsel said.  As far as I know, nothing was recounted to me

that -- nobody got hurt.  And I'm not sure that there was

any -- at the actual verification process meetings, there

wasn't any situation that came up that required us to come

back before Your Honor and say, "Look, stop it."

        But that doesn't mean that our people were not very,

very concerned and very scared like I said before.  And at the

time that we asked for the relief, this was ongoing.  And, you

know, there could have been more narrow things that Your Honor

could have done regarding the verification process, you know,

had the thing been fully briefed and the verification process

ongoing.

        The reason that we didn't drop the motion, Judge, is

because we think that this kind of conduct is affecting and

will continue to affect our ability to communicate with the

plaintiffs and the plaintiffs' participation in the cases

because it continually -- you know, they're getting

intimidated.  It's a social stigma issue.  There's

misrepresentations of facts.

And I -- again, I'm not going to go through -- I'm not going to go through everything, but I just want to just refresh Your Honor's recollection of this is one of the things Mr. Huanay said on the radio at the time.

He says, "After 14 years, almost 15" -- that's a lie because our -- as you know, our case hasn't been going on that long. "After 14 years, almost 15, plain and simple, the judge, or the judge in the Missouri case, has ordered the plaintiffs' attorneys to come to Peru and sample 108 people that the Court itself has identified. Why? Because, as you began to explain at the beginning of your interview, they found false documentation, forged notary signatures, notary stamps, forged documents regarding the education, and the forged documents regarding their health."

So, again, I think Your Honor pointed out in the last hearing that a lot of the stuff or some of the stuff was in the docket, you know, in one of the filings or in one of the transcripts. But, I mean, you know, you got to believe again that this guy's following all that on Pacer or somehow getting access to all that.

And then there is some things in here -- and I think Your Honor pointed it out too -- like the fact that the fraud was the -- you know, had to do with notarizations.

There's also an interesting dynamic that I want to

point out to the Court. The defendants are claiming that it's more -- and I'm kind of spilling into the other -- another motion, but it relates to this as well. The defendants are claiming that there was fraud in these notarizations and that, because there's fraud in the notarizations, that's -- and all -- and, I guess, other fraud as well. But the primary fraud that I remember from Romero's affidavit is, like, he had a fake notary stamp, he said, and some of these profiles were notarized outside the presence of the plaintiffs.

So there was all of these alleged fraud on the notarization. How do we have 1,257? We're going to get into that. If we were fraudulently notarizing documents -- rhetorical question -- wouldn't we have notarized these 1,257 that aren't notarized? I mean, to me, you know, it doesn't make any sense.

But anyway, Judge, we think that there's still an issue even though the verification process has come and gone relatively without incident, and we think that the issue is that it impacts the case. We don't think that they should be disseminating information, you know, from the court file, certainly nothing under seal; but, I mean, for them to have their agents go out into the community and, you know, go over social media and create, again, a sense of intimidating our clients and scaring our clients, we don't think that's appropriate, and we think that's something that Your Honor

should curb that conduct.

And we certainly don't think it would be appropriate to have sanctions under these circumstances because the issue, essentially, when sanctions, is was it reasonable?  Was the -- you know, was the motion reasonable at the time that it was presented?

Again, we contend under these circumstances it was certainly reasonable; that the Court certainly has discretion on this area.

Anyway, Judge, that's all I have.  I will respond.

THE COURT:  Thank you.

MR. DRAKE:  Thank you, Your Honor.

We've been dealing with this motion, I guess, for nearly two months now.  And I have to say, Your Honor, I'm still not exactly sure what it is that the plaintiffs are asking for or what their legal authority is for it, and indeed Mr. Rodriguez's argument today I think did not add any clarity to that whatsoever.

The reality is that they haven't offered a single legal citation -- and Your Honor's question got right to the heart of this -- any legal citation -- I'm not aware of any either -- that would provide the authority to enter some sort of injunction -- although they call it a protective order; it's an injunction -- that would prohibit some vague activity of which there is no evidence of it having occurred, all

around the fact that somebody who worked for Doe Run Peru -- who, by the way, is not a defendant in this case and is a different entity altogether from the clients that I represent -- that somebody who worked for Doe Run Peru 16 years ago is doing radio interviews about information that, as we established in the chart that we attached to our brief, is 100 percent in the public domain and has been now for about five, four or five months.

That is the key issue, I think, Your Honor, in connection with this motion.  This is a very politically charged hot topic -- this case -- down in Peru.  All sides are talking about it.  It's on the radio.  It's on social media.  Mr. Rodriguez, Mr. Shkolnik are advertising and talking bad about our clients on the media down in Peru.  It's the way of life down there.  It's what's going on.

And I don't think we're at the point in this case that now the Court would be -- would have legal authority to issue an injunction on all of the parties from vague activity that's not connected with any evidence to what's going on down there.

