1          **IN THE UNITED STATES DISTRICT COURT**
          **FOR THE EASTERN DISTRICT OF MISSOURI**
2                   **EASTERN DIVISION**

3  J.Y.C.C., et al.,              )
                                  )
4                 Plaintiffs,     )
                                  )
5      vs.                        ) No. 4:15-cv-01704-RWS
                                  )
6  DOE RUN RESOURCES              )
   CORPORATION, et al.,           )
7                                 ) October 28, 2022
                  Defendants.     )
8

9  _____

10 A.O.A., et al.,                )
                                  )
11                Plaintiffs,     )
                                  )
12     vs.                        ) No. 4:11-CV-00044-CDP
                                  )        (CONSOLIDATED)
13                                )
   THE DOE RUN RESOURCES          )
14 CORPORATION, et al.,           )
                                  )
15                Defendants.     )

16            **TRANSCRIPT OF STATUS CONFERENCE**
17     **BEFORE THE HONORABLE RODNEY W. SIPPEL**
        **and THE HONORABLE CATHERINE D. PERRY**
18            **UNITED STATES DISTRICT JUDGES**

19

20              (Appearances on Page 2)

21 **REPORTED BY:**            Laura A. Esposito, RPR, CRR, CRC
                             U.S. District Court
22                           111 South 10th Street
                             St. Louis, MO  63102
23                           (314) 244-7739
                             Laura_Esposito@moed.uscourts.gov
24
            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25     PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

| | |
|---|---|
| 1 | **APPEARANCES** |
| 2 | **FOR PLAINTIFFS:**        Francisco R. Rodriguez, Esq. |
| | (Case #15-cv-1704)     Rodrigues and Tramont |
| 3 | 255 Alhambra Circle, Suite 1150 |
| | Coral Gables, FL  33134 |
| 4 | |
| | **FOR PLAINTIFFS:**        Kristine K. Kraft, Esq. |
| 5 | (Case #11-cv-44)       Nathan Stump, Esq. |
| | Nathan Emmons, Esq. |
| 6 | Schlichter Bogard LLP |
| | 100 S. Fourth St., Suite 1200 |
| 7 | St. Louis, MO  63102 |
| 8 | **FOR DEFENDANTS:**        Andrew T. Bayman, Esq. |
| | Geoffrey M. Drake, Esq. |
| 9 | Rania Kajan, Esq. |
| | King and Spalding LLP |
| 10 | 1180 Peachtree St. N.E. |
| | Atlanta, GA  30309 |
| 11 | |
| | Thomas P. Berra, Jr., Esq. |
| 12 | Lewis Rice LLC |
| | 600 Washington, Suite 2500 |
| 13 | St. Louis, MO  63101 |
| 14 | Tracie Jo Renfroe, Esq. |
| | King and Spalding LLP |
| 15 | 1100 Louisiana St., Suite 4100 |
| | Houston, TX  77002 |
| 16 | |
| | Robert J. Kuntz, Jr., Esq. |
| 17 | Rivero Mestre LLP |
| | 2525 Ponce De Leon Blvd. |
| 18 | Miami, FL  33134 |
| 19 | Jeffrey R. Hoops, Esq. |
| | Dowd Bennett LLP |
| 20 | 7733 Forsyth Blvd., Suite 1900 |
| | Clayton, MO  63105 |
| 21 | |
| | Jon A. Bierman, Esq. |
| 22 | Polsinelli PC |
| | 100 S. Fourth St., Suite 1000 |
| 23 | St. Louis, MO  63102 |
| 24 | |
| 25 | |

1          *(Proceedings convened in open court at 1:06 p.m.)*

2          **JUDGE SIPPEL:**  Good afternoon.  We're here today on

3     two cases:  Mine, *J.Y.C.C, et al. against Doe Run Resources,*

4     *et al.*, 4:15-CV-1704.

5          **JUDGE PERRY:**  I know the cause number by heart.  The

6     name is *A.O.A. against Doe Run, et al.*, Case No. 4:11-CV-44.

7          **JUDGE SIPPEL:**  Given the nature of the issues, at

8     least the first point, we felt it would be helpful to have a

9     consolidated hearing.

10         The first issue is -- unless there are announcements

11    that I need to hear before we get started.  Hope springs

12    eternal that you've agreed to all of this and we know what's

13    going to happen next, but I doubt it.

14         Okay.  Would counsel make their appearances, please.

15         **MR. RODRIGUEZ:**  Yes.  Frank Rodriguez from the law

16    firm of -- [inaudible].

17         *(Court reporter clarification.)*

18         **JUDGE PERRY:**  Okay.  Let's start with one thing.  You

19    have to use that microphone and point it as close to you as

20    you can.

21         **MR. RODRIGUEZ:**  I'm sorry, Judge.  Frank R. Rodriguez

22    from the law firm of Rodriguez Tramont Nuñez on behalf of

23    the plaintiffs.

24         **MR. STUMP:**  Good afternoon, Your Honor.  Nathan Stump

25    on behalf of the plaintiffs in the *Reid* case.  With me,

```
 1   Kris Kraft and Nathan Emmons.
 2        MS. RENFROE:  Good afternoon, Your Honors.
 3   Tracie Renfroe with King and Spalding on behalf of
 4   defendants in both the Collins and Reid cases.
 5        MR. DRAKE:  Good afternoon, Your Honors.
 6   Geoffrey Drake, King and Spalding, for the defendants in
 7   both cases.
 8        MR. KUNTZ:  Good afternoon, Judge Sippel, Judge Perry.
 9   Robert Kuntz on behalf of defendants Doe Run and the Renco
10   Group.
11        MR. BIERMAN:  Jon Bierman of the Polsinelli law firm,
12   Your Honors, on behalf of both Doe Run and Renco in both
13   cases.
14        MR. BERRA:  Good afternoon, Your Honor.  Tom Berra
15   from Lewis Rice for the Doe Run Resources Corporation and
16   the individual Doe Run defendants.
17        MR. BAYMAN:  Good afternoon, Your Honors.
18   Andrew Bayman with King and Spalding on behalf of all the
19   defendants in both cases.
20        MS. KAJAN:  Good afternoon.  Rania Kajan from
21   King and Spalding on behalf of the defendants in the Collins
22   case.
23        MR. HOOPS:  Good afternoon, Your Honors.
24   Jeffrey Hoops from Dowd Bennett on behalf of the Renco
25   defendants in both cases.
```

1          **JUDGE SIPPEL:**  Is that everyone?  Very good.

2          So, first up is Plaintiffs' Motion for Anti-Suit

3  Injunction to Prevent Frustration of the Court's Protective

4  Order.  If you would approach the podium, please.

5          **MR. RODRIGUEZ:**  Good afternoon, Your Honor.

6          Judge Sippel, you may recall that on February 1st, the

7  defendants filed a request for sweeping discovery.  It was

8  based upon the report that they had filed, I think it was

9  sometime in October, if I'm not mistaken, of the previous

10  year.

11          **JUDGE PERRY:**  Can you pull the microphone closer to

12  you.  Let me explain these microphones.  They work very

13  well, but they have to be pointing right at your mouth.

14  Okay?

15          **MR. RODRIGUEZ:**  Got it.  Sorry.

16          You may recall that -- oh, sorry.

17          **JUDGE PERRY:**  Move it any way you want, but we need to

18  hear you.

19          **MR. RODRIGUEZ:**  Is this good, Judge?

20          **JUDGE PERRY:**  Yes.

21          **MR. RODRIGUEZ:**  Okay.  I'll try to keep it there.

22          Your Honors may recall that sometime in October, I

23  think of 2021, the defendants filed the report authored by a

24  law firm that refused to get sworn in or make an appearance,

25  so we really had no basis of following up on some of these

1    allegations and some of the rank hearsay that was in the

2    report.

3         The -- and if there ever was a sequence of events that

4    should be followed, assuming we were going to go down this

5    path with Judge Sippel, Your Honor has already decided not

6    to.  It certainly would make sense to first delve into some

7    of these allegations and some of these so-called facts

8    primarily promoted by a witness with very questionable

9    credibility who the record indicates had been paid thousands

10   and thousands of dollars the same day that he gave an

11   affidavit.  And a great part of that report was -- not

12   entirely, but a great part of the report was predicated upon

13   this gentleman, Mr. Romero's affidavit, again, which he

14   was -- he was bought and paid for to sign.

15        On March 3rd the plaintiffs moved for a protective

16   order specifically related to this massive discovery,

17   claiming that the info was privileged, that it was broad,

18   overly burden, duplicative, and that the protective order

19   was necessary; otherwise, the whole case was going to be

20   derailed, and it was oppressive and burdensome and something

21   that we shouldn't undertake, at least at this point.  And

22   one of the arguments I made:  If at all, we should go first

23   and do some discovery regarding the authors and the

24   witnesses behind the report.

25        Well, Your Honor, Judge Sippel, you may recall that on

1    March 24th we had a status conference before Your Honor, and

2    at that point Your Honor determined that, instead of going

3    down that path -- we had also asked for some discovery

4    and -- I don't recall now.  There might have been a

5    protective order by the other side on our discovery.  But in

6    any event, our discovery was in play, their discovery was in

7    play.  And Your Honor decided at that time that the best way

8    to handle it was to focus on the initial trial pool

9    plaintiffs, which at that point in time in our case had been

10   reduced to 108, and go through this verification process,

11   which, again, was fairly extensive.

12        Well, Your Honor granted our motion for protective

13   order and the defendants clearly didn't like it, so instead

14   of appealing Your Honor's decision -- which, as Your Honor

15   knows, they have done in the past in other protective

16   orders, and certainly they could have done that here -- they

17   went down to Florida and they -- and I would say

18   essentially, but I mean they just made an end run, gross

19   forum shopping, and they made an end run trying to get a

20   better result in a different forum.

