UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| J.Y.C.C., et al., | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
|     v. | ) |
| | ) |
| | ) No. 4:15-CV-1704 RWS |
| DOE RUN RESOURCES CORPORATION, et | ) |
| al., | ) |
| | ) |
|     Defendants. | ) |


MOTION HEARING
BEFORE THE HONORABLE RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE
AUGUST 27, 2024

APPEARANCES:
For Plaintiffs:        Francisco R. Rodriguez, Esq.
                       RODRIGUEZ TRAMONT & NUÑEZ
                       255 Alhambra Circle, Suite 1150
                       Coral Gables, FL  33134

For Defendants:        Thomas P. Berra, Jr., Esq.
                       Patrick Thornton, Esq.
                       LEWIS RICE LLC
                       600 Washington Avenue, Suite 2500
                       St. Louis, MO  63101

(Appearances Continued on Page 2.)


REPORTED BY:           SHANNON L. WHITE, RMR, CRR, CSR, CCR
                       Official Court Reporter
                       United States District Court
                       111 South Tenth Street, Third Floor
                       St. Louis, MO  63102
                       (314) 244-7966


PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

APPEARANCES CONTINUED:


For Defendants:          Tracie Renfroe, Esq.
                         KING & SPALDING, LLP
                         1100 Louisiana Street, Suite 4100
                         Houston, TX  77002

                         Edward L. Dowd, Jr., Esq.
                         DOWD BENNETT LLP
                         7733 Forsyth Boulevard, Suite 1900
                         Clayton, MO  63105

                         Andrés Rivero, Esq.
                         RIVERO MESTRE LLP
                         2525 Ponce De Leon Boulevard, Suite 1000
                         Miami, FL  33134

```
1        (THE FOLLOWING PROCEEDINGS STARTED AT 10:35 AM:)

2             THE COURT:  Good morning.  So we are here in the case

3   styled J.Y.C.C. against Doe Run Resources, et al.,

4   4:15-CV-1704.  Would Counsel make their appearances.

5             MR. RODRIGUEZ:  Good morning, Your Honor.  Francisco

6   R. Rodriguez on behalf of -- from the Rodriguez, Tramont &

7   Nuñez firm on behalf of the Plaintiffs.

8             MR. RIVERO:  Good morning, Judge.  Andrés Rivero for

9   Doe Run and Renco on the sanctions hearing, Your Honor.

10             MR. BERRA:  Tom Berra, Lewis Rice, Your Honor, for

11   Defendants Doe Run Resources Corporation and the individual

12   Defendants in relation to the motion to compel.

13             MR. THORNTON:  Patrick Thornton, Lewis Rice, for

14   Doe Run Resources and the individual Defendants.

15             MR. DOWD:  Good morning, Your Honor.  Edward Dowd Jr.

16   representing Ira Rennert, Doe Run Acquisition Corporation,

17   Renco Holdings, and Ira Rennert.

18             MS. RENFROE:  Good morning, Your Honor.

19   Tracie Renfroe, King & Spalding, representing all the

20   Renco Defendants.

21             THE COURT:  Very good.

22             So let's start with the Plaintiffs' motion for

23   sanctions.

24             MR. RODRIGUEZ:  Excuse me if I am sweating a little

25   bit, Judge.  You're scheduling these status conferences in
```

4

1    probably one of the hottest days in St. Louis we've had in a

2    while.

3             THE COURT:  Well, it was all planned.

4             MR. RODRIGUEZ:  I can't find a closer hotel, I don't

5    think, to the courthouse, but I may have to look.

6             Your Honor, we're here on plaintiffs' motion for

7    sanctions and to strike pleadings.  It's based on the

8    defendants' abuse of the judicial process.  And specifically

9    we're going to focus on the production to the Peruvian

10   prosecutor to the -- well, first to their Peruvian lawyer,

11   who's not counsel of record in this case, and then to the

12   Peruvian prosecutor and then to the Peruvian prosecutor's

13   file -- the production of medical records, including eight

14   minors, from the discovery cohort plaintiffs.

15            What was produced were the names and the dates of

16   birth and the DNI numbers of these 26 discovery cohort

17   plaintiffs.  Also produced were 600 -- the names of 600 or

18   so -- this is an approximate number -- of plaintiffs that had

19   been recently, at that time, at the time that what was

20   produced to the prosecutor, which was a letter from Patrick

21   Lanciotti of my firm, producing personal profile sheets.

22            At that time, they had been recently filed.  And I'm

23   sure that there are some -- there are many that are still

24   plaintiffs, and there are many that are minors.  And then also

25   produced was 85 pages of names, dates of birth, and DNI

1   numbers of plaintiffs that were dismissed with prejudice but

2   also many of the plaintiffs that were dismissed without

3   prejudice, including several minors.

4        Now, and it's not only the fact that these items have

5   been produced that are clearly confidential, especially

6   anything relating to minors, but, you know, part of the

7   problem here, or the issue that we want the Court to focus on,

8   is the fact that there has been a concerted effort on the part

9   of the defendants for quite some time, since they started the

10   proceedings in Peru, to, number one, use the -- mislead this

11   Court as to what's going on in the proceedings in Peru and,

12   number two, mislead the prosecutor as to the role of the

13   plaintiffs' lawyers in the *Collins* cases, vis-a-vis some other

14   target, some target defendants that they have down there in

15   that investigation, specifically an individual by the name of

16   Miguel Curi. And Mr. Curi has never worked in the *Collins*

17   cases. I wouldn't know him if he was standing right here.

18   Had nothing to do with the *Collins* cases. He's worked solely

19   on the *Reid* cases.

20        And the investigation in Peru was initiated, I think,

21   almost solely based on an affidavit that was given by

22   Miguel Curi and some alleged wrong -- there's also issues with

23   that affidavit, but I won't get into that right now. The

24   affidavit alleges misconduct that is totally unrelated to the

25   *Collins* cases.

1          And at the same time that they're doing this, they're

2     coming into this court and they are -- and I want to go back

3     to the filing of the Jones Day Report because I think it

4     relates to the particular motion in front of Your Honor.

5          They filed this Jones Day Report.  Your Honor may

6     remember that soon thereafter -- it was October 21, I think,

7     of 2021.  Your Honor may remember that the first status

8     conference that we had in December, they brought in the

9     Jones Day lawyers and the Jones Day lawyers wouldn't -- they

10    wouldn't go under oath, and they wouldn't file an appearance.

11         So you had this hearsay document that was essentially

12    the underpinnings of the documents were these two affidavits,

13    one by Miguel Curi, which has nothing do with our cases, and

14    one by Richard Romero, who worked for us for a couple years.

15    We fired him eight years ago.  But the majority of the conduct

16    indicated in the Romero affidavit was related to before he

17    worked on our cases.

18         But in any event, in addition to filing this

19    Jones Day Report, Your Honor may recall that the defendants

20    asked for the report to be sealed and should be for litigation

21    counsel's eyes only, which, you know, put us at a big

22    disadvantage because I, at that time -- I mean, that was a lot

23    to take in, you know, everything that was in the report.  And

24    at that time, we didn't feel it appropriate to discuss the

25    matter with our team in Peru.  So we really -- you know, we

1    had very little way of understanding the facts as it related

2    to our case.