So we think that's a significant issue, and the reason that we cross-moved for sanctions, Your Honor, is because the motion's just simply moot.  The motion was filed out of a stated concern about the verification process.  And as we just discussed at length, that process is complete, it's

Case: 4:15-cv-01704-RWS   v. Doc. #: 679   Filed: 07/31/22rp. Page: 30 of 63 PageID #: 7/19/22
21402

30

over, it's been over, and as Mr. Rodriguez said, there were no incidents. So it's done. It's complete.

We asked the plaintiffs to withdraw the motion so that we did not have to file a response to it not only because it included no legal support in it whatsoever, but because it was moot. They refused. They've made us continue to go through this process. That's why we filed our cross-motion for sanctions.

They also refer to the inability to notarize their long-deficient profile sheets and somehow now are connecting this motion to that one. That's the subject of another motion to dismiss that's next on the agenda, and Ms. Kajan is going to address that particular issue, but there's just no evidence that they have come forward with. You can't just stand up in court and make accusations. And you can't accuse us -- Mr. Rodriguez used the term "agent." There's no evidence that this gentleman in Peru is an agent of ours. He never even worked for our clients. He worked for Doe Run Peru 16 years ago.

And to level accusations without evidence, we believe, is improper when we've made -- we've made our own accusations, as Your Honor is aware, in this case, and we did it with evidence. And we submitted an entire report. I gave an entire presentation at the March 24 conference with what we believe the evidence is in terms of fraud that's being

committed in this case, and that's the way to proceed, Your Honor.

But we don't believe that there, at bottom, is any legal authority for the Court to interject itself into what is a very hot political environment in Peru, with lots of people talking about this case on both sides of the aisle, some -- and those individuals may or may not be connected to the case.

The only people that we know of who are connected to this case who are talking on media in Peru are plaintiffs' counsel who are running advertisements to try to sign up more plaintiffs and, in those advertisements which we provided a text of, are speaking themselves about the fraud and their own views of whether it occurred or did not occur.

Thank you.

MR. RODRIGUEZ:  Yeah, Your Honor.  The silence is deafening on the issue of, you know, "We have no connection with those people.  We didn't do any of this.  We didn't encourage it.  We didn't give them the information.  We didn't ask them to do it."  None of that.  So I think that's pretty significant.

And we, in our reply memo on page 4, we cited the case of *Brown v. McIBS, Inc.* for the proposition that the Court has the authority to make any order which justice requires to protect the party or person from annoyance, embarrassment, oppression, or undue burden or expense.  So I

think Your Honor clearly has the authority to do that.

With regard to the award of fees, I think the standard is an Eighth Circuit case that we cited in our reply, *NAACP v. Atkins*. It's a 1990 case and stands for the proposition that award of fees and costs under 28 U.S.C. 1927 is not warranted. It is not warranted if it requires a finding -- I'm sorry -- is only warranted if there's a finding of both objectively unreasonable behavior and a finding of bad faith.

And I don't think you have that in this case, Judge. But in any event, I -- again, Your Honor has the authority to do so. I think there's some bad behavior. We've laid out -- there is evidence, because evidence -- the fact that this gentleman was in-house 16 years ago and has information that certainly, inferentially, very likely came from the defendants and the fact that the defendants have not denied that they gave that information and they haven't denied that they asked this guy to go on the airways and do these things, I think, is very significant.

Thank you, Your Honor.

THE COURT: Anything further, Mr. Drake? I'm not inviting. I just want to make sure that you didn't say, "I sure wish I would have said . . . ."

MR. DRAKE: No. Yeah. The only thing I wanted to add, Your Honor, if I may, is that I'm not aware of any

evidence -- and that Mr. Rodriguez certainly hasn't offered any evidence -- that connects the people that we represent, our clients, Doe Run Resources and Renco Group, with the gentleman that you're talking to and what's going on on the media down there.

Mr. Rodriguez is just coming up and throwing around a bunch of accusations. I'm not aware of any evidence that that's -- that they're accurate.

THE COURT: I'm not going to regulate the discussion in Peru on the radio, by social media, or otherwise. It's not -- it defies a little bit of common sense that a former employee of Doe Run of Peru doesn't have any relationship with Doe Run in this case, but I'm not going to regulate the public discourse over what's going on.

It will take its natural course. Truth is always the best antidote to any discussion, and that's why we're here. We're going to find out the truth of the allegations or the defense and eventually have a jury make a determination.

And similarly, I'm not going to find that the arguments were objectively unreasonable or made in such bad faith that sanctions are appropriate.

So that takes us to the next motion to dismiss.

MS. KAJAN: Good morning, Your Honor. May it please the Court. Rania Kajan from King & Spalding on behalf of the defendant.

34

So I will next address defendants' motion to dismiss those plaintiffs who have failed to produce signed and/or notarized profile sheets. As the Court recalls, we filed this motion back on April 29, and plaintiffs were given an extension to respond until June 21, and then we filed our reply on July 8.

At the time that we filed our motion, we had 256 plaintiffs who had failed to even have a basic signature in their profile sheets. We also had 1,256 plaintiffs who were missing the required notarizations, 53 of which were in the ITP alone.

Since we filed our opening brief, we identified one additional ITP plaintiff who was also missing a signature; so that bumped all the figures up by one. So we had 257 without a signature, 1,257 without the notarizations, 54 of which were in the ITP.