21        And they filed a state court action against a

22   gentleman by the name of Victor Careaga and a lawyer by the

23   name of Lou Thaler.  Careaga is a guy that was involved in

24   these cases from the beginning in Judge Perry's cases, I

25   think from 2007, and later on in our cases beginning around

```
1   2014, I believe.  So -- and then Lou Thaler is a lawyer that
2   went out and I believe signed up between two or 300
3   plaintiffs and was working with Careaga.  The defendants
4   make a big deal about the fact that Careaga has been -- or
5   has been suspended or disbarred, I'm not even sure.  His
6   role is -- in this case is commensurate with his position,
7   which he's not a lawyer, he's not treated as a lawyer, he's
8   not given any responsibilities that would, you know, based
9   upon his situation now, which he is -- again, I don't know
10  if he's suspended or disbarred, but he is, and we're mindful
11  of that.
12       So the -- I think the next place I want to go is that
13  the defendants, in their papers, have said, Well, you know,
14  this is -- we just decided to go down there in Florida and
15  file a malicious prosecution and failure to supervise case
16  against Careaga and Thaler.  By the way, they also filed a
17  28 U.S.C. 1782 case in the federal district court seeking
18  discovery.
19       Well, here's the problem with this:  Before we had a
20  motion for an anti-suit injunction and before this issue was
21  being litigated, defendants were letting their true
22  positions be known to the various courts that they were
23  present in.  So, for example, in -- let me just read from
24  the state court case.
25       What happened in the state court case is, they filed
```

1    it and then they wanted to move, to transfer to the Complex

2    Litigation Division, and in order to do that, they made some

3    allegations, sort of a justification as to why the Complex

4    Litigation Division was appropriate for this case.

5         And this is what they say in their motion:  "Next,

6    this case will require management of large amounts of

7    documents, both paper and electronic, during the pendency of

8    the matter and at trial.  Seventy-one individual plaintiffs'

9    claims were dismissed with prejudice in the Missouri

10   litigation.  Files kept by the plaintiffs' attorneys on each

11   of those plaintiffs will be subject to discovery, as will

12   communication between Careaga and the attorneys for whom he

13   worked, including Thaler.  Some of the discovery may be

14   international in scope given that dismissed claims were

15   filed by individuals living in Peru.  This will be a massive

16   undertaking and will require in-depth motion practice."

17        Now, it's also worth noting what they said in the

18   ex parte application, which, by the way, the most -- I mean,

19   in my estimation, the most serious issue that I see --

20   there's many.  I shouldn't say the "most serious," but a

21   serious issue is that they failed to tell Judge Lenard that

22   Your Honor had addressed these very same issues that they

23   bring up.

24        Let me read the introduction in the ex parte

25   application.  It's particularly egregious since it's an

1   ex parte application.  Anyway, the introduction reads:  "A

2   large group of consolidated personal injury claims brought

3   by Peruvian citizens in a federal court in Missouri has now

4   been believed to be riddled with fraud.  Many of these cases

5   appear to be the fruits of a scheme to defraud, not only

6   Renco and Doe Run, but also the courts of the United States,

7   a scheme now the subject of the Peruvian authorities'

8   ongoing criminal investigation.

9        "The fraud, comprising a network of 'Peruvian

10  plaintiffs recruiters,' in quotes, and document collectors

11  working on behalf of lawyers and supervised in part by

12  discovery target Careaga, recruited some Peruvian citizens

13  to claim that they were injured by emissions from a

14  metallurgical complex in La Oroya, Peru.  Careaga's

15  recruiters manipulated, doctored, or fabricated evidence to

16  support many of those claims.  Those sham claimants joined

17  the thousands of plaintiffs in consolidated lawsuits against

18  Renco and Doe Run in the United States District Court of the

19  Eastern District of Missouri."

20       Again, what's missing from this articulation of the

21  facts is that Judge Sippel had considered this very

22  circumstance and had determined that the appropriate way of

23  handling it would be to proceed with a verification process,

24  focus on the 108.  There was no -- I'm not even sure there

25  was any allegation of fraud by individual plaintiffs, and

1    Your Honor pointed that out.

2         I don't -- you know, I can't see there's any other way

3    than the filings in Florida being, you know, blatant forum

4    shopping and an intent to frustrate the Court's orders and

5    get a better ruling from different judges.  Any suggestion

6    otherwise, I think, is incredible and not -- should not be

7    believed.

8         Now, Congress -- this is getting into the legal

9    arguments that we made in our papers, and certainly in more

10   detail, but Congress has conveyed the power to the federal

11   courts to prevent this kind of forum shopping and allowed

12   the Court to protect the exercise of its jurisdiction from

13   being circumvented and frustrated.

14        And this is the All Writs Act, and it's 28

15   U.S.C. Section 1651.  And quoting from the *U.S. versus*

16   *New York Telephone* case, which is a U.S. Supreme Court case

17   decided in 1977 -- it's cited on page 1 of Plaintiffs' Memo

18   in Support of the Anti-Suit Injunction.  There, the Supreme

19   Court said that:  "The Supreme Court and all courts

20   established by act of Congress may issue all writs necessary

21   or appropriate in aid of their respective jurisdiction and

22   agreeable to the usages and principles of law."

23        Continuing from the *New York Telephone* case:  "The

24   Supreme Court has repeatedly recognized the power of the

25   federal court to issue such commands under the All Writs Act

```
 1    as may be necessary and appropriate to effectuate and

 2    prevent the frustration of orders it has previously issued

 3    in its exercise of jurisdiction otherwise obtained."

 4          What's significant is that the Eighth Circuit, in the

 5    case of Phillips Beverage Company versus Belvedere -- it's

 6    an Eighth Circuit case, like I said, cited in page -- well,

 7    cited in our memo.  I'm not sure of the page.  In that case,

 8    that involved a bottling company, and Belvedere went up to

 9    the court and asked for a TRO.  The court denied the TRO,

10    and Belvedere then went to the U.S. Customs Service and

11    asked for the same relief that the federal court had denied

12    it.  And this case emphasizes a need for the district court

13    to prevent litigants from circumventing adverse rulings.

14          And if I could -- if I may, I'd like to read from the

15    case:  "Here, Belvedere initially chose to invoke the

16    district court's jurisdiction by filing its Motion for a

17    Temporary Restraining Order.  Belvedere then attempted to

18    make an end run around the district court's refusal to grant

19    the interim relief, the interim relief Belvedere sought in a

20    case over which the district court continued to have

21    jurisdiction, by going back to Customs and asking Customs to

22    do what the district court would not.  In these

23    circumstances the district court could order Belvedere to

24    withdraw its pending Customs application to prevent the

25    frustration of the order it had previously issued in its
```

1   exercise of jurisdiction otherwise attained.

2       "The district court promptly issued an order under the

3   All Writs Act to protect integrity of an earlier order and

4   to prevent parties over whom the court had continuing

5   jurisdiction from resorting to alternative forum to

6   relitigate settled issues."

7       And citing other cases:  "The court's use of the

8   All Writs Act to prevent litigants from frustrating or

9   circumventing its orders and to guard integrity of its prior

10   ruling over which it expressly retained jurisdiction" -- I'm

11   sorry.  Citing the *Winkler versus Eli Lily* case.

12       And the *Winkler versus Eli Lily* is a Seventh Circuit

13   case and it stands for the proposition, the federal courts,

14   through the All Writs Act, have the authority to enjoin

15   state courts from proceeding with -- from proceeding to

16   circumvent their orders.  So we know that, under certain

17   circumstances, that can be done.

18       And I think it would be instructive again to read this

19   briefly from the *Winkler* case:  "The All Writs Act -- in the

20   All Writs Act, the Supreme Court teaches, permits a federal

21   court to support its jurisdiction by issuing such commands

22   as may be necessary or appropriate to effectuate and prevent

23   the frustration of orders it has previously issued in its

24   exercise of jurisdiction otherwise obtained.  As previously

25   noted, the aid of jurisdiction language in the All Writs Act

```
 1   parallels that of the Anti-Injunction Act, and courts

 2   regularly construe the two statutes similarly with respect

 3   to their aid of jurisdiction clauses.

 4       "Consequently, we believe the two statutes in concert

 5   permit a district court, under certain circumstances, to

 6   issue an injunction to safeguard a pretrial ruling," like

 7   the discovery order at issue here.

 8       "Litigants who engage in forum shopping or otherwise

 9   take advantage of our dual court system for the specific

10   purpose of evading the authority of a federal court have the

11   potential to seriously impair the federal court's

12   flexibility and authority to decide that case."

13       And that --

14       JUDGE SIPPEL:  Let's cut to the chase.  But on its

15   face, filing a state court action in Florida against

16   plaintiffs dismissed with prejudice from malicious

17   prosecution is no longer a concern of this Court; right?

18       MR. RODRIGUEZ:  The ones that are dismissed, you're

19   right, Judge.

20       JUDGE SIPPEL:  And on its face, that's what we're

21   dealing with; right?

22       MR. RODRIGUEZ:  Well --

23       JUDGE SIPPEL:  That's what the state court action is?

24       MR. RODRIGUEZ:  Well, Judge, I would respectfully

25   suggest or tell you that that's the pretext for them to
```

1    conduct the discovery.  I mean, yes, it's a malicious

2    prosecution case.  Yes, it's, I think, a negligent

3    supervision case.  But the purpose of it, as stated, I think

4    pretty unequivocally in its Motion to Transfer to the

5    Complex Litigation Division, is to conduct discovery that

6    Your Honor wouldn't otherwise allow them to do in your case.

7        I mean I think that's -- I think it's pretty clear.

8    The timing is not -- you know, is consistent with what I

9    just said.  They went ahead and were asking you for months

10   and months.  They wanted to take leave and start going down

11   this rabbit hole of fraud all over the place based upon, you

12   know, sketchy witnesses and reports that are rank hearsay.

13   Your Honor wouldn't have it.  Your Honor didn't want the

14   case derailed.  Your Honor didn't want the delays that that

15   would impose on the case.  And what did they do?  When

16   Your Honor granted the previous protective order, they went

17   ahead and appealed you there in the Eighth Circuit.

18        By the way -- and they could have done that, but

19   instead, they went to Florida in front of Judge Lenard in

20   state court.  Yes, that's the pretext.  Is that the real

21   reason?  I think before we entered into litigating over this

22   issue, I think their real purpose was shown.

23        And what we're asking is for Your Honors to sustain

24   the order that you already entered and not allow them to

25   frustrate your order by going ahead and doing this

```
1    discovery.  I mean it's going to have an impact on your

2    cases.  And what they're trying to do is get information and

3    discovery that they otherwise wouldn't be allowed.  And, by

4    the way, if it's going to be that -- and I'm not suggesting

5    that it should, and I'm emphatically, respectfully saying

6    that it shouldn't, and you shouldn't allow it, but if you

7    were to allow it, how does it make sense to skip over the

8    first part of things, which is for us to take discovery?

9         By the way, it's a dog and pony.  I don't want to go

10   down this road.  I don't want my words to be misinterpreted.

11   But it makes no sense for them to be taking this discovery

12   before we're able to take discovery regarding the very

13   report that they're basing all these allegations in Florida

14   on.  So I'm not sure that answers the question, but --

15   Your Honor, at this point, I mean I have -- I have other

16   cases to discuss but I think that it relates primarily to

17   arguments that I suspect that the defendants are going to

18   make.

19        At the end of the day, there's -- they cited a ton of

20   cases, some U.S. Supreme Court cases, some circuit court

21   cases regarding the Anti-Injunction Act, regarding the

22   relitigation exception of the Anti-Injunction Act, but the

23   fact of the matter is, the cases that I have cited to the

24   Court are the ones that I believe allow the Court the

25   authority to enjoin this kind of conduct.  There's also the
```

```
1    inherent power of the Court, of course, that you have, but

2    the fact is that the All Writs Act certainly gave you a tool

3    that you can use to prevent the frustration of your orders.

4         Let me sit down for now and I'll come back.  Do you

5    have any questions, Your Honor?  I'm sorry.

6         JUDGE PERRY:  No.  That's fine.  Go ahead.

7         I'm going to address the lawyers in the case I have.

8    The question is:  Do any of the plaintiffs' counsel in Reid

9    wish to be heard on this?

10        MR. STUMP:  Thank you, Your Honor.  We're sitting back

11   here away from the counsel table.

12        JUDGE PERRY:  Come on up so we can hear you.  Yeah, I

13   know, but you're counsel of record, so you can step up to

14   the lectern.

15        MR. STUMP:  Your Honor, thank you for giving us an

16   opportunity to be heard.

17        You know, we've been watching all this from a

18   distance, as we're trying to do again here today.  It's not

19   our motion, it's not our fight.  From what we can tell --

20        JUDGE SIPPEL:  Some of these plaintiffs are your

21   former clients.

22        MR. STUMP:  Well, from what we were able to determine,

23   none of the 71 or so former plaintiffs that were identified

24   were our clients.  There may be some spillage here, and I

25   think there has been, and a lot of the arguments have been
```

1    made, and the discovery that's being sought, but from what

2    we can tell, nothing that would be sought in discovery in

3    Florida would be communications related to our clients or

4    our case.  Certainly if they would be, we would oppose it.