3          We now know that the Curi affidavit has nothing to do

4    with our case and, in fact, has been somewhat discredited

5    because Curi, we know, from looking at the prosecutor's file

6    in Peru -- Curi alleged that he wasn't paid for -- at all by

7    defendants.  We know that's not true from filings the

8    defendants have made, although I don't know too much about the

9    Curi affidavit other than that.

10          And then there's the Romero affidavit, which the

11    defendants came in this courtroom and in that status

12    conference in December -- I think we had another one in March

13    of 2022 -- and the allegations and the suggestions that they

14    were making to the Court was, look, you know, these horrendous

15    and horrible conduct on the part of Romero and Curi and, you

16    know, this all relates to the *Collins* cases and there's

17    pervasive fraud in the *Collins* cases.

18          Well, we now know that at the time -- and then they

19    were also saying, well, this is such a big deal that the

20    matter is under investigation in Peru.

21          We now know they initiated that investigation.  And

22    the Peruvian prosecutors are very interested in what Romero is

23    doing and, you know, blah, blah, blah.

24          Well, we now know that the Romero affidavit in fact

25    was not the basis of initiating that investigation in Peru.

1    It was solely the Curi affidavit initially.  And the Romero

2    affidavit wasn't provided to the Peruvian prosecutor until

3    about a year and a half later, in March of 2023.

4          And then we further know that Richard Romero -- that

5    the affidavit is totally discredited and essentially nullified

6    because Romero, when he was questioned by the prosecutor,

7    wouldn't -- the Peruvian prosecutor -- wouldn't answer any

8    questions related to that affidavit other than he acknowledges

9    that he signed it.  So it's a hearsay document.  You know, the

10   affiant is not -- you know, refuses to answer questions, you

11   know, regarding the content of the affidavit.

12         So in that backdrop, let's take a look at -- and let

13   me just say, before we get into the specifics of the

14   production, that the defendants have clearly started a

15   campaign to intimidate clients.  And we've filed other motions

16   related to this issue of intimidation in the past, and we

17   refer to them in our motion for sanctions.  So they have done

18   this.  And they are also intimidating, or trying to

19   intimidate, plaintiffs' counsel.

20         In one of their recent filings, the defendants point

21   out to the Court that, well, you know, the plaintiffs'

22   counsels aren't targets yet as, you know -- it's a clear

23   threat, if I ever heard one.

24         So let's look at the -- let's look at the production.

25   And by the way, as a result, before we get into the

1     production, one other item.  As a result of these allegations

2     in the Jones Day Report -- again, as it relates to the *Collins*

3     cases with regard -- regarding the Romero affidavit to a great

4     extent, if not completely discredited.  And that was the basis

5     of the, you know, Peruvian investigation and the Romero

6     affidavit.  That's the basis of arguing to the Court there's

7     pervasive fraud; we've got to do something; we've got to

8     appoint a special master; we have to take drastic measures.

9     And the Court, I think, very wisely, refused to do that.

10          But at that time, in order to try to move this

11     along -- and, again, I didn't have the wherewithal to be able

12     to evaluate what was being presented to the Court -- we, based

13     on my suggestion to the Court, adopted a verification process.

14     And that verification process involved the initial trial pool

15     plaintiffs, and it was a very detailed process where the

16     individual signed -- you know, all the initial trial pool

17     plaintiffs met at certain locations.  I think there was

18     Huancayo, there was Lima, I think, and there was La Oroya.

19     There was a representative of the defendant that was present

20     in all these meetings.

21          And the defendants -- excuse me -- the plaintiffs

22     and/or their guardians, depending on the age of the

23     plaintiffs, signed a verification document acknowledging that

24     they were plaintiffs; that they hadn't been coerced; that

25     there was no fraud; they wanted to go forward.  Anyway, I'll

1    get into that in more detail later.

2                THE COURT:  I recall all of this.

3                MR. RODRIGUEZ:  Okay.  Anyway, the long and short of

4    it -- I'm sorry.  It was a long-winded way of making the point

5    that we spent a lot of resources on -- you know, diverted a

6    lot of resources that -- I mean, it's not endless on our part.

7    And that's all based on this Jones Day Report -- it's all

8    hearsay -- and the Romero affidavit that is paid for, hearsay,

9    and totally now we know is totally nullified.

10               It's interesting, Judge, that the defendants have

11   never notified the Court, to my knowledge, that the Romero

12   affidavit essentially was nullified, because Romero was

13   questioned by the prosecutor and refused to answer any

14   questions about the report.

15               So I want to address the production because, Judge,

16   the problem here or the issue here is not only that there was

17   production of confidential material, the issue is that there

18   was production of confidential material in an effort to

19   manipulate the thinking of the prosecutor to focus their

20   attention on the plaintiffs' lawyers in the *Collins* cases and

21   the documents in the *Collins* cases which, you know, have

22   nothing to do with anything related to Curi.

23               Again, a lot of these things -- you'll see all these

24   documents that I'm going to point out.  There's Document

25   No. 849-1.  And it's a March 9 letter from a guy named

1  Peña Flores, a gentleman named Peña Flores, an attorney for

2  the defendants in Peru.  And it's a letter to the prosecutor.

3  He invokes the Curi affidavit.  He mentions the Curi

4  affidavit; that he's making this production as part of this

5  investigation into this criminal organization called the

6  "Huancayo Group," which again has nothing to do with the

7  *Collins* cases.

8          And he presents a letter from Patrick Lanciotti of

9  the Napoli Shkolnik firm and a disc, a picture of a disc,

10  where Lanciotti produces about 600 personal profile sheets.

11          I'm not sure exactly if they produced the disc.  I

12  don't think so.  But I'm not sure they didn't either.  There's

13  just a -- in the file there's a photo of this disc that

14  Lanciotti sent to the defendants.  In that production, as

15  Patrick always does, he has a list of all of the defendants,

16  their first and last names, that are the subject of the

17  production.

18          So he -- in effect, the defendants are producing to

19  the prosecutor the names of -- I don't know how many of the

20  600 have been dismissed or how many have been dismissed with

21  prejudice, but I'm sure a lot of them have not, probably the

22  vast majority have not.

23          They also -- and in that production it discloses the

24  names of minor plaintiffs.  And I think hand in glove with

25  this is the fact that they're indicating -- by invoking the

1    Curi affidavit, they're indicating to the Peruvian prosecutor

2    that these are the documents that were fraudulently produced

3    or fraudulently created by Curi that are being used by the

4    plaintiffs' lawyers to prove up their case in Missouri.

5         And shortly thereafter you had another instance.  And

6    this is another letter of the prosecutor, Document 849-2.  And

7    there's a lawyer, another defendant lawyer, representing their

8    interests with regard to this criminal investigation -- the

9    defendants' interest.  His name is Chaparro Ortiz.  And he

10   sends the prosecutor a letter, and he says it's in further of

11   the investigation of fraud, forgery, false documents, and

12   relates to the criminal organization.  The "criminal

13   organization" is in bold.  The references to the "criminal

14   organization" is the Huancayo Group, by the way, and he

15   doesn't say that here, but it -- again, something that has

16   nothing to do with the *Collins* defendants.

17        So you may recall, Your Honor, that you, in one of

18   our many -- I think you said it several times in one of our

19   orders -- that it's okay for them to get into and look into

20   issues related to dismissed-with-prejudice plaintiffs but not

21   dismissed-without-prejudice plaintiffs.