Now, given some of the claims that plaintiffs made in their opposition about their belated intent to cure some of these issues, I wanted to give the Court an update on what has changed since our initial filing, which is actually very little.

As plaintiffs noted in their opposition, they did produce some signature pages for certain plaintiffs. Of course, this production came after they ignored our initial conferral letter in early April and then, when we followed up,

were told that they were going to produce these the first week of May, which obviously never happened.

So on June 21 they produced 241 signature pages; however, six of those remained unsigned.  So as of today, we have 22 plaintiffs who have failed to produce a valid, signed profile sheet.  And these plaintiffs don't provide any explanation for this lapse whatsoever.  The opposition is entirely silent as to these plaintiffs.

So the only logical assumption left, Your Honor, is that, to the extent that they ever signed up at all, these plaintiffs have no intention to proceed with their cases and, therefore, their cases should be dismissed with prejudice, without further delay.

As the Court also saw in plaintiffs' opposition, Counsel vowed that they would immediately begin obtaining any missing profile notarizations for the ITP and that they anticipated that this production would be complete by today's status conference.

Well, this begs the question of why they didn't try to get these notarizations when we first sent them our letter in April or when we filed our motion at the end of April or when they were given more time to file their opposition or even, at minimum, at the verification process that, as Your Honor knows, just took place at the end of May and early June.

It also raises some questions as to why plaintiffs

are solely focused on the ITP when this Court's orders have long obligated them to produce these notarized profile sheets for all plaintiffs, not just those in the ITP.  In any event, this proved to be an empty promise by plaintiffs because we have not received a single notarized profile sheet since then.

So as of today, following 18 extensions over a six-year period, 1,257 plaintiffs, including 54 in the ITP, have yet to produce compliant, notarized profile sheets.

Now, in their opposition plaintiffs don't dispute that every plaintiff is required to produce both the signed and a notarized profile sheet whether they're inside the ITP or outside.  Instead, they ignore the fact that 22 haven't signed them at all and ask for the 1,200 plus who are missing the notarizations -- they simply give us a general list of excuses as to why they've been unable to timely comply.

And, Your Honor, I don't use the term "excuses" to try to be cute or snide, but I'm just using it to explain that the facts just don't bear out.

Even taking plaintiffs' assertions in their opposition at face value, despite the fact that they're not supported by any actual evidence, it still doesn't explain why we don't have these notarized profile sheets.

For example, they claim that the lone notary in La Oroya died in late 2018.  I believe it was in November.  So essentially between November of 2018 through 2020, they were

unable to notarize any profile sheets. They then say, well, a new notary was available in 2021. But what about the 900 un-notarized profile sheets that were produced between 2013 and 2017, well before this notary's death, or the fact that since 2021, when plaintiffs admit that a notary was available for their use, we have not received a single notarized profile sheet?

Plaintiffs' counsel also make much of the fact that in that 2018, 2019 period, they had to charter their team and their clients to Tarma, an hour and a half away, to try to get these things notarized. Well, we don't have a single profile sheet in our production that was notarized in Tarma during that time period.

And, Your Honor, this all assumes that every single plaintiff that's missing these notarizations even lives in La Oroya. I mean, as we saw in the record production, many of these plaintiffs have moved away, live in different cities. So what is preventing them from getting their profile sheets notarized in their respective towns?

And apart from these logistical claims that don't hold any water, plaintiffs' counsel only point to the fact that they've been focused on other aspects of this case, like the verification process, like the record production, that has resulted in them being unable to comply with this requirement.

Well, as the Court knows, record production concluded

last year. And as I mentioned earlier, if anything, the verification process should have facilitated with this effort, given that plaintiffs were already gathering for that purpose. And, of course, plaintiffs have chosen to bring these cases against defendants in this court such that any alleged strain on their team to meet this Court's requirements, which they've repeatedly agreed to, can't excuse their noncompliance.

As this Court has maintained consistently, each plaintiff here is a distinct plaintiff with a distinct claim. So this motion, like others before it, turns on what each individual plaintiff has or hasn't done such that these generalized excuses applied indiscriminately across the board to all plaintiffs is not sufficient to defeat dismissal. But that's all that we have here.

And even now under their proposal, that's too little too late, vague, some reasonable rolling production schedule, we have no dates, no specific timeline, no concrete commitments -- nothing. And we've heard it over -- we've heard the same thing over and over and over again.

Your Honor, we'd respectfully submit that our pattern of consistently hounding plaintiffs for these records, providing them with specific lists of exactly what's missing, conferring without success, and then moving forward with this costly motion practice to resolve the issue is -- has delayed these proceedings long enough.

39

And likely because plaintiffs know that they can't disclaim this clear record of delay, in this motion, and as in others in the past, they misconstrue the Eighth Circuit standard for dismissal here, saying that it requires both contumacious conduct and a clear record of delay when, of course, only the latter is required.  And their own cited authority --

THE COURT:  If the measure was contumacious, we would all lose.