5         *JUDGE PERRY:*  And is that true in -- you believe in

6    both the federal -- the discovery that may be sought in the

7    federal case as well as the state case?  Because the state

8    case is the one with the 71 plaintiffs; right?

9         *MR. STUMP:*  Right.

10        *JUDGE PERRY:*  The federal case, they're also seeking

11   discovery that the plaintiffs in Judge Sippel's case are

12   seeking to enjoin; right?  So are you concerned about your

13   attorney-client privilege being disrupted in that -- by that

14   discovery?

15        *MR. STUMP:*  Yes, absolutely we are, Your Honor.  I

16   should have made that distinction.

17        It appears to be sort of all-encompassing, and so that

18   would pull us in, and that's why we appreciate the

19   opportunity to be here.  But this is not our motion.  We

20   haven't briefed this issue, so we -- you know, it's hard for

21   me to stand up and argue anything other than, yeah, we're

22   deeply concerned by all the allegations that the conduct of

23   the defendants has been an end around with the Court's order

24   in an attempt to conduct one-sided discovery into privileged

25   communications involving our clients.

```
1          And I'll just say, while I have an opportunity to be
2    heard on that, Your Honor, that we do also have a concern
3    about other conduct that's been going on in Peru:  Lawyers,
4    former lawyers for Doe Run Peru, who we believe to be under
5    the control of the defendants, making public statements in
6    the radio and social media.  I know this has been before
7    Judge Sippel already.
8          We have concerns that the actions in Florida and the
9    actions of Doe Run former attorneys are part of what appears
10   to be a concerted effort to interfere with our relationship
11   with our plaintiffs and spread disinformation in the public
12   in Peru.  So all that is deeply concerning to us.  We're not
13   here asking for any relief on any of that right now, but we
14   do appreciate the opportunity to be heard on it.
15          JUDGE SIPPEL:  Counsel for the defendants?
16          JUDGE PERRY:  Yeah.  Actually, let me ask you one
17   follow-up question.
18          So, on the -- with regard to the stuff on the radio
19   and the other allegations of things going on down in Peru
20   right now, are you -- you're concerned about it, but have
21   you heard from the lawyers and people you have working for
22   you down there if there's been any direct interference with
23   your own clients so far that you know of?
24          MR. STUMP:  The quick answer, Your Honor, is no.
25   There's nothing that we've seen that we consider to be
```

```
 1    direct interference with any of our clients.  There was one

 2    instance that we're aware of where an attorney who claimed

 3    to be representing Doe Run Peru came to the house of the

 4    father of two of our clients looking for him in particular.

 5    Beyond that, we didn't have any information that there was

 6    anything that we felt needed to be brought to the attention

 7    of the Court.  It's more -- not direct attempts to contact

 8    our plaintiffs, although -- I should say, by the way,

 9    Your Honor, we understand there's an ongoing criminal

10    investigation going on in Peru right now; understand that

11    investigation was initiated by the defendants, and that

12    apparently, through the filings, we've learned that in Peru,

13    at least, it's customary or appropriate for some

14    representative of the complaining party, which in this case

15    would be Doe Run and Renco, to come with the prosecuting

16    attorney's office when they go conduct interviews.  So that,

17    of course, is concerning to us as well, but that seems to be

18    some process involving Peruvian authorities, and we don't

19    have any say over that.

20        The long story short, Your Honor, we don't have a

21    concern right now there's been any direct attempts to

22    interfere with client relationships.  It really just seems

23    to be more -- many, many different indirect attempts.  We

24    have had to field questions from our clients.  We have had

25    to put to bed a lot of misinformation and disinformation, so
```

1   that's frustrating and it's concerning to us.

2          **_JUDGE PERRY:_**  Okay.  Thank you.

3          **_JUDGE SIPPEL:_**  Counsel for the defendants?

4       **_MR. BIERMAN:_**  Your Honors, good afternoon.  May it

5   please the Court.  My name is Jon Bierman of the Polsinelli

6   law firm, and I am an attorney for defendants Doe Run and

7   Renco.

8          With respect to the malicious prosecution action that

9   they filed in Florida state court, I'm the attorney who

10  filed that case.  I entered my appearance in the present

11  matter for the purpose of addressing the Court's concern

12  with respect to that case.

13         And I'd also like to introduce my colleague,

14  Robert Kuntz.  He's with the firm of Rivero Mestre.

15  Mr. Kuntz represents Doe Run and Renco with respect to the

16  1782 action.  He's the attorney who filed that.  And he's

17  entered his appearance in this matter to respond to

18  plaintiffs' concerns in that regard and will do so after I

19  speak.

20         I'd like to start by addressing certain factual

21  inaccuracies contained in plaintiffs' briefing of this

22  matter, as well as some apparent misimpressions held by this

23  Court, as the same were related in the order calling for

24  this status conference.  Correcting these inaccuracies and

25  misimpressions is critical to the analysis of both whether

1    an injunction of the Florida state court action is warranted

2    and whether this Court has the authority to issue such an

3    injunction.

4          First, Your Honors, plaintiffs assert in their Motion

5    and Memorandum in Support that the malicious prosecution

6    action in question was brought to frustrate this Court's

7    exercise of its jurisdiction.  Similarly, this Court, in its

8    order setting the present status conference, wrote that the

9    discovery in the malicious prosecution case will also seek

10   information regarding the recruitment of plaintiffs in the

11   cases before this Court, thus implicating this Court's

12   jurisdiction.

13         This Court also then wrote, "Defendants' Florida

14   proceedings directly seeks to gain information regarding the

15   recruitment of the plaintiffs in the two cases before this

16   Court."

17         Your Honor, Judge Sippel, I think, made the point a

18   moment ago that the plaintiffs who are at issue for whom

19   Doe Run is seeking a remedy for the malicious prosecution,

20   those plaintiffs are no longer before this Court.  There

21   were 71 plaintiffs.  They were dismissed with prejudice.

22   There are other plaintiffs that were dismissed without

23   prejudice, which, under Florida state law, their cases have

24   been terminated as well.

25         It is Doe Run's position that, with respect to those

1   plaintiffs, they also have the predicate for a malicious

2   prosecution claim.  And so I did want to clarify for the

3   Court that it's not simply the 71 who were dismissed with

4   prejudice.  There are others that potentially Doe Run would

5   be the prevailing party for purposes of maintaining its

6   cause of action in Florida.

7        **JUDGE PERRY:**  I mean, let me just understand this.

8        So the discovery that you all are going to do in that

9   case or you intend to do, you think the issues about

10  recruiting and contacting those plaintiffs, which is part of

11  what you want for the malicious prosecution, but that's not

12  going to bleed over into the plaintiffs' recruiting and

13  contacting -- or, you know, anything related to the people

14  who are still plaintiffs in our cases?  That's what you're

15  saying, it can be cabined to just deal with the people who

16  are the 71 that are affected there?

17       **MR. BIERMAN:**  Your Honor, I don't know exactly where

18  the discovery is going to go in that case.  What I can say

19  is that, with respect to that discovery, whether that

20  discovery is appropriate, whether that discovery is relevant

21  is going to be a question for a Florida state court to

22  decide.  And I can get into the legal arguments.  I've got

23  them all mapped out here.  But when it comes to the

24  relitigation exception, for instance, the question is

25  whether we're dealing with the exact same claims, the exact

1    same issues.  And it's not the case that we're dealing with

2    the exact same issues.  The question, of course -- and I

3    apologize, Your Honors for -- the question of whether the

4    Court has the authority to issue an injunction if one of the

5    exceptions under the Anti-Suit -- under the

6    Anti-Injunction Act is met, the re-litigation exception

7    would be implicated here.  It's not the same issue.

8         The question of whether the discovery was appropriate

9    in this case, Judge Sippel, you determined that it was not,

10   and I believe it was because of a case management concern.

11   You said that it wasn't relevant to the 108 plaintiffs in

12   the trial pool.  Well, the question for this Florida state

13   court is going to be very different.  The question for the

14   Florida state court is going to be:  Is this relevant to the

15   question of malicious prosecution?  And there may very well

16   be pattern and practice evidence.  I mean I expect --

17        **JUDGE SIPPEL:**  What Judge Perry's asking you is that,

18   when you talk, it sounds tidy, but in reality, to seek all

19   this information about how the recruiting took place, how

20   the contacts took place, it's not quite as cabinable as you

21   want us to believe.

22        **MR. BIERMAN:**  I would make two points:  One, I believe

23   it is tidy, Your Honor, again, because it does not implicate

24   (a) the jurisdiction of this Court; right?  So we can talk

25   about the second exception to the Anti-Injunction Act, which

 1   is that it be necessary, in aid of the Court's jurisdiction,

 2   the order that you would enter enjoining.  It doesn't impact

 3   the Court's jurisdiction.

 4        These plaintiffs are not before the Court, number one.

 5   Number two, as I said earlier, the question then becomes,

 6   okay, this discovery is going to be undertaken, but this

 7   discovery is going to be undertaken with respect to what is

 8   happening in the Florida state court action, period, not

 9   with respect to the actions before this Court.

10        This Court, if there is -- there are not going to be

11   discovery disputes before this Court.  If depositions are

12   taken, they're not going to be under the auspices of this

13   Court.  Those disputes -- I'm sure they will arise -- are

14   going to be decided by a Florida state court judge.