22        And so here you had Chaparro Ortiz indicating that in

23   furtherance of this investigation to this criminal

24   organization, he's going to submit these tables.  There's two

25   tables.  And one specific table is 1-A and 1-B.  This is

1   Document 849-2.  And Document 1-B specifically deals with

2   specific information on underage applicants.  So you have 85

3   pages of 10 to 25 plaintiffs per page, and you have the names

4   of underage kids that are being produced to the Peruvian

5   prosecutor.

6           Next item that I want to talk about, Judge, is -- and

7   I think this is particularly serious and heinous.  Starting in

8   July of 2023, July 5 of 2023, I want to direct the Court's

9   attention to Document 812-1.  Defense counsel Mr. Peña Flores

10  writes a letter to the prosecutor, and he suggests that the

11  Blufstein lab results have been adulterated.

12          Now, keep in mind that we have -- the plaintiffs'

13  lawyers have already produced the Blufstein lab results by

14  this time.  I don't know the exact date, but we had produced

15  all the results.  And there's not a -- there's no doubt that

16  the defendants and their lawyers knew that those tests were

17  ordered by the plaintiffs' counsel.

18          Now, so in this July 5, 2023, letter, Mr. Peña Flores

19  asked the prosecutor to obtain all the medical records and the

20  results of tests on 26 discovery cohort plaintiffs, eight of

21  which are minors.  And Peña Flores goes on, and he tells the

22  prosecutor "Help us investigate the prosecution of more false

23  documents presented in Missouri courts," referring to the

24  Collins cases.

25          So, again, you know, he's injecting the issue,

1    putting a bug in the -- more than a bug.  He's telling the

2    prosecutor that this is -- these are -- these records could

3    very well be false.

4         At this point, there's no indication that these

5    records are false.  In fact, these records are not false.  At

6    that point in time, we had produced a -- we had produced to

7    defendants authorizations for them to get the records.  And

8    what happened is they went to try to get the records, and the

9    Blufstein laboratory -- I think they're called "Unilabs"

10   now -- said, "We're not going to accept this generic

11   authorization.  We want a specific authorization that we

12   require in order to produce the documents."  So that's the

13   backdrop of this.

14        So they're telling the prosecutor that they want the

15   prosecutor to get the records because they feel that the

16   records are adulterated, and they want the prosecutor to

17   determine -- to ask the Unilab people "Who paid for the

18   record?  Who paid for the testing?"

19        They already knew who paid for the testing, but I

20   think they're suggesting that whoever paid for the testing is

21   somehow involved in this scheme to -- in this fraudulent

22   scheme.

23        THE COURT:  Try to bring some focus to this.  I mean,

24   what the Peruvian prosecutor elects to do is a category.

25        MR. RODRIGUEZ:  Right.

1          THE COURT:  What I'm worried about is any violation

2    of a sealing order or protective order in this court.  And the

3    one thing I made clear before this is we're not going to do

4    this huge rabbit -- go down this rabbit hole.

5          If there is fraud in these cases, they'll come out as

6    each case is prosecuted.  We did go back and do the

7    verification process.

8          MR. RODRIGUEZ:  Right.

9          THE COURT:  But how is it that the identities of

10   people whose identity was sealed in this court were made known

11   to anyone outside the categories of people who are allowed to

12   see it?  That's what I want to know -- to protect the

13   integrity of our court.

14         I'm not going to micromanage a prosecutor in another

15   jurisdiction.  But the source of the information, to the

16   extent it violated an order of this Court, is most important

17   to me.  Let's focus on that.

18         MR. RODRIGUEZ:  Your Honor, let me -- two things.  As

19   Your Honor well knows, all the minors -- their information is

20   sealed and should never -- that should never be disclosed to

21   anyone.  So that's --

22         THE COURT:  Well, there's a category of people.

23         MR. RODRIGUEZ:  Right.

24         THE COURT:  Counsel of record.

25         MR. RODRIGUEZ:  Right.

16

1    THE COURT:  You know, how did information get to the

2  outside the category of folks who were entitled to this

3  information?

4    MR. RODRIGUEZ:  Well, Your Honor, I would contend

5  that that category is all -- you know, the litigation counsel

6  or counsel that relate to this case but not Peruvian counsel,

7  that they -- other -- at other times they've sort of suggested

8  there's a firewall there.

9    But not only the Peruvian counsel, but the prosecutor

10  and the file that -- the prosecutor's file.  As I understand

11  it, the targets of the investigation -- and there are many; I

12  think there's, like, eight or ten or something -- and all

13  their lawyers have access to those files and those records,

14  and they're not subject to any confidentiality orders.

15    THE COURT:  That's the question -- how did they get

16  access?

17    MR. RODRIGUEZ:  They got access by the defendants

18  providing the information to their lawyer in Peru and their

19  lawyer in Peru --

20    THE COURT:  You used the word "defendants."  There

21  are many defendants.  Are you referring to counsel or a party?

22    MR. RODRIGUEZ:  No, no.  I'm referring -- I'm not

23  focusing on counsel.  I'm referring to defendants, the

24  parties.  The parties produced the -- presumably, you know.

25  Because one of their --

```
 1              THE COURT:  Do you know which party, or do you have

 2   any information to tell us which party disclosed information

 3   that's sealed in this court?

 4              MR. RODRIGUEZ:  I know it's one or more of the named

 5   defendants, Judge, as far as I know.  And I know that the

 6   named defendants have participated in the investigation.  They

 7   have been interrogated and provided what amounts to a

 8   deposition by the Peruvian counsel.

 9              That doesn't directly answer your question, but I

10   know it was of the -- it's one of the named defendants.  So

11   they're the ones that produced this information.

12              And, you know, by the way, Your Honor, Your Honor may

13   remember that -- I don't remember the exact time frame, but

14   there was a motion that was filed by the defendants to ask

15   Your Honor for leave to be excused from the confidentiality

16   order regarding next friend petitions, personal

17   profile sheets, medical records, and Your Honor denied the

18   motion.  They filed a motion for reconsideration.  I mean, it

19   was hotly litigated.

20              By that time, they had already produced certain

21   documents.  I don't know if they had produced the ones that

22   were the subject of their motion for leave to be relieved from

23   the order.

24              Now, I will also say, Judge, that in the --

25   Mr. Lanciotti has been the one that's been producing these
```

1    documents.  And the confidentiality order requires that

2    once -- if any of the documents are slated as "confidential,"

3    it's up to the defendants to mark -- and they're produced

4    electronically -- it's up to the defendants to mark any hard

5    copies "confidential."

6              I can't tell you, as I sit here today, what

7    Mr. Lanciotti -- I know that some documents were referred to

8    as "confidential."  I don't know if all of them were.

9              But the point is that I think all the parties in this

10   litigation, based on that earlier motion before the Court, I

11   think, understood that these are confidential documents, and

12   they all assumed they were the subject of the confidentiality

13   order.  But they were --

14             THE COURT:  So I just want to bring focus to it.

15   There were nine known minor plaintiffs whose identity was

16   disclosed to the prosecutor.

17             MR. RODRIGUEZ:  There were more than that.

18             THE COURT:  There's also this disc that you talk

19   about that has 600 names on it.

20             MR. RODRIGUEZ:  Right.

21             THE COURT:  And we don't know how many have been

22   dismissed or how many may have already reached.

23   Unfortunately, the age of this case, they may have reached the

24   age of majority and we already crossed over that bridge.

25             MR. RODRIGUEZ:  Right.  But we know some had not

1  been -- we know many had not been dismissed, and we know,

2  presumably, many have not reached the age of majority of those

3  600.