MS. KAJAN:  Exactly, Your Honor.

And their attempts to distinguish our other cases on this point fall flat as well.  One key example we cited, *In re Prempro Product Liability Litigation*, a case out of the Eighth Circuit, where plaintiffs say, well, in that case, the court established a firm deadline before dismissal.  But that's exactly what this Court has done in four case management orders to date, in numerous references at status conferences over the years -- for example, warning plaintiffs back in December 2020 that the drop-dead date or final date to produce valid profile sheets was in February of 2021 -- and then when they didn't meet that deadline and this Court gave them an additional month, it emphasized to plaintiffs' counsel that they were on a short leash because deadlines certainly have value.

And so it's hard to understand how plaintiffs could

interpret these deadlines as anything but firm. But I won't belabor -- continue to belabor the point because I know that we have briefed this for Your Honor several times before.

But I just want to point out one additional point on this, which is that plaintiffs seem to be reading in some sort of bad faith requirement into the dismissal standard, which does not exist here. And as the cases we cite particularly in our reply show, this Court doesn't need to find that any plaintiff acted in bad faith in order to impose dismissal, only that that plaintiff or their counsel deliberately, as opposed to involuntarily, took some action.

So -- and, of course, plaintiffs do not and cannot claim that they accidentally failed to sign or notarize their profile sheets over a several-year span or that their refusal to seek more time to do so beyond the latest deadline in March of 2021 was anything but a conscious choice.

So while they may not have acted in bad faith, there's no question that their conduct was willful such that dismissal is warranted here.

And that brings me to their argument that defendants have not been meaningfully prejudiced by this failure to produce these signed and notarized profile sheets. Nothing is more critical in these cases for defendants to understand the claims of each individual plaintiff than these profile sheets. And plaintiffs don't dispute that.

They also don't dispute that these 1,200 plus plaintiffs' unsigned or un-notarized profile sheets are invalid regardless of their content; yet somehow they argue that defendants have not been prejudiced because they have provided -- these at-issue plaintiffs have provided complete profile sheets that defendants were able to make their ITP selections from.

First, Your Honor, as the case law makes clear, these unverified and un-notarized profile sheets are undeniably incomplete regardless of their underlying substance.  And plaintiffs fail to distinguish the law that we cite which demonstrates that, because these sheets are procedurally invalid and therefore a nullity, they're akin to no profile sheets having been produced at all.  So courts deem these types of critical deficiencies as sanctionable.

And, second, and critically, Your Honor, the fraud evidence that has surfaced since we made our ITP selections just further highlights the prejudice that defendants have already suffered and will continue to suffer if these plaintiffs aren't dismissed.

Most immediately, defendants can't make their 14 trial picks when 54 ITP plaintiffs have not notarized their profile sheets.  But also, Judge, those plaintiffs -- for those plaintiffs that are outside the ITP, these profile sheets are the only mechanism we have to assess whether these

plaintiffs intend to be in these cases and wish to proceed.

And, in short, Your Honor, these plaintiffs just can't credibly claim that defendants haven't been prejudiced by this failure to comply with your Court's orders.

And, finally, Your Honor, against this record, and as supported by the multitude of cases we've included in our briefing, dismissal with prejudice is the appropriate remedy here. Plaintiffs effectively concede in their opposition that their behavior is sanctionable, but they say, "Impose a lesser sanction than dismissal." But what lesser sanction is there at this point?

Following multiple warnings that dismissal would ensue if they failed to comply, they still haven't done so. And even though we're talking about a large number of plaintiffs here, defendants stress that the Court shouldn't be hesitant to dismiss them simply because of their sheer number or because of their associated impact on the proceedings as a whole.

As Your Honor has explained in the past, each ruling should be issued with each individual plaintiff's case in mind, and there's no dispute here that each plaintiff is required to both sign and notarize his or her profile sheet. So whether one fails to do so or 1,257 of them fail to do so, the outcome should be the same.

In closing, Your Honor, I just want to note that

Case: 4:15-cv-01704-RWS    Doc. #: 679    Filed: 07/31/22rp   Page: 43 of 63 PageID #: 21415

43

plaintiffs' counsel accused defendants of trying to deprive plaintiffs of their day in court, but in reality it is their own inability to meet this Court's deadlines, to which they've repeatedly agreed, and their own conscious disregard of this Court's orders that has been the most consistent source of delay in this litigation. And they focus only on their right to have their day in court but entirely ignore the other competing considerations that this Court should balance, including preventing undue delay, avoiding court congestion, and respecting this Court's procedures.

So for these reasons, Your Honor, and for those listed in our briefing, we request that this Court grant the appropriate remedy of dismissing these plaintiffs with prejudice.

Thank you very much.

THE COURT: Thank you.

MR. RODRIGUEZ: Thank you, Your Honor.

I think delay is where the rubber meets the road. I'm going to get into that in a second, Judge.

First, let me get into what I -- I mean, I'm personally embarrassed about not having the ITP plaintiffs have notarized profiles. That's something that could have easily been done when we had the verification process meetings. It's just 100 percent my fault. The buck stops with me. I should have been on top of that, and I should have

connected the dots.  I did not.