15        **JUDGE PERRY:**  I guess I'm still having trouble with

16   this.  So if your discovery -- and I realize there's a

17   dispute because somebody says, Oh, no, you're taking --

18   you're assuming a dispute arises.  But, so if you guys start

19   taking discovery that goes into asking questions or would --

20   the answers would reveal attorney-client privileged

21   information for clients other than those 71, clients who may

22   have been clients and may be parties to our cases, you're

23   saying, well, it doesn't matter.  Somebody -- the

24   defendants' lawyers in the Florida state case, in other

25   words, if they need to protect that, and if they say, I

1   don't need to say anything to object to something that's

2   going into attorney-client privilege from someone that's a

3   client of Mr. Schlichter's firm, they don't need to object.

4   Nothing can be done about that.  So you could -- they may

5   say, It's not my clients they're asking about.  I don't need

6   to worry about it.  Right?  For instance, tell me all the

7   other people you contacted.

8       **MR. BIERMAN:**  So to the extent that they would be

9   waiving any privilege that belonged to their clients, they

10  couldn't.  I don't know what kind of privileged information

11  they would have with respect to Mr. Schlichter's other

12  clients.  But in any respect, again, that is a question to

13  be decided by the Florida state court.

14      ***JUDGE PERRY:***  But nobody will ever bring it up to them

15  because nobody has an interest to protect people who are not

16  before the court, do they?

17      **MR. BIERMAN:**  No.  And then, Your Honor, the question

18  would be yours as to what you want to do with this

19  information if it's brought before this Court in this case.

20  That would be the role of this Court and that would be the

21  appropriate means of dealing with it.

22      ***JUDGE PERRY:***  It's an adversary system.  Somebody has

23  to bring it before the Court.

24      **MR. BIERMAN:**  And I anticipate that some of these

25  folks would, but -- if I might, Your Honor, may I continue?

1   Thank you.

2        So, a couple things.  One:  You've just heard

3   Mr. Rodriguez speak about how Doe Run and Renco have

4   revealed their true intentions by relating to the --

5   relating to the court in Florida that there's going to have

6   to be a lot of discovery, it's going to be very complicated,

7   and it's because of a fraud perpetrated on this Court.

8        I would like to direct the Court to a sentence in

9   paragraph 26 of the complaint that we filed in Florida state

10  court in which Doe Run and Renco asserted that Doe Run and

11  Renco now seek to recover damages as compensation for the

12  harm these actions have caused Doe Run and Renco.

13       This is not an attempt by Doe Run and Renco to seek a

14  remedy on behalf of this Court for a fraud perpetrated

15  against it, despite the fact that one may have been.  This

16  is an attempt to remedy wrongs against Doe Run and Renco.

17  And despite Mr. Rodriguez's attempt to cast the evidence as

18  hearsay evidence by one incredible witness, that's not the

19  case here.  That's not what we're talking about.

20       We've got, for instance, the firsthand account of a

21  woman named Lucy Esther Rojas Argandona, a mother who says

22  that she signed documents that she was told would entitle

23  her to school supplies, but when she went where she was

24  instructed to obtain the school supplies, she was informed

25  that blood tests would need to be drawn from her children to

1    check their lead levels in order to receive what she had

2    been promised.  Two years later she first learned that her

3    children had been enrolled as plaintiffs despite not ever

4    having signed any sort of consents.  She stated that her

5    signature was forged on these documents.

6         This is what Doe Run is trying to vindicate.  These

7    are the sorts of things that Doe Run has evidence of which

8    can demonstrate that, in fact, these have been malicious

9    prosecutions.  There was absolutely no probable cause to

10   bring these cases.  And we believe that both the defendants

11   in that case in the Florida state court and certainly maybe

12   others were aware of it.

13        The fact that Mr. Rodriguez says that he doesn't know

14   if Mr. Careaga has been disbarred?  Mr. Careaga was

15   disbarred in 2015.  He was disbarred both for mishandling

16   client funds and for practicing law without a license after

17   he was suspended.  Well after 2015, he continued to work to

18   supervise these recruiters.  Again, this is all evidence

19   that there were wrongs perpetrated against Doe Run, and

20   those wrongs can be remedied by Doe Run.  It has a right to

21   remedy those wrongs in that case in Florida state court.

22   That is the --

23        **JUDGE SIPPEL:**  Despite the fact that I -- look, we

24   would all -- if what you say is true, there's two

25   observations.  We have over 3,000 plaintiffs.  You have one

1   very good example perhaps that you can prove.  But I

2   explicitly told counsel that we would discover the fraud and

3   we would deal with the fraud in this courtroom, and we would

4   do it in an orderly and pragmatic fashion, that there was

5   going to be a remedy if, in fact, these things turned out to

6   be true.

7          **MR. BIERMAN:**  And with respect to --

8          **JUDGE SIPPEL:**  Where were you then without a remedy

9   when I promised from the bench, if this was true, we'd deal

10  with it?

11         **MR. BIERMAN:**  So, again, Your Honor's talking about

12  the cases that are presently before this Court, and what I'm

13  talking about is the cases that are no longer within this

14  Court's jurisdiction.

15         There is a tort, as Your Honors know better than I do,

16  called malicious prosecution.  It has been committed here.

17  My clients have been damaged by it.  My clients are seeking

18  a remedy for that.  They are not seeking a remedy for what

19  has been done in this Court.  That is the distinction.

20         If I might just make a few more points, Your Honor --

21  Your Honors.  Pardon me.  One:  Plaintiffs rely in their

22  reply brief almost exclusively on this *New York Telephone*

23  *Company* case.  Mr. Rodriguez just again cited it.  The

24  New York -- that case doesn't even implicate the

25  Anti-Injunction Act.  That is a case in which a Court

1    enjoined a New York utility company, ordering it to allow

2    its profiter to be used by law enforcement in surveillance.

3    It is not an injunction issued against a court of the state;

4    therefore, the Anti-Injunction Act doesn't even come into

5    play, and that's the crux of this matter.

6         And, so, to make this very simple, Your Honor -- and I

7    will short circuit this -- the plaintiffs in this case rely

8    on *Winkler*.  They ignore the fact that *Winkler* has since

9    been qualified.  It's been limited by the Seventh Circuit.

10        The court, in *Adkins v. Nestlé Purina*, overturned an

11   anti-suit injunction and wrote:  "No matter what one makes

12   of the word 'jurisdiction' in Section 2283, an injunction is

13   proper only when necessary to protect federal jurisdiction.

14   The parties argue that closing down the Missouri case would

15   be prudent, beneficial, helpful," and so on.  The unstated

16   premises is that Section 2283 allows whatever a federal

17   court thinks is good litigation management, but that's not

18   what 'necessary' means.

19        We have other cases that go on to hold, to stand for

20   the proposition that, unless the court's jurisdiction is

21   made nugatory, meaning that, best of my knowledge, although

22   I've never used that word in real conversation, that the

23   federal court is being denied its jurisdiction.  And,

24   Your Honors, the federal court is not being denied.  Your

25   court is not being denied its jurisdiction here.  You

```
1   continue to maintain jurisdiction over all of the cases that
2   are before you.  There's no implication whatsoever.
3        What I -- two more quick points, Your Honor.  The
4   Phillips v. Belvedere case that was just cited is also an
5   apposite.  That is essentially an in rem case, so that's a
6   case in which the remedy that was sought was, there was
7   property being held in customs.  The federal court
8   wouldn't -- I believe would not release the property.  The
9   defendant, I believe in that case, then went to the Customs
10  Service and tried to have the property released; the idea
11  there being that, once the property's gone, the federal
12  court no longer has jurisdiction over it.
13       And there's a lot of case law out there that stands
14  for the proposition that when it comes to the -- in aid of
15  the court's jurisdiction -- and there's an Eighth Circuit
16  case on this point.  It's, In re Bank -- In re BankAmerica
17  Corp., 263 F.3d 795, which stands for the proposition that
18  in aid of jurisdiction only applies when we're talking about
19  in rem actions where a court's jurisdiction is actually
20  going to be denied because the subject matter of the case
21  will be disposed of.  That case specifically states that if
22  we have two in personam actions, even if they're on parallel
23  tracks -- meaning the same sorts of issues are being
24  decided, which is not the case here -- that an anti-suit
25  injunction would not be appropriate.
```

1            Your Honors have any further questions?

2            *JUDGE SIPPEL:*  No.

3            **MR. BIERMAN:**  Thank you both.

4            **MR. KUNTZ:**  Good afternoon, Judge Sippel, Judge Perry.

5    My name's Robert Kuntz.  I'm with the law firm of Rivero

6    Mestre.  I've never had the opportunity to appear in the

7    Eastern District of Missouri, so it's a pleasure to be here.

8    This is a spectacular courthouse.

9            If it pleases the Court, I want to do three things in

10   a short time.  Unfortunately, the Court has been misled

11   about some critical facts regarding the 1782 and the process

12   underway now in Peru, and I'm going to clear those up.

13           Second, I'm going to provide a few key details about

14   that Peruvian criminal process because I think you can

15   contextualize in an important way the 1782 application.

16           Third, building on what Mr. Bierman just said, I'm

17   going to explain to you, I hope, why the All Writs Act --

18   the All Writs Act is a particularly ill-suited instrument to

19   enjoin your sister federal court in the Southern District of

20   Florida or to impede the process in Peru.

21           So let's talk about some things that need to be

22   cleared up on the record.  An important instance, Judge,

23   goes -- Judges, goes back to the plaintiffs' ex parte

24   emergency motion.  There's a statement in that motion that

25   they attribute to the unsigned declaration of a Peruvian

1  lawyer named Catherine M. Puerro.  That statement says this:

2  "Peruvian law gives plaintiff" -- here, defendants' attorney

3  -- "the right to guide the investigation, and he has asked

4  for and received permission to participate in the

5  questioning of the witnesses he has identified."

6      Your Honors, I invite you to go back and look at the

7  unsigned M. Puerro declaration because it doesn't say that.

8  And the reason it doesn't say that, signed or unsigned, is

9  because no Peruvian lawyer would say that because that's not

10  at all, as I'll explain momentarily, how the process there

11  works.

12      So that you're just not listening to my impressions of

13  how Peru works, we've also submitted an affidavit from -- a

14  declaration from Emerson Miguel Campos Maldonado.  He is a

15  Peruvian lawyer, a practitioner and instructor in Peruvian

16  criminal law.  Now, those mischaracterizations were

17  recapitulated and amplified in the motion for the All Writs

18  injunction.

19      There are several examples, but I'm going to read just

20  one.  They state:  "Plaintiffs state that Doe Run is

21  proceeding with the federal court lawsuit alleging fraud on

22  this court."

23      Your Honors, a 1782 application is not a lawsuit; it

24  is not litigating the alleged fraud; it doesn't implicate

25  your jurisdiction; it seeks no remedy; it seeks to avoid no

1    remedy.