4         And then there was the 85 pages that I referenced

5  which had the DNI numbers of -- and the names of

6  dismissed-with-prejudice clients and

7  dismissed-without-prejudice clients, and Your Honor has always

8  differentiated between those.

9         And by the way, Your Honor, if I may, I understand

10 and I, of course -- I understand that you don't want to meddle

11 in the affairs of what the Peruvian prosecutor is doing.  I

12 get it.  But what's happening here is they're trying to

13 intimidate the lawyers that are before you by --

14        THE COURT:  I understand your argument as to the

15 motive.

16        MR. RODRIGUEZ:  Right.

17        THE COURT:  What is before me is what do we do about

18 any breach of the protective order or this Court's sealing

19 orders.

20        MR. RODRIGUEZ:  Right.  So we know there are

21 violations.

22        THE COURT:  Because what happened with that, if there

23 are sanctions, the consequences of that breach have to be

24 evaluated.  We have to get over the first question before we

25 get to the "what's appropriate remedy?"

1    So I want to hear from the defendant.  How did this

2  information -- and when I look at the protective order,

3  there's no exception for prosecutors in another country.  So

4  how did this information leave this court?

5    MR. RIVERO:  Good afternoon, Judge.  Andrés Rivero

6  for Doe Run and Renco.

7    And I want to be laser focused on the question that

8  the Court is raising.  Judge, the answer is:  It was my team

9  that was involved in the disclosure of the 28 names, Judge,

10 which, as we've said in our papers, involved nine minors.

11    Now, Judge, it's a bit tedious -- this is what was

12 raised in the first motion for sanctions and what's before the

13 Court is what they said on April 23.  And you may remember,

14 Judge, that the only other time I had the pleasure to be

15 before you, I had -- they made that allegation in reply -- in

16 response to a completely different motion, and I told you that

17 it was not my understanding that things had occurred as they

18 said.  And today, Judge, it is not my understanding that

19 things occurred as they said, because they didn't.

20    As we raised in our papers, Judge -- and I want to

21 address that as well -- is a separate issue about the sealing

22 order.  And to the extent there's a misstep -- and, Judge, I

23 was the one who put it in my papers.  They never raised the

24 sealing order -- that's on me.  And at the end of the day, I

25 take responsibility for what my team does, Judge.

1          But if I may -- it's a bit tedious -- I want to go

2    through and show you exactly the protective order, then

3    discuss the sealing order.

4          Now, before I do that, Judge, I do want to say --

5          THE COURT:  The Court has, just so you're not

6    confused, the inherent power to protect the conduct of the

7    court.  And if something is sealed, even if it's not listed in

8    the protective order, I have the inherent power to protect the

9    sanctity of the court orders.

10          MR. RIVERO:  I know that, Judge.  I've been

11    practicing before federal district courts for 38 years.  I was

12    a federal prosecutor.  I have the utmost respect and know the

13    power of a federal district judge, Your Honor.  And it is

14    always my intent, Your Honor, to respect the orders of this

15    and every other federal district court.  So I do understand

16    and take it very seriously, Judge.

17          And I would ask your permission to go through what

18    exactly was produced, what the true facts are.  They're not

19    the set of facts purported by the plaintiffs.  But I do want

20    to say one thing before I do that.  I have it right here.  If

21    the Court will give me permission to show some slides I can go

22    through.

23          But I want to say one thing, Judge.  With all

24    respect -- and I've known Mr. Rodriguez for many -- for

25    decades --

1          THE COURT:  Nothing good comes after that.

2          MR. RIVERO:  Then, Judge, here's what I do want to

3    say -- is the plaintiffs have decided the good -- the best

4    defense is a good offense.  And there's a lot of things that

5    were said that are not true.  I can establish -- and, Judge --

6          THE COURT:  Mr. Dowd will tell you I take nothing

7    from the argument.  We'll see where it takes us.  Every

8    argument stands on its own.  But I'm concerned about the

9    disclosure of the identities of people whose identities were

10   sealed by this Court.

11         MR. RIVERO:  Judge, let me -- I understand that.  I

12   do understand that.

13         And, Judge, let me start with the protective order,

14   which is what the plaintiffs raised in their papers.

15   Paragraph 18 of this protective order, the order of this

16   Court, says:  "It is expressly understood by and between the

17   parties that in producing confidential information in this

18   proceeding, that parties shall be relying upon the terms and

19   conditions of the order."

20         So that is -- this is not a loosey-goosey order.

21   This is a very specific order.

22         Paragraph 7, which I'm showing to the Court on the

23   screen, this is the protective order, Judge.  Your order.  It

24   says, "In designating materials as 'confidential information,'

25   the producing party shall do so in good faith, consistent with

1    the provisions of this order.  Nothing contained herein shall

2    be construed to allow global designations of all materials or

3    documents as 'confidential information.'"

4            And then your order tells the parties exactly how to

5    do that job.  And, Judge, you'll see in paragraph 8, which

6    I've put up, the parties have to mark documents with certain

7    phrases, "confidential," "highly confidential."  Judge, with

8    electronic information, they need to use a cover letter that

9    says "confidential."

10           And then with, Judge, as you may have gathered from

11   what I'm saying, the plaintiffs didn't mark any of this

12   information ever as "confidential."  I'm going to show you

13   that in one moment.  Bearing in mind there's a sealing issue,

14   Judge, which is a different issue that again we raised in

15   our response.

16           THE COURT:  Everything kind of springs from that.

17   Once the identity of those minors is disclosed, things start

18   happening.

19           MR. RIVERO:  If I may, though, Judge, I just want to

20   put to rest the question of the protective order, which was,

21   again, what was alleged by the plaintiffs in these papers.

22   And I hear that the Court is directing to the sealing order,

23   and I want to address that as well.

24           If I may, the authorizations.  This is the timeline,

25   Judge.  In April of 2022, you ordered that the plaintiffs

1   should give authorizations for medical records to Blufstein.

2   Almost a year later, in March, they provide the first set of

3   authorizations.  This is what they provide, Judge.  And you're

4   going to see this is a cover letter -- I'm sorry -- a cover

5   email with a share link.  No marking of "confidential."  No

6   marking in the share link of "confidential."

7           So the allegation that they start from, they never

8   followed the order.  They didn't mark this as "confidential."

9           Judge, they do a follow-up.  They say, "Okay."

10          My side says, "Hey, you didn't give us all the

11  information."

12          They do a second one.  This is March 23, Judge.

13  Judge, right in front of you, here's the missing

14  authorizations.  No marking is "confidential."  Nothing in the

15  share link that says "confidential."

16          Now, what happens from there, Judge, is we received

17  those.  And I just want to put in context, because there's

18  simply no marked "confidential" information.  There is no

19  violation of the confidentiality order, Judge.  That's just

20  not the case.

21          THE COURT:  So if I give you a medical authorization

22  to gather records and you do so for the purposes of this

23  litigation, what do you do with the information you gather?

24          MR. RIVERO:  Well, Judge, my position on that is

25  that, first of all, we didn't share the information we

1  gathered.  What we did, Judge, is to -- to go ahead on this

2  timeline, is having got the authorizations, there was an

3  individual who's given a declaration who went to Blufstein,

4  presented the authorizations.  Blufstein gave back one set of

5  records -- it's all we had at that time -- and told us -- it's

6  in the affidavit.  I'm going to paraphrase, Judge, but I can

7  quote it to you.  The Blufstein representative said, out of

8  these twenty -- there's some confusion whether it's 26 or 28.