That's why, when I found out about it, I immediately tasked a team to go out and get -- there's actually -- of the 92, there's 43 that were not notarized.  The 50-odd number that counsel just gave Your Honor has to do with the 108.  I'm not as concerned about the other ones because we may very well agree that those should be dismissed.

So we focused on the 92.  There's 43.  We have in our possession 40.  The reason that they were -- and I understand that, you know, a lot of this is last minute, but that's the conditions that we're dealing with.

Were it not that Mr. Patrick Lanciotti's uncle passed and he was out of the office the last couple of days, that's why -- that's one of the reasons why he's not here today -- we would have -- it would have been the last minute, but we would have provided them with the 40.  We have 40 in our possession. We have three more that we will be getting in the next couple of days, but we have 40, I can represent to the Court, in our possession.

My associate confirms -- she went over all of them and confirmed that we have 40 of them.  And we sent them to Mr. Lanciotti's office, and they're going to be produced -- I don't know how long it takes; I think they have to be typed up -- but in the next couple of days.

And I'm personally embarrassed.  And that's not an

excuse. It's just an explanation. It's something that could have easily been done during the verification process.

And, you know, it goes to one of the things that I always tell people: I'm really happy I'm a lawyer, not a doctor, because, when I mess something up, nobody dies. It just costs me time or money or, in this case, an embarrassment.

But anyway, Judge, that's the first --

THE COURT: The old joke is lawyers bury -- I mean doctors bury their mistakes; lawyers get written up in books.

MR. DRAKE: Right.

MR. RODRIGUEZ: So anyway, that's the first point that counsel made.

Now let's talk about -- I'm going to talk to you about the facts, Judge. I think you know it. Counsel, respectfully -- I don't think she was with us in all of these status conferences that we had, but you know and some people in this room know that we had monthly status conferences all through 2020. And I can't remember when they stopped being monthly, but I think it was sometime in 2021. And the Court and everybody was up to speed on what was going on. Because of the pandemic, we were focusing on getting the profiles. The defendants have the profiles. They have the information.

We can get the notarizations. And I'm going to tell you, the Court, what I propose in just a couple minutes, Your

Honor.  But here's -- look, the leading case.  We got to talk about Eighth Circuit cases.  And, you know, the leading case on the 41(b) dismissal issue -- and it's either 37(b) or 41(b).  The leading case on 41(b) is *Bergstrom v. Frascone*, and that case says that dismissal is proper only when there's a clear record of delay or a contumacious behavior.

And counsel is also right.  I did notice in our brief that we used the word "and," and it is an "or."  She's right about that.  But, look, not only do we not have contumacious behavior, but there's no delay.  Okay?  And I'm going to get into -- well, let me finish with this case, and I'm going to get into one of the cases cited by the defendants in a second, the *Prempro* case.

So in this case, if -- you know, the issue is, is there delay?  Judge, there is no delay.  What's caused delay in this case is our inability to efficiently collect and retrieve documents during the pandemic that we were focused on in the 120 initial trial pool plaintiffs.

That was a chore.  Your Honor remembers that.  And that was delay.  I mean, that's congesting the court, and that's creating an issue, but it's not -- I mean, under the circumstances -- I think Your Honor would agree -- I'm pretty proud of my team.  They did a pretty damn good job, considering the challenges.  There was lockdowns.  I mean, there was just a mess over there.  It was much worse in that

area of Peru than it was in our country. So that's the first point.

There is no contumacious behavior, and there is no delay, okay, because the delay is caused by if there's any problems with the 120 initial trial pool plaintiffs. This is a side issue. They're entitled to them, and I'm not saying that they're not; but for them to say that they've been prejudiced and to say that we've delayed the proceedings, that's not correct. That has not caused delay. And they have the information. So if they want to evaluate the cases, they have the information already.

So according to *Bergstrom*, only a finding of bad faith would excuse not considering a lesser sanction. And I would respectfully submit, Your Honor, there's no bad faith here.

They've selected their 60 initial trial pool plaintiffs. We are now in the process of hopefully moving this case once they decide if they're going to try to get any more documents from the authorizations that we've obtained. The lack of not having notarized profiles has not delayed the litigation at all.

The lesser sanction, for example, that we can have is what I had proposed, which is a rolling -- and I'm going to give you a number now in open court of, say, 100 a month. There is one notary in La Oroya. The issue of the notary

being sick initially; then, unfortunately, he passed; so we had no notary -- that is an issue.

The fact that Tarma is an hour and a half away is an indication of why it wasn't done -- because traveling an hour and a half under the circumstances when we were so focused on trying to resolve the issue of moving the 120 initial trial pool plaintiffs along and getting and retrieving all the documents that we had to retrieve. So it hasn't delayed things. That hasn't been a -- that hasn't congested the court.

Now, their accusations of this rampant, widespread fraud and all the efforts that have gone into that, that is, you know, unsupported by any credible evidence -- that's created a congestion, and that's created a delay.