2         And then again in their reply memo, they say, "For

3    example, the federal court complaint sought to remedy an

4    alleged fraud in this court."

5         And one section is even entitled, "This Court has the

6    authority to enjoin prosecution of the federal court

7    lawsuit."

8         A 1782 is not a lawsuit.  We are not litigating the

9    issues before this Court.  It is not in any way impute --

10   impinging on this Court's jurisdiction.

11        Now, Your Honors, how do I know that you've been

12   misled?  Because, Judge Sippel, some of these areas have

13   actually worked their way into the orders that you've

14   written.  In your May 19 order you wrote, "The complainant

15   has the right" -- meaning Doe Run Resources and Renco in

16   this case -- "has the right to guide the investigation and

17   may ask questions of the witnesses."

18        Now, that's an echo from that made-up citation to the

19   M. Puerro declaration, but, again, I'll explain in a minute,

20   that simply isn't the case.  That's not how it works in

21   Peru.

22        You wrote that, "Doe Run will be permitted to engage

23   in impermissibly questioning or guiding the questioning of

24   current plaintiffs through the guise of a separate criminal

25   proceeding."

1      Again, Your Honor, that's not so.  We're not entitled

2  to do that in Peru, as I'll explain.

3      Respectfully, those statements just don't reflect the

4  facts on the ground in Peru, which brings me to my second

5  point, to talk about how that procedure works a little bit.

6  Again, you have Mr. Maldonado's declaration, which is

7  evidence, but let me explain to you in brief summary what

8  some of that says.

9      Pardon me.  I'm fighting a cold, Judges.

10      The Peruvian criminal justice system differs in some

11  ways from the United States system but in other ways has key

12  similarities.  Peru is a civil law country where

13  investigation of criminal matters is largely conducted by

14  prosecutors.  A criminal investigation, not a case, not a

15  charge in Peru, begins with something called a noticia

16  criminal, literally "news of a crime."  This can come to the

17  prosecutor in several ways.  They might receive a noticia --

18  that's essentially a police report -- the prosecutor can

19  initiate an investigation sua sponte, or they can receive

20  what is called a denuncia, quite literally a "denunciation."

21  A denuncia doesn't have to follow a particular form.

22  There's no provision in Peruvian law explaining what one of

23  those looks like.  It doesn't and it cannot on its own

24  initiate a criminal investigation.

25      The best analogy in our system is something that I'll

1    bet many lawyers in this room have done because I think

2    we're all civil practitioners.  You get a fraud case that

3    looks just too severe for you to want to pursue it in the

4    civil realm, so you package up your best evidence and you

5    take it to the prosecutor, to the U.S. Attorney or the state

6    attorney, and you say, Look at this.  You should prosecute.

7            That's not guidance, it certainly isn't control, as

8    anyone who's ever done it can tell you, because when you

9    give it to the prosecutor, sometimes the prosecutor's

10   interested and sometimes the prosecutor isn't.

11           A denuncia in Peru isn't made by the government or by

12   law enforcement.  It can be given by a natural person to a

13   prosecutor or by a figura corretaje [sic] -- that is a legal

14   figure, a company.  It's often accomplished, just as it is

15   here, just as it was with this denuncia, through the

16   services of an attorney.  Once that denuncia is laid, if the

17   prosecutor accepts it as a noticia criminal, then the

18   prosecutor does what prosecutors do:  Investigate, question,

19   look at evidence, perhaps subpoena witnesses.

20           These are the diligencias preliminares, the

21   preliminary proceedings.  That's where this matter stands

22   now in Peru.  We're still a long way from any criminal

23   charge being laid.  In the Peruvian system, the prosecuting

24   attorney will accept, from the denuncia, suggestions of

25   questions to ask, suggestions of people to talk to, but

```
1    she'll ask them or she won't; she'll interview them or she
2    won't.
3         Now, there's one difference in the Peruvian system
4    that is key, and it's a difference about which you've been
5    misled.  Unlike the system here -- and Mr. Stump got it
6    correct.  Unlike the system here, when the prosecutor
7    questions witnesses, the denunciata, the person who brought
8    the denuncia, is permitted to be present, to be present.
9    They're not permitted to ask questions and they're certainly
10   not permitted to tell the prosecutor what the prosecutor may
11   or may not do.
12        After this process the decision to bring a charge or
13   not to bring a charge is solely in the province of the
14   prosecutor.  The denuncia, like a complainant to a
15   prosecutor here, they have an interest in the case, but
16   that's not the only interest that the prosecutor's
17   vindicating.  The prosecutor's looking at all of what are
18   called the averiados, the people who have been potentially
19   harmed or impacted by the crime.  They're considering the
20   rights and interests of the accused as well.
21        Now, there's one important feature, last thing I'll
22   talk about, Peruvian system that's salient here.  This case
23   is proceeding in Peru in reserva, which is essentially under
24   seal.  What does that mean?  Neither the party being
25   investigated nor the denunciantes -- Doe Run and Renco in
```

1  this case -- are permitted to know what the evidence is.  We

2  can put evidence in, we can make suggestions, but we don't

3  get to see the criminal file, we're not told what the other

4  evidence is.

5        In summary, Doe Run and Renco cannot initiate an

6  investigation, have no right to guide or direct the

7  investigation, are not permitted to question witnesses in

8  the investigation, and can only suggest to the fiscal

9  evidence they should look at, which brings us to the 1782.

10 This is exactly what the 1782 was made for.

11       The 1782 is a process apart from the proceedings in

12 this Court.  It's not a lawsuit and it doesn't adjudicate

13 any matter before this Court.  Importantly, Judge Sippel, it

14 does not in any way violate your March 24th order.  Your

15 March 24th order granted two motions for protective order.

16 It prohibited seeking anything from a plaintiff called

17 W.M.B.F.  It prohibited ex parte communications with any

18 plaintiff or parent.  It stated that you would not hear the

19 evidence that had not possibly been obtained by such

20 ex parte communications.  None of that is implicated in the

21 1782.

22       The 1782 exists expressly for the gathering of

23 evidence -- which is to say testimony, documents -- for use

24 in a criminal -- in a foreign proceeding.  That the

25 proceeding in Peru is a proceeding within the contemplation

1  of the act is stated in the act itself.  One of the -- it

2  defines a proceeding, among other things, as criminal

3  investigations conducted before formal accusation.  That

4  Doe Run and Renco are interested parties is clear from

5  *Intel*, the lead case on 1782.  You've heard something in the

6  papers from the plaintiff that Doe Run and Renco, they're

7  not interested parties; that's the government of Peru, the

8  prosecutor.  *Intel* expressly rejects the notion that only

9  the parties to a litigation are the interested persons in

10  the meaning of 1782.

11      Which brings me at last to my third goal here,

12  Your Honors, which is to talk a little bit about the law.

13  The 1782 and the Peruvian criminal investigation it supports

14  certainly touch on some of the events about which this Court

15  is and has for a long time been concerned, but they do not

16  implicate the same interests and they do not impinge on this

17  Court's jurisdiction.  This is an independent matter before

18  a separate sovereign.  Independent of this Court's

19  interests, Judge Sippel particularly, since you addressed

20  this, about the conduct and the integrity of the proceedings

21  before it, Peru, a sovereign nation, has an interest in

22  potential criminal acts that took place there.

23      Independent of Doe Run's interests in the proceedings

24  here, independent of its rights to pursue its defenses here

25  within the bounds that you and Judge Perry set within the

1    law, Doe Run has interests as a crime victim in Peru, and it

2    has some limited rights, the provision of evidence, to

3    vindicate those rights.

4        This Court can certainly decide what evidence it's

5    going to allow through those doors, but it doesn't have the

6    authority, nor should it, to attempt to limit what facts and

7    evidence the Peruvian justice system can gather or what

8    evidence Doe Run is permitted to provide in that independent

9    matter.

10        Now, Mr. Bierman addressed some of the fundamental

11   infirmities of the All Writs Act.  Let me address the

12   special concerns when one federal district court considers

13   enjoining another federal district court or impeding,

14   through an injunction, the proceedings in a foreign

15   sovereign.

16        *Grider v. Keystone Health* points out how -- the

17   paucity of case law about this matter, and it says that's a

18   clue.  The reason there's so little case law about federal

19   courts enjoining other federal courts is because it doesn't

20   happen very much and shouldn't.  The All Writs Act isn't an

21   any writs act.  It doesn't, as the Supreme Court has said,

22   authorize courts to issue ad hoc writs whenever compliance

23   with statutory procedures, like the 1782, seems

24   inconvenient.

25        In fact, there are three instances in which a federal

```
 1    court can appropriately enjoin another federal court.  These
 2    are the Jimmy John's exceptions.  Every time I think of it,
 3    I think of the sandwich.  These are the Jimmy John's
 4    exceptions, and there are three:  When it will protect the
 5    integrity of an MDL proceeding -- this is not an MDL; when
 6    there's a pending or final class settlement or judgment --
 7    that isn't the case here; and to prevent duplicative
 8    litigation between the same parties on the same issues.
 9         Crucially, the 1782, it's litigation because we're in
10    court, Your Honor, but it's not a lawsuit that's seeking a
11    remedy at all, and so it's not seeking to obtain any remedy.
12    The parties to the 1782 is the discovery target,
13    Mr. Careaga.  It doesn't seek to relitigate or disturb
14    anything this Court is doing or has done, including the
15    March 24th order.
16         I want to speak briefly about Phillips.  Mr. Bierman
17    addressed it, but it's important to notice, Phillips --
18    first of all, it was not a district-court-to-district-court
19    injunction; it was a district-court-to-party requiring them
20    to remove something from the proceedings of a federal agency
21    injunction.
22         In Phillips, although it was decided well before
23    Jimmy John's, if it had come up today it would still have
24    stood because it absolutely falls under one of the
25    Jimmy John's exceptions.  The very same parties who are
```

1    seeking the very same relief from the very same parties lost

2    in front of the district court and went and tried someplace

3    else.  If *Phillips* had been decided now, it would fall under

4    the Jimmy John's exception, but this one doesn't.

5         The other cases that they, plaintiffs, have cited in

6    support of their district-to-district-court judgment --

7    injunction are no better availing.  *Liles v. Del Campo*, that

8    was a class action case.  *In re Bank of America Wage & Hour*

9    was an MDL.  *In re Managed Care*, also an MDL.

10        Two final points, Your Honors:  International comity

11   and remedies at law.  Beyond the federal-to-federal

12   concerns, which are pretty pointed, the plaintiffs want you

13   to walk past *Goss*, the Eighth Circuit case, and ignore the

14   real international comity concerns here.  I'm not entirely

15   sure why they cite *Goss* because it doesn't help them at all.