9  Out of these, we only have one, and there are signs of fraud.

10  That got reported back to me, Judge.

11        We said that is something that the prosecutor should

12  know about.  And, Judge, we provided to Mr. Peña, who's

13  counsel who works for us, information that was not under your

14  confidentiality order.

15        Again, let me address the sealing in a moment.

16  Mr. Peña turned that in to the prosecutor.  Prosecutor looked

17  at it and said, "I can't make a connection to any identity.

18  There's nothing here that helps me.  There must be some errors

19  in the names," or whatever.

20        So what we have so far, Judge, is we have turned over

21  28 names, nine minors.  And, again, what I'm saying is not

22  designated "confidential."  There is a sealing order issue.

23        Now, what happens next?  Prosecutor says to Peña, who

24  works at our direction -- says, "Hey, I can't do anything with

25  this.  You've got to give me TOBs, DNIs" -- it's the national

1    identification number there -- et cetera.

2            Peña doesn't come back to us or go to any document

3    produced in the case.  He goes to a public record database in

4    Peru.  Not like in the U.S. where you couldn't get our Social

5    Security numbers.  There Peña just puts the names in.  He

6    finds the DNIs and the DOBs.  He's given an affidavit to that.

7    And he turns it over under an order from the prosecutor.

8            That's what happened, Judge.  That's what happened.

9    Now --

10           THE COURT:  We still have the disclosure of the

11   nine plaintiffs who were minors that's under seal by this

12   Court.

13           MR. RIVERO:  Judge, and I will repeat that that is

14   correct and that we brought it to the attention of the Court

15   because we take it very seriously.  Now, so there's just no

16   way around that, Judge.

17           THE COURT:  That's breached.

18           MR. RIVERO:  I'm not trying to -- what I would say in

19   mitigation and in explanation, Judge, is the context was not

20   what is being said, that we were trying to mislead the

21   prosecutor.  Instead, we had a statement from a --

22           THE COURT:  I don't care the motive.  If you breach

23   the seal of this Court, you breach the sealing order of this

24   Court.

25           MR. RIVERO:  And, Judge, that's our misstep.  And,

1   Judge, let me just say in mitigation, if I may, because I have

2   to explain.  This was going to what the Peruvian law and this

3   Court have identified as a confidential proceeding that is

4   only available to the prosecutor and to --

5           THE COURT:  But they're not in the zone of people who

6   have permission to see this information on a sealing order by

7   this Court.

8           MR. RIVERO:  They're beyond.  They're beyond.

9           THE COURT:  If you go to one person, we're outside

10  the bubble.

11          MR. RIVERO:  Acknowledged, Your Honor.  And it's

12  beyond.

13          But what I'm saying to the Court is the plaintiffs

14  have suggested that we made some kind of public record filing.

15  That's not the case.

16          So, Judge, there are mistakes, and there are

17  mistakes.  And I'm acknowledging that those nine names

18  shouldn't have gone.  What I'm saying is it didn't go out into

19  the universe.  It went to a limited proceeding.

20          In fact, plaintiffs' counsel ought not have access to

21  that.  There's an order of this Court acknowledging Peruvian

22  324, cited in our papers, makes it a confidential proceeding.

23          So then in addition, Judge, what the mitigation is,

24  Judge, we didn't mean to do this.  It was an error we made.

25  And it is not a repeated event, Judge.

1    They raised on their reply the question about the 85

2    pages and the 600 names.  There's no evidence on any of that.

3    We have explanations on our sur-reply on that, Judge.  What

4    I'm here to talk about at the moment is what the Court is

5    talking about, these nine names.

6    And, Judge, in that regard, I just want to say that

7    there was no intention to violate the order, Judge.  It was an

8    error.  And the relief sought by the plaintiffs is dramatic.

9    It's the civil death penalty, Judge.  And that would not

10   follow under the existing case law in any way, Your Honor.

11   And as counsel, Judge, this is not a matter directed by the

12   parties.

13   Unfortunately, at the end of the day, the

14   responsibility lies with me, Judge.  The reasons we did it

15   were not to violate your sealing order.  And I would ask the

16   Court to take that into account with regard to -- with regard

17   to anything that you feel is appropriate about that.

18   It was a one-off, Judge.  Since that date, there has

19   been no disclosure.  There are issues raised about prior

20   events, but we have not done anything like that that's been

21   demonstrated to the Court outside of this.

22   So, Judge, I'm willing to answer questions about any

23   of that.  I know that the Court is indicating that you

24   consider this a violation.  I understand, Your Honor.  We --

25   again, we raised it first.  But, Judge, there are other issues

29

1   raised.

2           THE COURT:  What do you think the appropriate remedy

3   is for violating the sealing order of this Court?

4           MR. RIVERO:  Judge, it's an important question.  I do

5   want to note that there was -- there was no intention to do

6   so, Judge.  It was a misunderstanding.

7           THE COURT:  I didn't mean to run the stop sign.  I

8   still did.  Somebody is still hurt.

9           MR. RIVERO:  Well, Judge, just a moment.  That's

10  where I want to -- that's what I want to -- there's no

11  evidence this has gone anywhere beyond that prosecutor's file

12  except for the fact that it went to Mr. Rodriguez and the

13  rest, who aren't supposed to have it.

14          So it's a case of we did roll that stop sign, Judge,

15  but we didn't run into anybody.  That hasn't been widespread.

16  I certainly --

17          THE COURT:  So what is the appropriate remedy?  It

18  can't be nothing.

19          MR. RIVERO:  I understand that, Judge.  I do

20  understand it.

21          Your Honor, number one, I'm here, and I'm

22  acknowledging that this is an error.  And that, in and of

23  itself, Judge, as you know -- and I know you do sentencings

24  all the time and you hear this -- I would ask Your Honor to --

25  I assure you, Judge, that I'm very unhappy about this having

1   happened, and have to face whatever it is.  I believe that

2   whatever sanction you impose should be directed to me and my

3   law firm.

4           THE COURT:  So the plaintiff argues or believed that

5   this violation was occasioned by a party, but you're telling

6   me it was your conduct that gave rise.

7           MR. RIVERO:  Yeah, Judge.  There wasn't a -- and I

8   can't invade attorney-client privilege.  But I can tell the

9   Court, Your Honor, I was a federal prosecutor for many years.

10  Just so you understand, again, you've heard the context

11  already.  I saw this information, Judge, and I said that is

12  consistent with a lot of other information contrary to what

13  you've been told -- and I know that's not what you're here to

14  hear right now -- but we've got a substantial report, and we

15  have substantial evidence of wrongdoing.  Mr. Romero and

16  Mr. Curi are both --

17          THE COURT:  We'll get to that, as I said.

18          MR. RIVERO:  That's right.

19          THE COURT:  As these cases are prepared for trial,

20  we'll find out any misconduct.  So we'll get to that.  That's

21  but for -- that's this other silo of issues.

22          What's before me today is a motion for sanctions for

23  violating the protective order, but I saw it more as a motion

24  for violating the Court's sealing order, because that gives

25  rise to the subsequent events.

1    MR. RIVERO:  Judge, and let me just say that when we

2  got the motion, or my folks and I started to look at it, we

3  realized right away there wasn't a confidentiality order

4  issue, but we did know there was a sealing issue, which is

5  why, again, we told you about it.