The other critical case on the Eighth Circuit is the *Schoffstall v. Henderson*. It's an Eighth Circuit case we cited in page 6 of our response. That's a 37(b)(5) case. And that stands for the proposition that 37(b)(5) authorizes the court to impose sanctions upon parties who fail to comply with discovery orders but only if three things occurred: If there's an order compelling discovery; if there's a willful violation of that order; and prejudice to the other party. That's the third thing.

Again, no prejudice. They have the information. There's no delay, because what delays this case is not moving

the 120 initial trial pool plaintiffs along. Certainly there's no willful violation, and I think Your Honor would hopefully agree with that. I have just said there's no prejudice to the opposing party because there is no delay.

By the way, we're plaintiffs. We want to move this case along. We're not interested in delaying the case. And they do have the information contained in the profiles, just without the authorizations.

Since 2014, Judge, we've collected about 2,000 profiles -- the team has. As I mentioned or stated in the response, since 2016 the notary was of ill health. So that goes back, him being sick, to 2016. He passed, I think it was, in 2019. So we had no notary in La Oroya during 2019, and then you had the pandemic. And I think he opened back up it was either in very late 2020 or early 2021, and then only one day a week.

Let me just go into the cases that were cited by the defendants. I want to get into that just briefly. First of all, their *In re Prempro Products* case that counsel cited to the Court, interestingly, that case the Court specifically cited that there was derelict oversight by plaintiffs' counsel, and that case involved 200 -- the plaintiff in that case was one of 200 plaintiffs that were selected for the limited case discovery.

So in that case, the plaintiff that wasn't providing

the discovery was the equivalent of one of our 120 initial trial pool plaintiffs. And that's certainly more understandable than, you know, not having notarized profiles from plaintiffs that are not part of the initial trial pool. So that's easily distinguishable from our case.

They also cite another Eighth Circuit case, the *Guidant Corp.* case, *Gaydos v. Guidant Corp.* That's a 60(b)(6) -- or that's a 60(b) case rather. And in that case, the Court dismissed -- the District Court dismissed the case with prejudice. The plaintiff did not -- did not move in time to set aside the dismissal, and so the only remedy they had available was 60(b). And it's a totally different analysis. It's an excusable neglect analysis.

You know, a lot of the cases -- all the cases we've distinguished them in our papers, Your Honor. I think the issue here is was there -- was there delay? Which I would submit, Your Honor, there has not been delay. There has not been contumacious behavior.

And going to the 37(b) case, the *Schoffstall* case, there's no order compelling discovery; there's certainly no willful violation of an order; and there's no prejudice to opposing counsel. I think in this case, if anything, they should move for an order to show cause, and I think, Your Honor, we can -- we can continue to move the case along, we can work on the initial trial pool side, and we can start

51

providing profiles.

By the way, on the -- well, when we start providing profiles at 100 a clip, again, the limit -- again, the notary there is not like a notary here.  I think Your Honor understands that.  You just can't go to the corner bank, and you don't have a notary, you know, in everybody -- in every lawyer's office or a notary in every bank.  There's one notary in a town like La Oroya, and then there's one notary in a town, you know, an hour and a half away or in various towns an hour and a half away.  So it's a logistics issue.

So we would propose as a lesser sanction that Your Honor enter an order requiring us to produce 100 a month and with the total -- I'm talking about the notarizations because, again, they have the content.  They have the facts that they need to evaluate the case.  I'm talking about the notarizations, 100 a month, and the full 1,256 or 1,257, whatever it is, would be completed in -- within a year.

That's all I have, Your Honor.  Thank you.

THE COURT:  All right.  Anything further?

MS. KAJAN:  Thank you, Judge.  I just have a few points in response.

First, Mr. Rodriguez did not address at all the 22 plaintiffs who have not signed their profile sheets.  So from defendants' perspective, these plaintiffs should be out today.  No further delay.  No further motion practice needed.

The other thing is the proposal of 100 notarizations a month. First of all, we don't agree with that. Obviously, we think this is belated, extremely untimely, and they shouldn't receive any additional time. But 100 a month would take an additional year plus. I don't understand how that gets us past the point of delay.

I also didn't understand the distinction that counsel tried to make in the *Prempro* case. We have 54 ITP plaintiffs that are implicated in this very motion.

Also, Mr. Rodriguez didn't --

THE COURT: His point was the Venn diagram between the people who didn't show up for verification and those; so he's not counting the whole 54. He saw 43.

MS. KAJAN: Understood, Your Honor.

THE COURT: Where the diagram intersects.

MS. KAJAN: Understood.

THE COURT: So I am listening.

MS. KAJAN: He also didn't address any of the factual inconsistencies that I noted about their production. Again, even taking what they say at face value in their motion in their response, despite the fact there's no evidence supporting it, what about in 2021? Mr. Rodriguez said, "There is a notary available." We're in 2022. It's July of 2022. We have not received a single sheet from 2021 or 2022. I'm giving them the full benefit of the doubt for what they've

said in their motion, and it still doesn't make sense.