16        Remembering in the first place that, insofar as the

17   plaintiffs want this Court to enjoin even mere participation

18   in a foreign proceeding, *Goss*, citing *Laker Airways* -- which

19   was one of the first sort of cases really elucidating the

20   All Writs Act in modern times -- makes it clear, it's not a

21   get-out-of-injunction-free card to say, Well, I'm not

22   enjoining a federal -- a foreign court; I'm enjoining a

23   participant.  *Laker* makes it very clear.  It states, "While

24   an injunction may only operate on the parties within the

25   court's jurisdiction, they effectively restrict the foreign

1    court's ability to exercise its jurisdiction."

2         This concept of comity the Supreme Court has called

3    the animating purpose behind the 1782 statute.  The point is

4    to permit federal courts here to assist foreign and

5    international government bodies.  It promotes respect for

6    those bodies and, importantly, promotes the reciprocal

7    process that we're so eager to have bring evidence here.

8         Finally, remedies at law.  It's a bedrock principle,

9    Your Honors, and it's no less applicable to the equitable

10   relief sought in an All Writs Act injunction than in any

11   other injunction, that where there's a remedy at law, there

12   isn't room for the equitable imposition of the court's

13   powers.

14        The 1782 statute states -- and it's amazing how much

15   is in it because it's a really small little statute as these

16   things go.  It says, "A person may not be compelled to give

17   his testimony or statement or to produce a document or other

18   thing in violation of any legally applicable privilege."

19        In other words, thanks to the language of the statute,

20   thanks to the Rules of Civil Procedure, if discovery under

21   the 1782 application appears to be impinging on someone's

22   privilege, then they have every ability, right, and power to

23   go to Judge Lenard, who is fully capable of saying whether

24   something is or isn't privileged or conducting an in camera

25   review, doing whatever is necessary to decide that.

```
1         Now, Mr. Careaga is the target of this application,
2    but his papers in opposition -- and, by the way, he's filed
3    his objection to the 1782.  His papers in opposition
4    essentially were attaching all the All Writs pleadings to
5    the -- to his objections.  My point being, Your Honor asked,
6    Well, what will happen -- I think you asked, Judge Perry,
7    What will happen if there's a question that implicates the
8    privilege of someone who's not there?
9         Well, Judge, what will happen is, like anyone whose
10   privilege is implicated, that person or persons or their
11   attorney's going to have the ability to come in and say, No,
12   wait, stop.  Let's go to Judge Lenard and find out what the
13   privilege issues are here.
14        Because this remedy --
15        JUDGE PERRY:  How do they do that?  I still have
16   trouble with this concept.  They're not there.  How do they
17   know what's going on?  We depend on Careaga to call them and
18   say this is happening?  You're not going to call them and
19   say, We're doing it.
20        MR. KUNTZ:  Well, Judge, I will tell you that, as it's
21   happened, Careaga's called them and told them what's
22   happening.  Mr. Careaga's objection to the 1782 -- so,
23   Judge Lenard looks at it, she grants it.  It's usually
24   granted ex parte, but then it's not ex parte for long
25   because you serve a subpoena on somebody.
```

1      Mr. Careaga got the subpoena.  His objection basically

2   was a page or so saying, I object.  Look at everything

3   that's being filed in the Eastern District of Missouri with

4   regard to the All Writs injunction.

5      Your Honor's concerns are not -- are certainly

6   understandable, but as a practical matter, Judge, these

7   proceedings aren't happening in secret.  It's not like the

8   plaintiffs aren't going to be there with Mr. Careaga, who

9   was a late -- or still their employee, and following all

10  this.  Mr. Careaga's appearing pro se right now but he's

11  appearing pro se by way of simply attaching all the papers

12  written by counsel.

13      But I would say, Your Honor, two things about that.

14  The first thing is:  You cannot prospectively try to protect

15  the privilege that someone doesn't take their own steps to

16  protect.  And the second thing I would say is that those

17  privileges -- that the question before you on the injunction

18  isn't whether those privileges will be litigated, but

19  whether you can prior restrain, through an injunction,

20  the -- even the asking of the question.  No privilege has

21  been implicated until someone gets asked a question.  We

22  haven't had a substantive objection to our request for

23  production, but as soon as we -- if Your Honors deny the

24  injunction and we reanimate the 1782 procedure down there,

25  we fully expect that the next thing you're going to get is a

1   Motion for Protective Order with regard to the -- probably

2   the whole panoply of discovery we've asked.  And at that

3   time, Judge, it will be litigated.

4        I understand your concern, Judge Perry, but these

5   things aren't happening at a remove.  Importantly, this

6   piece of discovery is going to happen in the United States,

7   subject to the laws of the United States, subject to all the

8   protections of the United States.

9        And Your Honors just don't have the authority -- and

10  it's always a dicey thing to tell a judge they don't have

11  the power to do something.

12       **JUDGE SIPPEL:**  The less we have to do, the better.

13       **MR. KUNTZ:**  I hear you, Judge.

14       But while I understand your concerns, you're not the

15  judge of everything that happens everywhere, much as that

16  concern and desire is understandable.

17       **JUDGE SIPPEL:**  Neither of us have any delusion.  When

18  we talk out of this building we have absolutely no power

19  whatsoever.

20       **MR. KUNTZ:**  Your Honors, I don't have anything further

21  to add, but I'm here to answer your questions if you want me

22  to.  Thank you, Judge.

23       **JUDGE PERRY:**  I will say, what you just said sounded

24  very close to some things I heard from my children when they

25  were growing up, which was, You're not the judge at home.

1      **MR. KUNTZ:**  You're not the boss of me, I think you put

2  it.

3      **JUDGE PERRY:**  That's actually -- the answer is, I'm

4  not the judge, but I'm your boss.  That doesn't work for

5  this.

6      **MR. RODRIGUEZ:**  May I?

7      **JUDGE SIPPEL:**  You may.

8      **MR. RODRIGUEZ:**  From listening to counsel, you would

9  think that the 1782 is initiated by the government of Peru.

10  In fact, it was not.  It was initiated by the Renco and the

11  Doe Run defendants that are defendants in this case.

12      If Peru wanted to come down, if they felt that

13  strongly about the circumstances, they wanted to get some

14  additional evidence, then they could initiate that kind of

15  action themselves.  They didn't do that.

16      You know, I was listening to counsel articulate the --

17  you know, the Peruvian system.  Well, you know, the

18  prosecution was initiated by counsel for the defendants in

19  this courtroom.  Now, "initiated" in the sense that they

20  brought the matter to the prosecutor; they gave the

21  prosecutor a list of witnesses, many of which are either our

22  clients or former clients; they suggested the questions.

23      I -- I'm bilingual and I can read Spanish, and there

24  were orders that were entered by the prosecutor in that

25  case.  I think counsel's also bilingual, but it seemed

1  evident from the orders that I read that the role of the

2  initiating party was more than just giving questions to the

3  prosecutor, although I would say that, if you're giving

4  questions to the prosecutor and the prosecutor chooses to

5  ask your questions, and you're sitting in the room at the

6  time that those questions are asked, then I think it's

7  pretty close.

8        But I'm representing to the Court that the reading --

9  and I believe that the information that we had in that

10 moving paper came, not only from the attorney that was the

11 expert witness, but also from the orders that were entered

12 by the prosecutor.

13       Really, you know, the issue -- all the various cases

14 that have been cited -- I want to get into just one last

15 case that -- Judge Higginbotham's case.  It's a Fifth

16 Circuit case, 2002, and I think it sort of encapsulizes

17 [sic] everything here because it's not a relitigation issue.

18 This is not any of the other exceptions.  This has to do

19 with the court's authority to protect its own jurisdiction

20 by enjoining others that -- from attacking its discovery

21 orders.

22       And the case that counsel discussed, I think the

23 *Phillips* case, cites to the *Winkler* case.  The *Phillips* case

24 does deal with the Customs Service, but it cites the *Winkler*

25 case, which is a Seventh Circuit case, and that case is

1    directly on point in that it deals with the court enjoining

2    another court from essentially disturbing a discovery order.

3        But I think -- I think Judge Higginbotham can say it

4    better than anyone, and I'd like to just read a little bit

5    from this Fifth Circuit decision.

6        **JUDGE PERRY:**  What's the name of the case?

7        **MR. RODRIGUEZ:**  *Newby versus Enron.*  It's -- the

8    citation is 302 F.3d 295, 2002 case.

9        Judge Higginbotham says, "Although the Anti-Injunction

10   Act is an absolute bar to any federal court action that has

11   the effect of staying a pending state court proceeding,

12   unless the action falls within a designated exception, it

13   does not preclude injunctions against the lawyers filing

14   prospective state court actions."

15       And then I'll skip -- "The All Writs Act provides that

16   federal courts may issue all writs necessary or appropriate

17   in aid of their respective jurisdictions and agreeable to

18   the usages and principles of the law.  The Act contains the

19   same language as the second of the three exceptions of the

20   Anti-Injunction Act, and the parallel necessary in native

21   jurisdiction language is construed similarly in both the

22   All Writs Act and the Anti-Injunction Act.

23       "The courts have read the language narrowly, finding a

24   threat to the court's jurisdiction only when a state

25   proceeding threatens to dispose of the property that formed

1   the basis for federal *in rem* jurisdiction or when the state

2   proceeding threatens the continuing superintendence by a

3   federal court.  Here, the principles of federalism lie

4   behind our reluctance to adopt an expansive reading, if

5   necessary, in a native jurisdiction, which extends to

6   injunctions against the prospective state court proceedings

7   even though they escape the reach of the Anti-Injunction

8   Act.

9        "At the same time it is widely accepted that federal

10   courts possess the power, under the All Writs Act, and issue

11   narrowly tailored orders enjoining repeatedly vexatious

12   litigants from filing future state court actions without

13   permission from the court, would have upheld an order

14   enjoining a litigant from bringing any future litigation on

15   any claim arising from a particular fact situation where the

16   litigant was abusing the court's system by harassing

17   opponents."

18        **JUDGE SIPPEL:**  Hold on.  If you want a record, you're

19   going to have to slow down.

20        **MR. RODRIGUEZ:**  Okay.

21        You know, I would respectfully submit that

22   Judge Higginbotham has it right, that Your Honors do have

23   the authority, through the All Writs Act, to enjoin what's

24   happening here, which is essentially an end run of your --

25   or attempted end run, I should say, of the order that

1    Your Honor entered.

2         If you give me a second, Judge, I'll just flip through

3    my notes.

4         **JUDGE SIPPEL:**  Even if you've never been here before,

5    no one leaves without saying everything they wanted to say.

6    You don't go home and say, I wish I would have said that.

7         Although Ms. Kraft may never want to see me again,

8    it's all good.

9         **MS. KRAFT:**  That's not true.