6         Obviously, Judge, what do I think should be done to

7  us is remedial measures, for example, Judge, including through

8  the parties -- we're not a party -- requesting return of the

9  information from the prosecutors.  And, Judge, if -- you know,

10  again, it wasn't -- this wasn't done with intention, but if

11  the Court feels that a monetary sanction is called for, Judge,

12  we'll have to face that.  I would ask the Court to make it a

13  reasonable --

14         THE COURT:  Well, that will solve itself.  If it's a

15  monetary sanction, it's not going to be a random number.  I

16  would ask plaintiffs to identify the cost of bringing the

17  motion, and you'd have an opportunity to respond.  I'm not

18  just going to make it up out of whole cloth.

19         MR. RIVERO:  Judge, but could I --

20         THE COURT:  And any consequential damages that --

21         MR. RIVERO:  But in that regard, Judge, I would point

22  out -- and I'm -- you know, you've asked me, and I'm

23  answering.  You know, I have heard that question from my

24  mother, Judge, so I understand.

25         THE COURT:  I hate to be compared to your mother, but

1    that's all right.  She may be a great lady but --

2            MR. RIVERO:  She's still with me, but I didn't like

3    to answer that question then either, Judge.

4            But, Judge, their motion didn't direct to what the

5    issue was.  Their motion went off to the side.  If I've wasted

6    anybody's time, Judge, it's yours.

7            However, I would say in that regard, because usually

8    when the --

9            THE COURT:  Well, you'll get to respond to their ask,

10    you know.

11            MR. RIVERO:  But I'm just saying, Judge, what the

12    consequence was, was, yes, well, they went off on the

13    confidentiality.  I came back to you and said, it's this

14    issue.

15            And, Judge, I think you know that.  We didn't walk

16    away from it.  We took it right at the beginning.  It's the

17    first introduction; that we wanted to address the sealing.

18            Judge, I would ask you to -- well, I know you're

19    going to address it in papers, but I don't think it should be

20    tied to these because all that information's incorrect.

21    What's been alleged isn't what it was.

22            It did cause us to look to the bottom, and I can't

23    think of another remedy, Judge.  I would just ask you to take

24    into account I've been doing this for a long time, I have not

25    been sanctioned, and it's difficult to have to admit that

1    we're in such a position.

2              But, Judge, if I can have just a few minutes.  Since

3    I think I have addressed this, I just want to say with regard

4    to the other materials, you know, we're talking about

5    dismissed plaintiffs.  And I've got a specific order of this

6    Court about how to -- or statements of the Court that we've

7    cited.

8              Judge, with regard to the names -- and I'm not

9    walking away from it, Judge.  But the plaintiffs asked you to

10   make all of the names fall under protection.  Then they later

11   withdrew it.  And you denied the motion.  So there is a

12   limit -- it is a sealing order -- but there's a limit that the

13   Court was unwilling to go beyond about the protection.  In

14   fact, you denied protection of the names in and of themselves.

15             All that said, Judge, I'm glad again to answer any

16   questions.  I think I've told you how we got to this point.

17             I do want to point out just one thing, if I may.

18   With regard to the broader question, however, Judge, not about

19   the specific sealing order issue, but the broader question

20   that's been raised here, which is that we're doing some

21   fishing expedition that has nothing to do with the trial

22   cohort, Judge, out of the -- and this is what the Court has

23   said -- that you're going to explore that in discovery.

24             Out of the first set of depositions, there were

25   already, right now, seven of the cohort plaintiffs there have

1  been documents produced with false, or somehow produced with

2  false educational records.

3       THE COURT:  We'll get to visit that, I'm sure.

4       MR. RIVERO:  And, Judge, but I say it to you for two

5  reasons.  Number one, you've heard a bunch about that, and

6  it's going on right now.  But, number two, Judge, context is

7  important.  I have not denied what the Court is raising, but

8  we thought that this was showing further improper conduct.

9  And perhaps, I think, Judge, there was -- we were overzealous,

10  and that was the basis for making that mistaken decision.

11      Judge, that said, again, I'm glad to answer any

12  questions about any of it, Judge.  Thank you, Your Honor.

13      MR. RODRIGUEZ:  May I be heard?

14      THE COURT:  Yes.

15      MR. RODRIGUEZ:  You know, first of all, there's more

16  than just the nine, the nine minors that we're talking about,

17  that were produced of the discovery cohort plaintiffs.  You

18  have the 600 names that were produced.  It's in -- I think I

19  mentioned it's in the court document 849-1.

20      THE COURT:  That's still a little too diffuse for

21  me -- 600 names, some of whom may have been dismissed, some of

22  whom may have reached the age of majority.  How do we get our

23  arms around that?

24      MR. RODRIGUEZ:  You know, I can be more specific.

25  I'll take the time.

```
 1           But, Judge, if you have 600 that were -- actually,
 2   there were plaintiffs that were filed sequentially, and that's
 3   what Mr. Lanciotti was producing in the disc, the personal
 4   profile sheets.  And then he listed all their names.  I mean,
 5   I'll tell you what.  There's more than nine, okay?  Let's just
 6   leave it at that.  There's more than nine.  And then you had
 7   the other production to the prosecutor.
 8           THE COURT:  What's my ruling look like without
 9   knowing what the universe is?
10           MR. RODRIGUEZ:  Well, it's more than nine.  I mean,
11   can we --
12           THE COURT:  I can't write a sanction order saying, "I
13   think it's more than nine" --
14           MR. RODRIGUEZ:  Allow me to --
15           THE COURT:  -- but I'm not sure.
16           MR. RODRIGUEZ:  If Your Honor will allow me some
17   time, I'll submit a filing to the Court, and I'll go through
18   the tedious task of determining which ones have been
19   dismissed, which ones have not.
20           THE COURT:  A motion for sanctions can only be
21   justified with specific conduct.  So it may be tedious, but if
22   you're serious -- and they have to have a right to respond to
23   that.
24           I mean, the only thing I know is the court of appeals
25   will reverse me for not giving them due process.  It's too big
```

1    a question to have it that vague.

2              MR. RODRIGUEZ:  We had a --

3              THE COURT:  I'm sure you agree.

4              MR. RIVERO:  Yes, Judge.  And, look, there are

5    different issues about that.  That was raised in the reply.

6              THE COURT:  Right.  That gets to the confidentiality

7    markings, and we haven't heard about that yet.

8              MR. RIVERO:  It was raised on sur-reply.

9              Your Honor, look, here's what I would say about

10   this -- is the nature of the thing, it's going to be the same

11   explanations.  So, Judge, I would ask you to do justice in

12   terms of it wasn't intentional.  We did it -- it wasn't

13   confidential.  We missed the issue about the sealing order.

14   And whether it was nine or 9,000, that's what it was, Judge.

15             And I'd ask you to -- if it's going to be tied to --

16   and I think it does make sense -- to what the Court, extra

17   work the Court had to do on sealing, Judge, I understand that,

18   and I'd ask you to do it.  It's one issue.

19             We won't be doing it again, Your Honor, I assure you

20   that.  But it's not -- there's 85 pages of dismissed.  The

21   Court's been real clear.  We have cited you.  Dismissed

22   plaintiffs are dismissed plaintiffs and not -- they're not

23   parties to the case at that point.