Also, as I mentioned, Mr. Rodriguez said, "Well, they have the information.  They have the information in these sheets.  It just hasn't been signed and notarized."

We don't have the information.  These profile sheets are invalid.  The case law is clear.  We cited multiple cases on this point, which they do not even attempt to distinguish. If the profile sheets are not signed or notarized, they're invalid.  It's as if we don't have them at all.  If we can't confirm the veracity and the accuracy of what's in there, we are prejudiced.  By default, we are prejudiced.

And I'm happy to answer any questions that the Court has if it would be helpful.  Thank you.

THE COURT:  Anything further?

MR. RODRIGUEZ:  I have a couple more things, Your Honor.

THE COURT:  Don't go far, then.

MR. RODRIGUEZ:  I know when I wear out my welcome.

Judge, the 22 -- counsel's right.  I didn't mention that, and I should have.  What occurred with those 22 is that as during the -- as Your Honor may recall, during 2020 there was a push to get not only the 120 initial trial pool plaintiff records, but we also were pushing to get profiles. But at the time we couldn't get anything notarized, and we were trying to do some things during the lockdown.

So during the lockdown our team called some folks, got their information with the intention of circling back and getting a signature, and that hasn't been done.  And, you know, we're certainly going to work on getting those 22 signatures done.  And I have no reason to believe -- you know, I'm going to respond to the motion at the appropriate time, but I have no reason to believe that those folks are not interested in going forward and will have that information.

Again, the *Prempro* case I think is critical, and that's why I was so animated when I learned that I had not gotten these -- first of all, when I learned that we had some in the initial trial pool that weren't notarized and, secondly, that I hadn't taken the opportunity to fix that during the verification process, which is when it absolutely should have been done, and now we're there -- I mean, we have 40 out of the 43.  We're going to get the other three in the next couple of days.

I think that would be delay, but it's not because we're going to get that done.  And that's -- now the ball is in, I believe, the defendants' court regarding what they want to do with the authorizations and if they're going to take time to go and get all the records.

Again, I would respectfully submit to Your Honor that, if they do that, they should have a basis for doing that.  But in any event, Judge, I think it's premature.  There

is no -- again, there is no order compelling production. There is no motion for order to show cause. And I think it's premature at this point.

Give us a chance to get those authorizations -- those notarizations rather. We can get that done in short order, and again the limitation being there's one notary.

Thank you, Your Honor.

THE COURT: All right. So the delay issue is kind of a false issue. I was asked by the defendants to stop everything and let's start everything over and do the verification for all the potential plaintiffs. I denied that, and we focused on the initial trial pool. So the delay is a false argument, because I overruled that to avoid delay that was requested by the defendants. But there is no doubt there has to be an end.

As to the 22 signatures that aren't even there -- and the point is well taken. It's a 2015 case. Now, this hasn't been forged fully for seven years, but I have to report cases to the Eighth Circuit that have been pending more than three; so, believe me, I've been dutifully informing the U.S. Court of Appeals that I have some three-year-old cases. Tragically, you may not be the oldest, but they do have similarities.

And congestion? All of the cases are consolidated here. There might have been an argument if every judge in the building had 200 of these cases they were dealing with, but

56

that would be bad for you guys because you'd have essentially ten similar rulings but not identical.  Who could keep track of that?  That would be impossible.

But for the 22, the deadline is going to be August 19 -- that's a month -- to get those signatures.  And they should be notarized.

As to the trial pool, you say you have 40 of the 43, as you count them.  They need to be delivered to the defendants by Friday, July 25.  That's not a Friday.  That's Friday, July 22.  And then I'll expect on the 25th a joint memorandum of what was and wasn't delivered, and we'll know what -- we'll see where we are.

As to the balance of the 1,256, we can't go another year.  At 100 a month, that puts us into August of 2023.  Let me look at my calendar.  I would encourage you to deliver them as soon as possible, but the deadline will be October 31.  And then on November 4 I'll expect a joint memo as to what's been delivered and what's not, and specificity, I think for the defendants' benefit, of the original cases for which those sheets have not been delivered.

We have been at this a long time.  There has to be an end.  I never say never, but absent some cataclysmic event, those deadlines are solid.  You know, we still have to stay focused.  These are about individual people, but the defendant also has the right to know what's going on.  And so we don't

treat them as a group.  It's a person-by-person analysis.  But we have to keep going.

And none of this has delayed the onset of discovery of the individual cases in the trial pool.  We're still on track.  It's not like we've delayed depositions or kept doctors' appointments or IMEs from occurring.

So that exhausts the agenda that was given to me.  Of some concern to the Court is the non-Missouri litigation that has cropped up.  I'd like to know from the defendants what action has been taken, if any, in the federal case in Florida for production of documents in a deposition because that document request, by your own admission, has the potential to invade the attorney-client privilege.

What's the status of that?

MS. RENFROE:  Your Honor, Tracie Renfroe, King & Spalding, for the defendants.

First of all, I appreciate the Court's questions.  We, King & Spalding, and none of the counsel for defendants --

THE COURT:  I understand.  But you're aware of that; so tell me what the status of the document production in the depositions.