10        **MR. RODRIGUEZ:**  Judge, I will leave you with a point

11   I've already made, but I think it's worth repeating, that

12   the -- this isn't a case as several -- like several of the

13   ones cited by counsel.  We're not asking for, or it doesn't

14   concern the relitigation exception of the Anti-Injunction

15   Act.  It is the necessary to aid jurisdiction exception to

16   the Anti-Injunction Act, and I think it clearly applies in

17   this case.

18        Thank you, Your Honors.

19        **JUDGE PERRY:**  Counsel in the *Reid* case, do you wish to

20   add anything here?  As Judge Sippel says, don't go home and

21   say you wish you'd said something.

22        **MS. KRAFT:**  Yes, Your Honor.  Thank you for the

23   opportunity.  Kristine Kraft representing the *Reid*

24   defendants.

25        I just have a couple of points that I'd like to state.

```
 1    I just want to emphasize our concern with respect to the

 2    series of circumstances that have been initiated by

 3    defendants, starting with the onset of the Peruvian

 4    investigation, followed by the state court action in

 5    Florida, and then now the 1782 action, and also want to

 6    emphasize that the discovery requested in the 1782 action

 7    does involve our firm, our plaintiffs, attorney-client

 8    communications.

 9         The subpoena served on Mr. Careaga in that litigation,

10    which is Exhibit E to Document No. 672 in the Collins cases,

11    seeks a broad range of communications involving our firm,

12    involving the Napoli and the Rodriguez firm, and it pertains

13    to plaintiffs.

14         And I just want to cite for the record the definition

15    of "plaintiff" throughout that subpoena.  And it defines

16    "plaintiff," in paragraph 14 of Exhibit A to the subpoena,

17    as, "any person who currently or at any time in the past was

18    recruited, whether directly or through a guardian,

19    representative, or family member, to be a possible plaintiff

20    in the Missouri lawsuits, whether or not that person

21    actually ever did become a plaintiff in the Missouri

22    lawsuits."

23         So it's very, very broad-based discovery, and we do

24    have grave concerns about that.  We're not a party to that

25    action.
```

1        And that's all the statements that I have for you.

2        **JUDGE PERRY:**  Mr. Kuntz says, well, you'll be paying

3    attention to it, you can just jump up and object if they get

4    into things that you think are privileged.  Is that how it's

5    going to work?

6        **MS. KRAFT:**  I don't think that's the same for us.  I

7    mean I don't think that that type of situation or burden is

8    appropriate.  Yes, we're concerned, and we'll have to watch

9    it, but that's not the proper platform for the situation.

10   We're an outsider to that litigation, and I mean it's a

11   problem.  It's a problem for us.

12       Thank you.

13       **MR. KUNTZ:**  Your Honors just heard Ms. Kraft express

14   her concern about items in the subpoena.  It's inconceivable

15   that Ms. Kraft and Mr. Rodriguez, who are fully aware of

16   that subpoena -- it's inconceivable that if they believe

17   that their clients' privileges and immunities are implicated

18   that they won't be exercising the remedies available under

19   the statute and under the Federal Rules of Civil Procedure

20   to vindicate those.

21       It's a subpoena.  No one's been asked a question, no

22   one's handed everything over.  We understand Your Honors are

23   not insensible to the notion that this is a very, very broad

24   subpoena.  It is necessarily so to support the very broad

25   criminal investigation that's happening in Peru.

1        But, Your Honor's concern, Judge Perry, that won't be

2   addressed, I don't think anyone can walk from this courtroom

3   and imagine that it won't be addressed by counsel who are

4   there to protect those interests.

5        **JUDGE PERRY:**  One of the concerns is a case management

6   issue concern, which I think your co-counsel mentioned was

7   part of Judge Sippel's issue.

8        But, you know, this litigation in this court is -- let

9   me just say it's keeping everyone busy.  So it seems like

10  there's a good argument that your clients said, Oh, let's

11  make them be busier.  Let's see if we can divert some of the

12  resources that have been going into the plaintiffs' work in

13  Missouri and see if we can divert some of those resources

14  and see about, you know, just making it that much harder.

15       And I understand you're going to tell me you're a

16  victim of a crime, but go ahead and tell me the answer.

17       **MR. KUNTZ:**  I'm not going to just tell you that I'm

18  the victim of a crime, Your Honor.  I don't want to be quite

19  that predictable.

20       The case law is clear that -- now, this is -- I don't

21  want to give away any notion that this is a parallel track,

22  that what's happening there is litigating an issue or

23  seeking a remedy that's before Your Honor.  But even where

24  there were parallel tracks being sought -- in that case a

25  federal and state case at the same time -- the Court says

1    there isn't a reason there can't be that if someone decides

2    an issue, then you've got res judicata, maybe you've got

3    issue preclusion.

4         I understand Your Honor's concerns, and they are real,

5    but we can't vindicate -- Doe Run and Renco cannot vindicate

6    their rights as a victim of a crime, which they believe they

7    are, in Peru in this court.  Your Honors don't have the

8    authority to enforce Peruvian criminal law.  Because they're

9    a victim of a crime in Peru, they have a limited right to

10   provide some evidence, and that's what they seek to do.  I'm

11   not saying, Your Honor, that it's not more work for

12   everyone.  I understand that.  But I don't think it's a

13   necessary implication that somehow it's a pretext.

14        And I think just the one example that Mr. Bierman

15   provided, basically this is not just some sort of pretextual

16   [sic] stop to create more work.

17        Judge Sippel?

18        **JUDGE SIPPEL:**  Can I ask -- I'm going to ask you to

19   get a transcript of today's proceedings and provide them to

20   Judge Lenard.

21        **MR. KUNTZ:**  I can think of no reason why I wouldn't do

22   that if you ask me to, Your Honor.

23        **JUDGE SIPPEL:**  I'm asking you to do so.  It's

24   important that we all know what's going on in each court to

25   avoid at least some duplication of effort.

1        **MR. KUNTZ:**  I agree with you, Judge.

2        Thank you, Your Honors.

3        **JUDGE PERRY:**  I agree.

4        **MR. RODRIGUEZ:**  Excuse me, Your Honor.

5        Your Honors, I don't think it's any coincidence that a

6   lot of this started happening -- well, it's been happening

7   for a while but it's been ramped up in the more recent past.

8   I know -- I don't know all the particulars, Judge Perry, but

9   I know that Your Honor's case is much further along, and you

10  have *Daubert* motions and case dispositive motions, and a

11  trial is not that far down the road.

12       I think that part of what's going on here is an

13  effort, a concerted effort by doing all these various things

14  to have the investigations in Peru, the criminal

15  investigations in Peru.  You have a concerted social media

16  and radio campaign of misinformation by -- which we're going

17  to get into in a little bit.  Huanay, this guy that was

18  general -- or he was in-house counsel for Doe Run Peru,

19  saying all kinds of things down there.

20       So you have -- you know, you have a situation where

21  they throw on the table this issue of the Jones Day report

22  and this alleged rampant fraud that's going on and don't

23  allow us to -- so far we haven't been allowed to dig into

24  the Jones Day report.  And then they -- that forms the basis

25  of them taking the position that there's rampant fraud and

```
 1    then, you know -- and they're using that in their social
 2    media campaign in Peru.  They're using that to go to the
 3    prosecutors in Peru, and the -- you know, it's -- and now
 4    they're initiating these lawsuits in Florida.  It's part of
 5    a concerted effort to just throw up everything they can
 6    possibly do to derail the case.  Delay, derail.
 7         I think the last thing that these defendants want is
 8    to go to trial.  And the case has been pending for quite
 9    some time, and I think all this is part of the effort.  And,
10    you know, I think the term "vexatious litigants," I think
11    applies here, and certainly applies with what's going on in
12    Florida.
13         I don't think anybody can reasonably believe that a
14    company like Doe Run -- I mean it's just incredulous that a
15    company like Doe Run would be interested in suing
16    Victor Careaga and Lou Thaler for malicious prosecution.
17    You know, that's not -- that is not -- that is nothing more
18    than a pretext as to what's going on down there.  They're
19    trying to get discovery they couldn't otherwise get from
20    Judge Sippel.  It's plain and simple, that's what they're
21    doing.  And, yeah, it is -- it creates all kinds of issues
22    in terms of -- there shouldn't be an assumption, and it's
23    not correct that we are writing any papers for
24    Victor Careaga.  Victor Careaga is representing himself.
25    We're not representing him in that case.
```

```
 1          Anyway, you know, I think the -- I think it's
 2   important to look at the macro picture of what's going on
 3   here and their conduct and all these, you know, multiple
 4   forums and multiple countries.  And then, you know, it's
 5   ironic that they come -- and you're going to hear it, I
 6   think, again today.  They take the position, Well, if
 7   anybody is dismissed with prejudice that must mean there's
 8   some indicia of fraud.  That's the only reason that
 9   somebody, you know, would be dismissed, somebody that's not
10   cooperating.
11          Well, you know, these people are simple people,
12   Your Honors.  This is beyond a third world country.  It's a
13   very rural place.  These people are -- they're modest
14   people, they're easily intimidated.  So there's this
15   campaign going on -- they even implicated the Napoli
16   Shkolnik firm.  It's like preposterous on a litigation that
17   took place involving some of the principals in that firm in
18   2014 in the State of New York.  That's actually been on the
19   radio waves in La Oroya.
20          So they aggressively pursue this misinformation
21   campaign through people in La Oroya that they claim -- you
22   know, they're not directly connected to us, you know, we're
23   not -- we have nothing to do with it.  Nothing to see here,
24   move on.  Yet it continues to happen, and it impacts the
25   continued participation of some plaintiffs.  I mean these
```

1    people, all they know is that the litigation has lasted, in

2    our case, since December, I think, 2015.  Nothing's

3    happening from their perspective.  They don't understand how

4    the process works.  And they hear all this misinformation on

5    the radio.  Then some of their, either relatives or people

6    that they know are being subpoenaed or the equivalent of

7    subpoena to go testify in Huancayo for -- in a criminal

8    investigation.  They're being told that there's fraudulent

9    documents and that they got to be careful what they sign.

10       I mean, you know, it's just -- I think you got to take

11   a look at the whole picture.  This is part of a piece of a

12   puzzle, and the puzzle, I think, is a lot of vexatious

13   litigation and efforts to derail a case -- your case,

14   Judge Perry, because our case, Judge Sippel, is not close to

15   going to trial, but I think yours is.  I think that's what

16   this is all about.

17       **MR. BIERMAN:**  Briefly, Your Honors.

18       Mr. Rodriguez may not understand or believe that a

19   company like Doe Run would want to pursue this malicious

20   prosecution case.  I'm not sure what he exactly means by

21   that.

22       The fact is, the one example that I gave you is just

23   that, it's one example.  We have dozens of examples of this.