24             So I guess, Judge, what I'll ask you to do is give

25   some finality to this on the information that --

1       MR. RODRIGUEZ:  Well --

2       MR. RIVERO:  -- they've had since April 23 to make

3 these allegations.  And we're now -- they raised a new

4 sanctions order last week.  So they're just going to continue

5 to dig into files they're not supposed to be looking at.

6       THE COURT:  The goal -- my goal -- I write it down --

7 try the cases on the merits.  We need to stay focused on where

8 we're going.  Justice for the defendants, justice for the

9 plaintiffs requires that resolution.  But we have to deal with

10 this.

11       So what's your proposal about the 600?

12       MR. RODRIGUEZ:  I'd like an opportunity to go over

13 and advise the Court which of the 600 are still filed

14 plaintiffs and which are minors.

15       If Your Honor doesn't think there's a difference --

16 Counsel says there's no difference between nine, violations of

17 nine or violation of 6,000 -- and that's a different issue --

18 but it goes to -- I mean, there was a misstep, and apparently

19 there was another misstep, filing these with the prosecutor of

20 these 600 names.  And then there was another misstep because

21 Counsel -- he's correct that Your Honor has said, you know,

22 if -- it's totally different if it's dismissed plaintiffs, but

23 it's dismissed with prejudice, Your Honor, in several of your

24 rulings.

25       THE COURT:  I need you to supplement your filing with

1   this 600 so I know what we're talking about.  How long for you

2   to do that?

3           MR. RODRIGUEZ:  Twenty days, Judge.

4           THE COURT:  Twenty days.

5           MR. RODRIGUEZ:  Your Honor, can I also supplement

6   regarding the 85 pages?  Because there's several in there that

7   are dismissed without prejudice.

8           THE COURT:  Sure.

9           MR. RODRIGUEZ:  And by the way, Your Honor, there's

10  something that -- I want to respond to something Counsel said.

11          You know, I think it matters why they're going ahead

12  and violating these sealing orders and why --

13          THE COURT:  Anyway, your amended motion is due

14  September 16, before we move on.

15          MR. RODRIGUEZ:  Okay.

16          THE COURT:  And then 20 days to respond?

17          MR. RIVERO:  Thank you, Judge.

18          THE COURT:  September 26.

19          And then you will get the last word on October 4.

20          MR. RODRIGUEZ:  October 4?

21          THE COURT:  Yeah.

22          MR. RODRIGUEZ:  Your Honor, just one thing that

23  Counsel said.  I think motive for lawyers that are before you

24  and what they're doing in Peru matters.  It matters because

25  it's going to create issues if my firm -- because the

1    prosecutor is misled from information that they've gotten

2    through discovery in this court if they mislead the prosecutor

3    into thinking that I'm or my law firm or the Napoli firm is

4    involved in something that we're not involved with.  So I

5    think it matters.

6          And one of the things that I want to point out to

7    you -- Counsel came in and said that they went to -- when you

8    go to Blufstein labs and you try to get the information and

9    Blufstein labs says, "I'm not going to give it to you," for

10   whatever reason, you got -- you come to -- what they did --

11          *[Proceedings interrupted by a ringing phone.]*

12          THE COURT:  Oh, no.  The marshal will have to come

13   get you now.

14          MR. RODRIGUEZ:  I'm sorry.  I've lost my train -- I

15   was talking about the --

16          THE COURT:  Blufstein labs.

17          MR. RODRIGUEZ:  I'm sorry.

18          THE COURT:  Blufstein labs.  I'm not going to give

19   you the --

20          MR. RODRIGUEZ:  If the Blufstein lab's not going to

21   give them documents -- and, in fact, we know from emails that

22   are part of the record -- I had them filed right before, like,

23   a couple days ago, where counsel, King & Spalding, reached out

24   to me, reached out to me and Patrick Lanciotti, and said,

25   "Hey, guys, the lab isn't going to give us documents because

1    the authorizations aren't cutting it."  Okay.

2          And with regard to -- so there was no mention of any

3    fraud.  There was no mention of there's only one -- in fact,

4    we know that they had 26, you know, blood tests.  And there's

5    no indicia of fraud in that at all.

6          So for them to go to the prosecutor -- and by the

7    way, when they first went to the prosecutor and they told the

8    prosecutor, "Hey, help us get these records," they should

9    never have done that.  If they wanted the records, they should

10   come and get it through you or through me, you know, through

11   the process of what's going on in this courtroom.

12         So they go to the prosecutor, and they tell the

13   prosecutor, "Hey, the records are adulterated."

14         So the prosecutor gets back to them.  This is all in

15   the filings.  The prosecutor gets back to them and says,

16   "Well, wait a minute.  You said that the records were

17   adulterated, and then you said that you didn't get them.

18   Which is it?"

19         And then they come back, and they say, "Well,

20   there's -- there's indicia of fraud," they tell the

21   prosecutor.

22         And then the prosecutor goes ahead and does this.

23   And now the prosecutor is thinking, well, you know what?  The

24   lawyers that are involved in the *Collins* cases may be up to

25   something.

1    I mean, it's just -- I don't know.  I just think that

2    that -- the motive and why they're doing it.  They mention

3    this private investigator who went and tried to get the

4    records and they were told by Blufstein lab, "We only have one

5    or the 26," that makes no sense at all, because they had all

6    26.  They ultimately gave it to the prosecutor directly.  And

7    then defense counsel in Peru went there and took photos of

8    them.

9          And then later on, months later, King & Spalding

10    comes to me and says, "Hey, guys, we need a better

11    authorization, one that the lab is asking for."

12          So, I mean, there's no indicia of fraud.  And for

13    them to create that impression and by doing so --

14          THE COURT:  What about should the authorization have

15    been marked "confidential" or just the records you get as a

16    result?  And who has that duty?

17          MR. RODRIGUEZ:  Well, I mean, Judge, an authorization

18    that we presume is going to be used by defense counsel to get

19    records that are, you know, that are otherwise confidential, I

20    don't think that has to be marked.

21          Look, I think that in hindsight we should have -- if

22    it wasn't done -- and I know that it took -- I'm not sure that

23    Counsel's accurate.  And by the way, I'm not impugning.  I

24    think he believes he's accurate.  I'm not sure that "none of

25    the records were marked 'confidential'" is an accurate

42

1    statement.  I think some were.  But all of them should have

2    been, you know, regarding the personal profile sheets and

3    those kinds of records.

4         But everybody treated them as confidential.  I mean,

5    they went before you, like, last year, and they asked Your

6    Honor for relief from the order.  The only relief from the

7    order for next friend petitions, personal profile sheets,

8    medical records -- of 39 plaintiffs, 22 were minors.  They

9    asked for relief from the order for those things.  So they

10   thought it was as well.  They thought that the motion for

11   protective order covered those items.  I think the parties

12   were traveling under that assumption.

13        But the focus -- Your Honor is right.  I mean, and

14   the minors -- there's no excuse for that.

15        And by the way, you may remember the last time we

16   were in front of Your Honor and Your Honor chastised Counsel

17   because he was asking for relief from the order for two next

18   friend petitions for two defendants -- I'm sorry -- two

19   plaintiffs, and they were in the age of majority.  They turned

20   over 18.  And Your Honor said, "How can you be asking me to do

21   this and then say their names in open court?"

22        So, I mean, you know, there should be some

23   confidentiality attached to all the plaintiffs until Your

24   Honor relieves the parties from the obligations of the sealing

25   of their names and their information.