MS. RENFROE:  I am not able to just to -- I don't know, Your Honor.  I don't know specifically.

THE COURT:  You need to inform your client that, if that proceeds with a document production or a deposition,

58

there will be -- well, we need to talk about it.  I've talked to Judge Perry.  Judge Perry and I are going to set a joint hearing because this affects her case and my case.

Her cases the discovery is completed, and they're at *Daubert*, and you know better than I do, because somebody there has labored mightily to file summary judgment motions and *Daubert* motions, and it's of great concern if the attorney-client privilege is invaded in her cases as well as my case.

And I want to know from -- I mean, I'm kind of wondering how you want to proceed to discuss the cases here, because at first glance we have a problem with the privilege issues occasioned by the subpoena duces tecum that was signed by a federal judge in Florida.

The state court case -- I have to say, honestly, the law in Florida on malicious prosecution must be different than in Missouri.  You have to prevail before and it has to be the party that brought the litigation.  There's great concern about the discovery that may go forward in that case, and not the least of which is I did tell you we would get -- if there's fraud in these cases, we will get to it in this courtroom.

And to ask other judges to interfere in these cases to ferret out the fraud is -- causes concern.  I haven't reached a conclusion.  That's why Judge Perry and I will

conduct a joint hearing.  But I'd like to hear how you wish to proceed with these issues.

MS. RENFROE:  I appreciate the Court's concerns and hearing where both Your Honor and Judge Perry -- what your concerns are.

Step number one, as far as we appreciate, should be that we will -- we want to be heard.  We want to be heard on the papers.  We will submit our response to plaintiffs' motion.  Currently, I think it's due around July 27.  We'd like a little additional time to complete that briefing.

THE COURT:  File a motion, and it will be granted, assuming it's not next year.  And it also assumes that this deposition isn't going forward and document production is not going forward because, despite you're not counsel, your clients are parties.

MS. RENFROE:  Understand -- excuse me.

MR. RODRIGUEZ:  I'm sorry.

MS. RENFROE:  I understand, Your Honor.  So what I suggest that we do is communicate with our clients the concern of the Court, both courts, and then we communicate back once we have some information about the timing of the deposition and the document production, both of which I understand, although I do not have specific information, but are in the beginning stages.

To my personal knowledge, not speaking on behalf of

anybody else, no steps have been taken by Mr. Careaga to actually respond to anything.  Now, again, I state that. That's my understanding --

THE COURT:  I mean, you have a big stake in this because there will be consequences here if evidence in this case or the attorney-client privilege in this case was breached by conduct in other courts -- of course, depending on what disclosures were made to those courts about the conduct of these proceedings and my promise to you that, if there was fraud, we'd find it.

MS. RENFROE:  I understand, Your Honor.

So going back to your question how do we suggest -- what is our suggestion for how we proceed.

THE COURT:  Right.

MS. RENFROE:  Step one, my suggestion is we complete our briefing and submit it in due course.  Step two, we will convey the Court's concerns to our clients about the concern about the attorney-client privilege not being compromised. And then, step three, if I may, following our conversation with our client, then I'd suggest we report back to this Court in due course, very short order.

But we hear the Court's concern, and I think we will -- we will convey that to our clients.  And I then think that we can even have a conference call with the Court in the next week or two if that would be of help to the Court.

But I think until we respond to the brief, to their motion with our brief, I think doing anything before then would be a bit premature, especially in light of the Court's caution to us.

THE COURT:  Both sides of the room.  You understand.

MS. RENFROE:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. RODRIGUEZ:  Your Honor, what I would add is that my understanding is that Careaga's deposition in the federal court case is scheduled for August 3.  And I'm not -- I'm certainly -- I believe that Careaga is going to take steps to object, but I don't know, and I don't have control, total control, over him.

So, I mean, I just wanted to advise the Court.  I happen to know that one fact that the deposition of Careaga in federal court, the case filed in the Southern District, for discovery purposes is scheduled for August 3.

THE COURT:  Well, I'm not prepared to reach the motion for the reasons articulated by counsel, but your client proceeds with that deposition at their peril.

MS. RENFROE:  I will convey that to our clients, Your Honor.

THE COURT:  That could have direct -- it could, in a panoply of potential sanctions, have dramatic impact on these cases, but I don't know.  You know, conduct has consequences.

We'll see where it takes us.

Anything further for the Court's consideration today?

MR. RODRIGUEZ:  Nothing from the plaintiff, Your Honor.

MR. DRAKE:  Nothing, Your Honor.

THE COURT:  Very good.  I'll pick a date for a future status conference, but absent some dramatic change, I expect the next time we get together Judge Perry and I will be co-presiding over discussion about the proceedings in Florida.

Thank you all very much.

**(PROCEEDINGS CONCLUDED AT 11:35 AM.)**

CERTIFICATE

I, Shannon L. White, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 63 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 21st day of July, 2022.


/s/Shannon L White
/s/Shannon L. White
Shannon L. White, CRR, RMR, CCR, CSR
Official Court Reporter