24   Victor Careaga, this individual, we know that he was

25   supervising folks in Peru, that he was engaged in threats,

```
1   in coercion, that they engaged in all of this behavior, and

2   that, as a consequence of that, claims were made against

3   Doe Run, and 71 claims -- 71 of those claims were dismissed

4   with prejudice.  Now, if we get into discovery and it turns

5   out that there were other reasons all 71 of those claims

6   were dismissed with prejudice, we'll see, but I don't think

7   that's going to be the case.

8        I believe it is -- to suggest that Doe Run doesn't

9   have an interest in vindicating its rights when a tort has

10  been committed against it, simply because Mr. Rodriguez

11  believes that this is being done for the purpose of an end

12  run, is wrong and unsupportable.

13       Oh, by the way, I'd also like to add that I had

14  seen -- I know I promised, but I'd seen --

15       JUDGE SIPPEL:  Lawyers always promise:  One more

16  question.  It never happens.

17       MR. BIERMAN:  This really is it.

18       I'd seen the previous transcript that Mr. Rodriguez

19  himself has admitted that there were irregularities in some

20  of the paperwork.  We have a right to look into those

21  irregularities in the malicious prosecution case because

22  some of those cases, I'm confident, are going to be based

23  upon those irregularities.

24       Thank you.

25       JUDGE PERRY:  Let me ask you this -- and I don't know
```

1  if I'm, I mean, getting too far into things that have been

2  briefed in Judge Sippel's case, but let me just ask you

3  this:  So what you said is, you have dozens of these

4  examples of fraud.  You have 71 defendants in your malicious

5  prosecution case.  Have you matched those up?  Are any of

6  the dozens part of the 71?

7       **MR. BIERMAN:**  We haven't been able to conduct that

8  discovery, so it's not possible for us to match those up.

9       **JUDGE PERRY:**  Don't you have people's names?

10      **MR. BIERMAN:**  Your Honor, we have not been able to

11 match up those.  The examples that we have, we have some

12 that have names to them, right?  So the one I gave you, the

13 example of this one woman.  For the most part we have lots

14 of other documentation, we have --

15      **JUDGE SIPPEL:**  That example on its face baffled me

16 because, on the one hand, you told us she signed a document

17 but didn't understand it, and then sometime later said she

18 didn't sign anything.  So even your version of events

19 doesn't make sense.

20      **MR. BIERMAN:**  If that's what I said, Your Honor, I

21 apologize, I misspoke.  It was her claim that she didn't

22 sign the document, so I --

23      **JUDGE SIPPEL:**  But you said on the front end she was

24 told it was for this when she signed it.

25      **MR. BIERMAN:**  She was told that she would be enrolled

1   in these to obtain school supplies and that she would have

2   to go somewhere to get them, and then --

3        **JUDGE SIPPEL:**  The evidence [inaudible] because it

4   can't be both.

5        **JUDGE PERRY:**  Is what you're saying, what you intended

6   to say was that she was told, show up at someplace and then

7   you'll sign something or whatever?

8        **MR. BIERMAN:**  That is my understanding, Your Honor,

9   that she was told to show up, sign up, she would get these

10  benefits.  She showed up and then she was told that, in

11  order to sign up, she would have to have her children have

12  their blood leads tested at this facility, which she

13  described as filthy, and she was unwilling to do it and also

14  had no interest in participating in this case.

15       **JUDGE PERRY:**  To the extent you have names of people

16  that you say were part of the fraud -- and I know there's a

17  very long report somewhere, et cetera.  But have you shared

18  those names with the plaintiffs' counsel in any kind of

19  discussions with them?

20       **MR. BIERMAN:**  No, Your Honor, I've not, but then

21  again, please understand that my involvement in this case

22  has been limited to appearing here today.  My --

23       **JUDGE PERRY:**  You're not involved in Florida?

24       **MR. BIERMAN:**  In Florida I am, yes.  So I'm trying to

25  understand who I would -- why would we share this with the

1  plaintiffs in this case?

2      **JUDGE PERRY:**  The lawyers in this case because it has

3  a direct effect on these cases, the people sitting here at

4  this table.

5      **MR. BIERMAN:**  Yes.  I understand to whom you're

6  referring, Your Honor.

7      **JUDGE PERRY:**  You're saying, why would you do that?

8      **MR. BIERMAN:**  Correct.

9      **JUDGE PERRY:**  Well, because you're screwing with the

10  long cases they've been working on for all these years, and

11  it seems like a courteous thing for a lawyer to do.  I'm not

12  telling you you don't have a right to do what you're doing.

13  This is something we're taking under submission, right, or

14  we'll be discussing.

15      I'm just saying, you know the effect that you're going

16  to have on people who are trying to prosecute these cases,

17  and so why wouldn't you do that?

18      **MR. BIERMAN:**  All I can say, Your Honors, is what I've

19  already said, which is that I don't believe that there is an

20  impact on their cases.  These malicious prosecution cases

21  will stand alone.  They are not before this Court.  The

22  discovery disputes would not be before this Court.

23      **JUDGE PERRY:**  I got you.  But you don't have any idea

24  if the examples you have in your big report are those people

25  in the malicious prosecution case, so if you --

1      **MR. BIERMAN:**  No.  Your Honor, I will acknowledge that

2   I cannot tell you whether those match up.  But as far as I'm

3   concerned -- and Mr. Rodriguez was correct --

4      **JUDGE SIPPEL:**  If they don't, then they do have an

5   implication in this case.

6      **JUDGE PERRY:**  Right.  If there are people who are --

7   if they don't match up -- you're saying you have allegations

8   against a bunch of people, they're not your part of your 71,

9   so sort of by definition doesn't that mean they are part of

10   these?

11      **MR. BIERMAN:**  Your Honor, my intent, first of all, is

12   to begin with doing discovery into the 71, and at that point

13   we will be able to make a determination as to what occurred

14   in those cases.  And, as I said, there are other plaintiffs

15   who have been dismissed without prejudice who may also no

16   longer be within the jurisdiction of this Court.  That's the

17   discovery that I intend to undertake.

18      The fact that there have been incidents of fraud that

19   I believe are demonstrable leads me to believe that we will

20   find others.  And, again, I believe that it is indicated by

21   the fact that these cases were dismissed.  That's where we

22   are with this.  I don't believe that it would be incumbent

23   upon me to initially match up the evidence that we have with

24   the 71 plaintiffs who have been dismissed without prejudice.

25   We need to conduct discovery into those, and we will in

1   Florida state court if Your Honors don't enjoin the action.

2       Anything further?

3       **JUDGE SIPPEL:**  Mr. Rodriguez is pregnant with thought.

4       **MR. RODRIGUEZ:**  Your Honors, I'm working against

5   myself here because I have a flight, but I can't -- I just

6   have to say this.

7       From the beginning -- every time, every time I come up

8   and I, in the past, tell Judge Sippel -- now both

9   Your Honors, Judge Perry and Judge Sippel -- about this

10  individual Romero who's unreliable, and the majority of the

11  report is based on his affidavit, which was paid for, I keep

12  hearing about this woman Rosa.

13      I just want Your Honors to understand the dynamic or

14  the situation that occurred here.  Initially when they

15  brought this up, Your Honor also entered an order,

16  Judge Sippel, saying that we couldn't discuss it with our

17  team in La Oroya.  So when it was an issue that I was very

18  interested in addressing, and get to the bottom of the

19  facts, I couldn't talk to my team about it.  I'm not sure if

20  my team was involved because I don't remember the exact

21  allegations, but I probably could have gotten to the bottom

22  of it or I could have learned more about it, but I wasn't

23  able to do it.

24      Your Honor then -- I can't remember the date now -- in

25  a subsequent status conference we were able to talk to the

1    team about certain things, but at that point Your Honor had

2    moved on and you were saying, Okay, you know, let's focus on

3    this other thing.  So I'm not -- I haven't focused on it.  I

4    am going to look into it so I'm able to address it at the

5    next status conference because I'm very interested in that.

6    But that's one person.  There's 3,000, you know, plaintiffs

7    in this case.  They have one person who -- and, by the way,

8    there's a lot of -- it's not very difficult.  I've been down

9    there a lot and I know those people.  They're salt of the

10   earth, humble people, but miscommunication is very, very

11   possible in that world.

12          That's all I have.  Thank you.

13          **JUDGE SIPPEL:**  Well, it's been very helpful today.

14   We're going to take the issue of the injunction under

15   submission.

16          I would like counsel to give -- in my cases we have

17   plaintiffs to deal with who may have not complied with my

18   previous orders.  We also have, beyond the trial pool,

19   plaintiffs who have a deadline of Monday, and there was to

20   be a report to me by November 7.  So I think we'll take up

21   those individual plaintiffs later in November.  So if you

22   could give me your exclusionary dates by Tuesday,

23   November 1, for the last two weeks in November.  That's

24   November 14th to December 1, knowing I won't bring you in

25   the Wednesday or the Friday of Thanksgiving week.  I'm

```
1   not -- I would only do that if I totally was angry, then

2   we'd do it at 8 a.m. on Friday after Thanksgiving, but --

3           JUDGE PERRY:  Just so you know, I won't be here.

4           JUDGE SIPPEL:  If you're Irish, we'd do it on

5   St. Patrick's Day; if you were French, you know, Mardi Gras,

6   whatever, but I'm not doing that.

7           But give me your exclusionary dates by Tuesday.  We

8   will get back together again and go over the dismissal

9   motions or the lack thereof because compliance has been had

10  of the individual plaintiffs.

11          Hopefully that gets you on your plane, Mr. Rodriguez.

12  And then you also have a motion to enforce or supplement my

13  March 24 order we didn't get to today.  We'll take that up

14  at that time as well.

15          Anything else for the Court today -- or the Courts

16  today?

17          MR. BIERMAN:  No, Your Honor.

18          MR. KUNTZ:  Nothing further, Judge.

19          MR. RODRIGUEZ:  Nothing from Collins plaintiffs,

20  Your Honor.  Thank you very much.

21          THE COURT:  Thank you all very much.  Court's in

22  recess.

23          (Proceedings adjourned at 2:41 p.m.)

24                          *   *   *   *

25
```

1              **REPORTER'S CERTIFICATE**

2

3       I, Laura A. Esposito, Registered Professional Reporter

4    and Certified Realtime Reporter, hereby certify that I am a

5    duly appointed Official Court Reporter for the United States

6    District Court for the Eastern District of Missouri.

7       I further certify that the foregoing is a true and

8    accurate transcript of the proceedings held in the

9    above-entitled case, that said transcript contains pages 1

10   through 67, inclusive, and was delivered electronically.

11   This reporter takes no responsibility for missing or damaged

12   pages of this transcript when same transcript is copied by

13   any party other than this reporter.

14      Dated at St. Louis, Missouri, this 4th day of November

15   2022.

16

17

18   _____
     *Laura A. Esposito*
     Laura A. Esposito, RPR, CRR, CRC
19   Official Court Reporter

20

21

22

23

24

25