43

1          That's all I have, Your Honor.  Thank you.

2          MR. RIVERO:  May I be heard briefly on this?

3          THE COURT:  Sure.

4          MR. RIVERO:  Judge, this last point really

5  illustrates on the confidentiality.  And, again, Judge, I've

6  been forthright about the issue on the minor names.

7          Judge, Mr. Rodriguez, last week, filed, I believe it

8  was, five not just names, educational records, medical

9  records, et cetera, in the public record in this case.

10          I agree that perhaps the plaintiffs wanted -- I can

11  imagine they wanted it confidential, but your order is very

12  clear about what you have to do to mark confidentiality.  And,

13  Judge, they didn't do it anywhere.

14          Here's the pages.  And I can show the Court.  Here's

15  all the pages they're talking about.  There's dozens of pages.

16  Not a one is marked "confidential."  Not one.  Not a cover

17  letter.  Nothing is marked "confidential," which is what's

18  required under the confidentiality order.

19          And, Judge, when you ordered the confidentiality --

20  the authorizations, in response to questions from you,

21  Mr. Rodriguez said, "We agreed in our proposal that we would

22  have our clients sign authorizations so the defendants can

23  look at whatever documents they wanted to.  Our suggestion is

24  we will sign every one of the 108.  We'll sign authorizations.

25  And they can go get whatever documents they want, and they can

 1   do whatever they want if they feel any of those documents are

 2   suspect from the 108."

 3        Now, I know that doesn't change your sealing order,

 4   Judge, but that's the approach.

 5        And one last thing.  Because there's this allegation,

 6   "Oh, there was some bad motivation," I have the affidavit

 7   right here of the person who went to Blufstein.  Ms. Tandetti

 8   [phonetic], I believe, is the name.  And she says that, when

 9   she showed the materials, they came back and showed one of

10   them and that they suspected fraud.  The Blufstein person said

11   they suspected fraud.

12        So this wasn't motivated by whatever -- Judge, the

13   reason that Mr. Careaga, Mr. Romero, Mr. Curi are under a

14   formal charge of a provisional nature in Peru is because

15   there's overwhelming evidence of the production of false

16   documents.

17        I know that the Court has decided how to treat that

18   here.  I know you'll get evidence about the seven cohort

19   plaintiffs that have produced false educational documents and

20   you'll deal with that in this court.

21        Going back to what it's about, though, Judge, to

22   suggest we were improperly motivated is not true.  We were

23   motivated to try to defend the clients' interests in Peru

24   where we believe that there's been wrongdoing by both in the

25   *Collins* and *Reid* cases.  And, Judge, I wish I had not

1   misstepped, and I understand the processes that you've put in

2   place, but it wasn't done for a bad motive, Judge.

3           Thank you, Your Honor.

4           THE COURT:  All right.  So where are we in taking the

5   depositions so that we can narrow the number of plaintiffs

6   down to 16?

7           MR. BERRA:  May I address that, Your Honor?

8           THE COURT:  I didn't know who to ask.

9           MR. BERRA:  Tom Berra for the defense, Your Honor.

10          We are not quite midway through the process.  We had

11  identified about 65 deponents roughly, consisting of

12  plaintiffs and various family members, including mothers,

13  fathers, grandparents, et cetera, who serve as guardians.

14          We've proceeded largely on a schedule that we've been

15  negotiating with plaintiffs' counsel throughout.  We've had

16  occasional hiccups where folks have had visas denied or for

17  other reasons have been unable to make their scheduled

18  appointments, and we're working through those with counsel as

19  we speak.

20          We are currently scheduled to finish the depositions

21  on schedule.  You'll recall, Your Honor, that the week of, I

22  believe, October 7 was supposed to be the final week of the

23  depositions.

24          THE COURT:  Discovery cutoff was October 18.

25          MR. BERRA:  Right.  And that is continuing to be our

1    target.

2           I will say that we may have a handful of folks that,

3    because of various problems we're having in Peru, might have

4    to go beyond that date.  We've discussed that with counsel,

5    and, frankly, I think we've already reached agreement that, if

6    we have to do that, we will do it as long as it's fairly close

7    in time.

8           Your Honor, that leads to the next issue that was

9    before you today, if I may pivot from that to talk about the

10   motion --

11          THE COURT:  I've already made my decision about that

12   issue.  I'll go through that at the end.

13          MR. BERRA:  I was going to advise Your Honor that

14   I've talked to counsel about the issue, and, frankly, I think

15   we've come to agreement.  We've been asking those questions

16   over the road, and they have not been objecting at all since

17   the first week of the deposition.  And we've been inquiring

18   into all of the issues that were set forth in our motion,

19   without objection or instruction not to answer.

20          So what we have asked for and I believe we have

21   agreement to is that, as to the families who were part of the

22   initial deposition group that were so instructed, that counsel

23   has agreed to supplement their interrogatory answers to

24   provide us with the information that we had requested, without

25   objection, and that to the extent we have continued issues

1  over the road here with these folks, that we will follow up on

2  the holes, if you will, and ask that counsel fulfill their

3  obligation to provide us with that information via

4  interrogatory answer.

5          So I think at this point, effectively we've come to

6  an agreement to proceed by getting the information that we've

7  requested, without objection.

8          THE COURT:  Is that correct?

9          MR. RODRIGUEZ:  Yes, Your Honor.

10         THE COURT:  Very good.  So it's mooted is the point.

11         We set forth a briefing schedule on the sealing

12 question.  I'd ask you to meet and confer.  You suggested that

13 you didn't believe they were all not marked "confidential."

14 Take a look.  We need to be precise.

15         I would ask you to meet and confer on that.  And if

16 you want to continue to pursue that issue, then let me know in

17 30 days if that remains a question for the Court to decide on

18 those issues, on the violation of the -- alleged violation of

19 the protective order.

20         We are aware, of course, of the Eighth Circuit's

21 ruling in *Reid*.  I don't think the mandate is back yet such

22 that Judge Perry can start scheduling status conferences and

23 trials.  I suspect you still have motions for summary judgment

24 and *Daubert* due or yet to be decided in those cases.

25         That's a good time to start thinking about mediation,

1    depending on how those cases come out.  Candidly, I've found

2    in, like, my MDL cases, until *Daubert* is ruled, you know, it's

3    hard to really have a serious mediation.  But once those

4    issues are resolved there, that might be a good time to sit

5    down and go to mediation.

6          That doesn't affect the plaintiff here, but it's hard

7    to imagine there wouldn't be a desire for a global settlement.

8    Just talking out loud about sequencing and pacing.

9          There's a lot of work left to be done, but every now

10   and then you need to stop and evaluate where you are and where

11   you're going before we just go for the sake of going.

12         Anything else on behalf of the Plaintiff?

13         MR. RODRIGUEZ:  Nothing from the Plaintiff, Your

14   Honor.

15         THE COURT:  Defendants?

16         MR. BERRA:  No, Your Honor.

17         THE COURT:  Very good.  Thank you all for your time.

18         It will be cool by Friday, and it was great weather

19   last week.  God must have been thinking.

20              **(PROCEEDINGS CONCLUDED AT 11:44 AM.)**

21

22

23

24

25

<u>CERTIFICATE</u>

I, Shannon L. White, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 49 inclusive and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 29th day of August, 2024.


/s/Shannon L White
/s/Shannon L. White
Shannon L. White, CRR, RMR, CCR, CSR
Official Court Reporter